IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

```
                              )  3:24-CV-00757-E
                              )  3:24-MD-03114-E
                              )
IN RE: AT&T INC. CUSTOMER DATA  )
SECURITY BREACH LITIGATION,    )  DALLAS, TEXAS
                              )
                              )  JANUARY 15, 2026
```

-------------------------------

TRANSCRIPT OF

MDL FINAL APPROVAL HEARING

VOLUME 1

BEFORE THE HONORABLE ADA E. BROWN

UNITED STATES DISTRICT JUDGE

-------------------------------


A P P E A R A N C E S

SPECIAL MASTERS:

        WILLIAM ROYAL FURGESON
        CRAIG D. BALL

FOR THE PLAINTIFFS:

      W. MARK LANIER
      THE LANIER LAW FIRM
      10940 W. Sam Houston Parkway N, Suite 100
      Houston, Texas 77064
      Phone: (713) 659-5200
      E-mail: Mark.lanier@lanierlawfirm.com

      JEFF OSTROW
      KOPELOWITZ OSTROW PA
      One W Las Olas Boulevard, Suite 500
      Fort Lauderdale, Florida 33301
      Phone: (954) 525-4100
      E-mail: Ostrow@kolawyers.com

      SHAUNA ITRI
      SEEGER WEISS LLP
      325 Chestnut Street, Suite 917
      Philadelphia, Pennsylvania 19106
      Phone: (215) 553-7981
      E-mail: Sitri@seegerweiss.com

FOR AT&T INC.:

      GILBERT S. KETELTAS
      BAKER & HOSTETLER LLP
      1050 Connecticut Ave. NW, Suite 1100
      Washington, D.C. 20036
      Phone: (202) 861-1530
      E-mail: Gketeltas@bakerlaw.com

      LISA M GHANNOUM
      BAKER & HOSTETLER LLP
      127 Public Square, Suite 2000
      Cleveland, Ohio 44114
      Phone: (216) 861-0200

      KIMBERLY S. MORRIS
      BAKER & HOSTETLER LLP
      600 Montgomery Street, Suite 3100
      San Francisco, CA 94111
      Phone: (415) 659-2600

      GREGG COSTA
      GIBSON DUNN & CRUTCHER
      811 Main Street, Suite 3000
      Houston, Texas 77002
      Phone: (346) 718-6649
      E-mail: Gcosta@gibsondunn.com

                    MEREDITH C SLAWE
                    MICHAEL W MCTIGUE, JR.
                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                    One Manhattan West
                    New York, New York 10001
                    Phone: (212) 735-3534
                    E-mail: Meredith.slawe@skadden.com
                    E-mail: Michael.mctigue@skadden.com

          FOR DIRECTV INC.:

                    J.T. MALATESTA
                    POLSINELLI PC
                    2100 Southbridge Parkway, Suite 650
                    Birmingham, Alabama 35209
                    Phone: (205) 963-7138
                    E-mail: Jtmalatesta@polsinelli.com

          FOR THE OBJECTORS:

                    SETH BARROW MCCORMICK
                    HARRER LAW PC
                    650 Warrenville Road, Suite 100
                    Lisle, Illinois 60532
                    Phone: (312) 858-3240
                    E-mail: Seth@harrerlaw.com

                    AMANDA GARRETT TAYLOR
                    BUTLER SNOW LLP
                    1400 Lavaca Street, Suite 1000
                    Austin, Texas 78701
                    Phone: (737) 802-1800
                    E-mail: Amanda.taylor@butlersnow.com

                    KYLE V MILLER
                    BUTLER SNOW LLP
                    1020 Highland Colony Parkway, Suite 1400
                    Ridgeland, Mississippi 39157
                    Phone: (601) 985-4514
                    E-mail: Kyle.miller@butlersnow.com

                    MAURY LORNE UDELL
                    BEIGHLEY, MYRICK, UDELL, LYNNE & ZEICHMAN, P.A.
                    2601 S. Bayshore Drive, Suite 770
                    Miami, Florida 33133
                    Phone: (305) 349-3930
                    E-mail: Mudell@bmulaw.com

C H R O N O L O G I C A L   I N D E X

**January 15, 2026**                                                **PAGE**

Appearances.........................................2

Proceedings.........................................5

Court in Recess...................................171

Reporter's Certificate............................172

* * * * *

(P R O C E E D I N G S)

THE COURT:  Good morning, everyone.  We are convened today for a Rule 23(e) final approval hearing, to consider whether the proposed class action settlement in the AT&T Incorporated Customer Data Security Breach Litigation is fair, reasonable, and adequate; whether the settlement classes should be finally certified; and whether the applications for attorneys' fees, costs, and service awards should be approved.

Notice of this hearing's been issued in accordance with a Preliminary Approval Order and Notice Program, which was earlier approved by this Court.  The hearing date, time, and logistics were communicated to the settlement classes through the approved notices and website.  These proceedings will be on the record.  And attendance by class members is certainly welcome, but not required.

Let's begin with introductions and let's get on the record who's here today.

MR. LANIER:  Thank you, Your Honor.  Mark Lanier. It's an honor to be in your court again.  Thank you for your and your Court's hospitality.

I've got with me at counsel table Shauna Itri, who is another one of your appointed leads in this case.  And Jeff Ostrow, who has come to us -- we've inherited him from Montana in the AT&T 2 case.

THE COURT:  Okay.

MR. LANIER:  And so he has come in here graciously.

There are a boatload of people who are the behind-the-scenes folks who've been working real hard at this, who are here to see the fruition of their hard work.  But I won't introduce all of them.  We'll be the ones speaking.

THE COURT:  Sounds great.

Well, to everyone in the peanut gallery who did all the heavy lifting to get this where it's gone, fantastic work.  And I'm glad you're here, thank you.

Defense?

MR. KETELTAS:  Good morning, Your Honor.  It's good to be back in your court.  Gil Keteltas from Baker Hostetler, representing the AT&T defendants.

I have with me a couple of my colleagues I would like to introduce.

THE COURT:  Please.

MR. KETELTAS:  Lisa Ghannoum from our Cleveland office.

THE COURT:  Hello.

MR. KETELTAS:  Kim Morris from our San Francisco office, both who have worked on the different tentacles of this matter.

We are also joined by three AT&T counsel, who

rolled up their sleeves and worked shoulder to shoulder with us, from the litigation to the mediation to the settlement process.  I'd like to introduce them as well.

Joe Tocco, vice president and assistant general counsel; Jennifer Morris, vice president and associate general counsel; and Thurston Webb, assistant vice president and senior legal counsel.

And then I'm going to let everybody else here do the heavy lifting.

THE COURT:  Hi.  It's so good to see you, too.

MR. MCTIGUE:  Good morning, Your Honor.  Also representing AT&T, Michael McTigue, from Skadden Arps.

THE COURT:  Glad to have you here.

MS. SLAWE:  Good morning, Your Honor.  Also representing AT&T, Meredith Slawe, from Skadden Arps.

THE COURT:  Great.  Glad to have you here, too.

MR. COSTA:  Good morning, Your Honor.  Also for AT&T, Gregg Costa from Gibson Dunn.

THE COURT:  Fantastic to see you.

MR. MALATESTA:  Good morning, Your Honor.  J.T. Malatesta, Polsinelli, on behalf of DIRECTV.

THE COURT:  Fantastic.  Glad to have you here, too.

Anyone else who'd like to make introductions?

MR. MCCORMICK:  Sure, Your Honor.  My name is Seth

McCormick.  I'm here on the objectors Mike Von Lunen and Susan Barrow and Adriana Acosta and LaTonia McClain.

THE COURT:  Fantastic.  Glad to have you here.

MR. MCCORMICK:  Thank you, Your Honor.

MS. TAYLOR:  Good morning, Your Honor.  Amanda Taylor on behalf of the second class of objectors.  I am with Butler Snow.  I'm here with my partner, Kyle Miller.  I'm from the Austin office.  Kyle is from Richland, Mississippi.  And we are joined by Maury Udell, from Beighley, Myrick, Udell, Lynne and Zeichman, all representing the objectors.

THE COURT:  Fantastic.  Glad to have you-all here.

Is there anyone else who would like to be introduced or be heard?

(No response.)

THE COURT:  All right.  I'd like to walk through today's objectives, the governing standards.

So beginning with the objectives and governing standards for today.  So I'm going to outline the objectives, governing standards, order of presentation, timekeeping, evidentiary expectations, and decorum.

Beginning with the objectives and governing standards.  The Court's charge is to determine whether the settlement is fair, reasonable, and adequate under Rule 23(e)(2), and whether final certification of the

settlement classes is appropriate under Rules 23(a) and 23(b)(3).

The Fifth Circuit's Reed factors continue to inform the assessment of settlement fairness; and the Court will consider the entire record, including briefing, declarations, expert submissions, the settlement administrator's reports, objections, and any additional evidentiary materials admitted today.

The Court also evaluates the requested attorneys' fees, costs, and service awards under Rule 23(h), guided by the Johnson factors.

The Fifth Circuit promulgated the Reed factors in 1983, in the case of Reed v. General Motors Corporation, to give guidance to trial courts like mine in the determination of whether a settlement is fair, reasonable, and adequate as follows:

The first being the existence of fraud or collusion behind the settlement; the second:  The complexity, expense, and likely duration of a litigation; third:  The stage of the proceedings and the amount of discovery completed; fourth:  The probability of Plaintiffs' success on the merits; fifth:  The range of possible recovery; sixth:  The opinions of class counsel, class representatives, and absent class members.

Everyone should understand that this is a fairness

hearing, not a trial on the merits.  The question is whether the settlement falls within a range of reasonableness, in light of the risks, costs, and delay of continued litigation, the methods of distributing relief, and the equitable treatment of class members.

Under Fifth Circuit law, I'm not required, nor do I intend to permit live testimony or the cross-examination of witnesses.  Instead, as I mentioned earlier, I will rely on affidavits, declarations, reports, arguments of counsel, and other materials in the record to inform my decision.

It is also within my prerogative to appropriately limit this hearing to whatever is necessary to aid me in reaching an informed, just, and reasoned decision.

As a general rule, I'm to consider the settlement as a whole rather than its component parts.  In that regard, I do not have wide latitude to modify or change various sections of the settlement.  It is basically all or nothing, except for consideration of attorneys' fees.

In examining the settlement, my bottom line is to determine whether the interests of the class are better served by the settlement itself instead of by further litigation.  I will follow this roadmap in the conduct of this hearing.

According to Fifth Circuit law, my decision is to be evaluated by an abuse of discretion standard.  Which

means it cannot be overturned unless it would be contrary to the judgment of all reasonable persons.

Let's discuss now the issue of attorneys' fees.

With respect to attorneys' fees, the Fifth Circuit endorses the continued use of the percentage method, crosschecked with the 12 factors set out in Johnson v. Georgia Highway Express, Inc.  Accordingly, as I evaluate the request for fees by class counsel, I'll take the following factors into consideration:

The first is the time and labor required; the second is the novelty and difficulty of the issues; the third is the skill required to perform the legal service adequately; fourth:  The preclusion of other employment by the attorney because he or she accepted the case; fifth: The customary fee for similar work in the community; sixth: Whether the fee is fixed or contingent; seventh:  Time limitations imposed by the client or the circumstances; eighth:  The amount involved and the results obtained; ninth:  The experience, reputation, and ability of the attorney; tenth:  The undesirability of the case; eleventh: The nature and length of the professional relationship with the client; and then finally, the 12th factor:  Awards in similar cases.

All of the Johnson factors are important; but the results obtained provide important context to the

consideration of the fee amount.

Let's turn now to the record, procedural posture, and notice of the case.

The Court previously granted preliminary approval; found the settlement likely to be fair, reasonable, and adequate, under Rule 23(e)(2) and Reed; provisionally certified the settlement classes for settlement purposes; approved the Notice Program and claim process; appointed the settlement administrator, and scheduled this final approval hearing.

The settlement proposed is two non-reversionary cash funds, with tiered and documented loss payments and related administration.

The administrator has reported on the implementation of the Notice Program, claims activity, opt-outs, and objections and declarations on file.  The parties have submitted their final approval papers, joint counsel declaration, expert declarations, witness declarations, briefs, objections, and responses to objections.  These materials, together with any supplemental filings in today's proceedings, comprise the record for the Court's determinations.

Turning now to the order of presentation and timekeeping.  The hearing will proceed in the following sequence:

First, opening logistics and appearances. Confirmation of on-the-record proceedings; second:  An overview by settlement proponents, identifying the issues to be decided, pinpointing the key record materials by docket citation, and summarizing the settlement structure, notice and claim status, and the requests for final approval, certification, fees, costs, and service awards;

Third:  Objectors who filed timely, compliant objections will be heard.  Argument should focus on points not fully addressed in the papers, and anchored to the existing record.  Duplicative argument will be curtailed;

Fourth:  Responses from settlement proponents and AT&T, organized by topic buckets that encompass objections across cohorts, followed by any brief rejoinder, as permitted;

Fifth:  Questions from the Court, discussion of any modifications to the proposed final approval order, and closing submissions.

The Court has allocated finite time for each segment to ensure a complete but efficient record.

Now let's turn to objections and topics.

The Court's reviewed the objections, including issues concerning the Rules Enabling Act and arbitration or class waivers, judicial estoppel, predominance, and state law variations; adequacy of relief and distribution;

allegations of reverse auction or collusion; the claims and opt-out procedures, and fee reasonableness.

Some objections raised procedure and logistics, including requests for alternative opt-out relief and electronic signature acceptance.  Objections that are untimely or fail to comply with the Preliminary Approval Order may be deemed waived, though the Court has reviewed the full slate of submissions.

The Court acknowledges that several individual plaintiffs have filed independent objections and motions asserting concerns with this settlement or the settlement approval process.  I want to assure all plaintiffs that this Court has reviewed those motions, and intends to address them in its final disposition, regardless of whether those individual plaintiffs are present at this hearing today or not.

And one more caveat.  The proposed class action settlement in this case was the result of a three-day mediation.  As a general rule, the details of a mediation are confidential.  But some of the objectors in this matter have sought to inquire about such details, with submissions filed with me in camera or in private.

I have those inquiries under consideration currently; and, consequently, there will be no need to discuss or present argument about those details or about the

mediation during this hearing today.

Let's turn now to decorum and professionalism.

Counsel must conduct themselves with professionalism, and confine argument and examination to the matters relevant to this hearing.  Please avoid speaking objections, and limit objections to concise statements of a legal ground.  Sidebars will be disfavored absent a compelling need.

The Court expects Counsel to avoid revealing confidential personal information of class members beyond what is necessary for the record and to maintain the integrity of the proceedings.

I note for the record that this hearing's being live-streamed for individuals to attend by listening and watching the presentation.

And then, finally now, at the conclusion of the argument, the Court will either take the motions under advisement or announce targeted rulings and directives concerning any supplemental submissions.

The Court appreciates Counsels' cooperation in keeping presentations focused, concise, and linked to the governing standards and the existing record.

And with that said, counsel for Plaintiffs, I look forward to your presentation.

MR. LANIER:  Thank you, Your Honor.

THE COURT:  You're welcome.

MR. LANIER:  May it please this Court.

THE COURT:  Please.

MR. LANIER:  Special Masters, and all parties and those interested.

Your Honor, it's a joy to get to present this to you.  I have tried to put it together in a way that will not only interest, I hope, you, but will supply the record with the requisite information that you have requested.

Background information to set this up.  Obviously cases were filed.  This concerned the entire United States of America.  We've got cases in all of the different states that were filed.  And they were consolidated here, in front of Your Honor, in an MDL proceeding for these class actions.

Now, that was done with what we are calling AT&T 1, which was the initial breach.  And this initial breach was one that I will detail more in a moment.  But there was a second alleged breach.  And that second alleged breach was consolidated up in Montana.  And so those two separate cases are actually before you now, together as one.

What I will call the AT&T 1 Leadership Team, you've allowed us to introduce so well, but I will remind you.  And I have inserted Evan Janush in here, the gentleman on the front row.  Because while you had not put him to leadership, he has been my right hand.  And I am remiss if I

don't have him on the record, out of appreciation.

And, of course, we've got countless others.  You recognize their faces out there.  But these are all people that you appointed to leadership.  They all did gallantly well.  And I am remiss if I don't mention Sean Modjarrad, Jim Cecchi, Chris Seeger, who should be here today as class counsel.  But he is sick as a dog, and I didn't want him to infect the rest of us.

THE COURT:  Thank you.

MR. LANIER:  And so I ordered him to stay back at the hotel.

And his partner, who you had on the Executive Committee, Shauna Itri, will stand in for him.  And she will make part of this presentation this morning.

Jean Martin, Rebecca Solomon, Joe Guglielmo, Larry Golston, Nicholas Lange, Tom Loeser, Charlie Shaffer, all appointed by you.  All doing excellent work, and all have done work.

AT&T 2 I will introduce as well on the record. Jeff Ostrow, who we have at counsel table.  Ralph Graybill, Devlan Geddes.  John Heenan I saw back there in the back.  I think they were just looking for an excuse to get out of the snow.

I know one of the counsel for AT&T from Cleveland got a call at 4:00 a.m. this morning, waking her up in her

hotel room, informing her that her kids would have a snow day today in Cleveland, with 18 inches of snow.  So they were all glad to be here.  But Jason Rathod.

And then I am also remiss if I don't point out the Honorable Judge Royal Furgeson.  I found this picture of him on the internet.  It looks like it might be a little bit old.  But that is him right there --

THE COURT:  Oh, my gosh.

MR. LANIER:  -- as a -- I believe a junior at Texas Tech University, who's serving on the Publication Committee for the La Ventana 1963 edition of Texas Tech's yearbook.  And so we have the Honorable William Royal Furgeson there.

Judge Furgeson, if I may continue to abuse that yearbook, pushed for us to mediate this case.  Now, this mediation did not come immediately.  This mediation came, as I'll talk about later, after much ado.  But there were three mediations conducted over three days in Los Angeles, in front of the mediator, Robert Meyer.  Famous, well-known, top-flight mediator, who oversaw these negotiations.

We did enter into a settlement agreement.  As part of that settlement agreement, Your Honor, the AT&T 2 cases have been transferred down here to you.  And you have got those, and those are under consideration and in your bailiwick as well.

Now, importantly, CAFA requires a notice of this to be supplied. And that's under 28 USC 1715. And that notice has to go to the U.S. Department of Justice. It also has to go to the attorney general for every state where there's an action pending. And that gives the government a chance to intervene if they should choose to do so.

That notice was delivered in June of 2025. It would include the complaint; it would include the scheduled hearing; it would include the class notice; it would include a final proposed settlement. And importantly, Your Honor, with all of that, and a reasonable estimate of who the class was, it gives the government a chance; all 50 states, the DOJ, to intervene and to say if they think there's a problem with this settlement.

The record should reflect that no one did any such intervention. They have had no expression of any interest whatsoever. And again, that was -- they were put on notice June 9th of 2025, over seven months ago.

So with that, Your Honor, there are three steps that we see that we've got to do. We have to get preliminary approval. Which you have done, as you have recited. You did have a Preliminary Approval Order. And in that order you already found, for purposes of settlement; without any adjudication on the merits, that the prerequisites for certifying the action as a class action,

under the Federal Rules of Civil Procedure 23(a), (b)(3), and (e) have been satisfied.  And that you would likely certify, at the final approval stage, the settlement classes.

You also found that the terms of the settlement agreement are preliminarily approved, and likely to be approved because, A:  The class representatives and class counsel have adequately represented the settlement classes. You have found already that the proposal was negotiated at arm's length.  You have already found the relief provided is fair, reasonable, and adequate; taking into account costs, risks, and delay of trial and appeal; the effectiveness of any proposed method of distributing relief to the class, including the method of processing class member claims; the proposed -- or the terms of any proposed award of attorneys' fees, including timing of payment; and any agreement made in connection with the proposal.  You charted the rule carefully.  And you found that the proposal treats class members equitably, relative to each other.

So with that, Your Honor, you also found it preliminarily fair, reasonable, and adequate, considering the factors set forth in Reed, as you've recited them already, and they don't need to be recited again.

So the preliminary approval was done by youth.  It was done with care.  It was done with briefing.  It was done

with specificity.  It was done following the law.  And it had every "I" dotted and every "T" crossed.  And I think the fruit of your good labor is going to be evidenced as we walk through these ideas for the final approval.

So we've got the final approval.  Ultimately, we will probably have some appeal of this matter afterwards.  Certainly we're prepared for that endeavor all the way, if necessary, to The Hague.  Actually, I guess, we'd stop at the U.S. Supreme Court.

But regardless, Your Honor, today --

THE COURT:  I admire your ambition.

MR. LANIER:  We'd be ready, Judge.

Today is the final approval hearing.  And so that's what I want to do.  And I've broken this presentation apart into three different areas.  I want to talk about the basics and then we will talk about the detail.

And I will bring in Ms. Itri at that point to talk about some of those details.  If need be, we will also bring in Mr. Ostrow if I mess up on the details of AT&T 2.  And then, finally, of course, Your Honor, we will have the objections.

This is the process you have set out.  And so I will try to follow it exactly as you have done so.

Your Honor, it will be useful for people on the internet, and to make sure the record is clear, that we have

a concise statement of what happened.

AT&T, among other things, provides internet services and phone services. On our smartphones, we have a lot of users. They use -- a number of them use AT&T as opposed to Verizon or some other wireless service.

Now, as part of that, those users give detailed information about themselves to AT&T. That's important for billing purposes. It's important for a number of different things. AT&T has a position of trust with that information, and is to guard it and to keep it. There are nefarious hackers. And in 2019, some nefarious hackers, from who knows where, hacked into AT&T and were able to pilfer that information.

They pilfered Social Security numbers, they pilfered phone numbers, they pilfered billing records. They pilfered a lot of different private information for individuals. And then in 2021, they posted it on to the dark web.

This is something where -- a facility where the information can be sold, can be utilized by different people, and can be used to generate all sorts of havoc upon an individual's life, from identity theft to individual hacking on other machines and matters. And a host of other problems.

This could have affected, as that material goes on

to the dark web, somewhere around 56 million people.  That's the AT&T 1 group.

Now, AT&T 2 is a little bit different.  It's not a 2019 mishap.  Again, we still have users who have put their information into AT&T.  But with AT&T 2, that information was actually stored into a cloud program called Snowflake.

Snowflake not only had AT&T's information in it, but it had a number of other companies as well.  Those are still corporate defendants that are pending, save for one that has settled.  I think Neiman Marcus has settled.  But those are still pending -- at least tentatively settled -- up in Montana.

So with that, the Snowflake cloud is what, in 2024, was hacked by nefarious beings.  And that's going to affect somewhere around 36,500,000.  There probably is some overlap in that customer data breach, but we don't know with specificity what it is.  And I don't want to represent something to the Court wrongly.  But that is the data that we've got for AT&T 2.  And that gives you some idea of what's going on.

Now, as I continue with the basics, it's a busy page that I've given you.  But it's a page straight from Kroll, the administrator.  You will see the claims rate at 4.91 percent.

Your Honor, I've dealt with a lot of -- I've dealt

with -- there's about 6 million in overlap.

THE COURT:  Perfect.  Thank you.

MR. LANIER:  Thank you very much.

Your Honor, I've dealt with a lot of class actions, and I am stunned at this high of a claims rate. 4.91 percent represents over 4.5 million people who have made a claim.  And it goes to show how strong the Notice Program you approved was.  It goes to show how strong your preliminary orders were.

We have 9,599 exclusions.  We have 45 objections. But this is an incredible number.  Over 1.2 million phone calls have been received by Kroll.  The Kroll notices have been over 95 million e-mailed out.  The page views include 18.8 million page views.

So there has been a massive number of people who have responded, and responded favorably.  We've got over four and a half million people asking for this settlement to be approved.

The way this settlement would break down, is it's a $177 million settlement.  The class members would receive over 60 percent of that settlement.  They would receive $106,549,769.  The administration, to pay for this, is around 7 percent of the fund.  It would be -- it's a 12,600,000 administration cost to see that this is handled.

The legal fees that we're asking are a third.

That's a $59 million legal fee, if approved.  In addition, there are legal expenses of just under $800,000 that have been expended in this case up to this point.  All of that is in your records, and you've got it in our declarations. There's no need for me to be redundant.

The service awards are those special awards that go to the people who have been named plaintiffs, who have gone out of their way.  And it's about $1,500 a person.  But it rewards them for willing to step in, to be discovered, to be the basis for this case.  And so we have them as well. And that's $54,000.

Now, the key papers that we rely on, where I will not be redundant, are the declarations of class counsel. Including a supplemental declaration that I made earlier this week.  You've got the declarations of the settlement administrator, including supplemental ones.

You've got a declaration of Brian Fitzpatrick, who is a specialist in this area, teaching at Vanderbilt Law School.  Recognized around the United States by courts in many class actions for his declarations and testimony as to the appropriateness of attorneys' fees and how the cases are handled.

We've also given to you an omnibus response to the objectors, that you have on file, as well as specific responses to certain objectors.  And we've given you a final

approval order.

And those documents, again, Your Honor, I will not reiterate. But that's the basics of what we're looking at.

As we move to the details of this, Your Honor, there was a lot of work that happened pre-mediation. And because of some of the accusations, and because of some of the complaints that are made, I think it important that the record reflect this pre-mediation work.

First of all, before you even file a lawsuit, there is an extensive amount of investigation that has to go on. You've got to investigate the legitimacy of the claim. You've got to investigate whether or not there's an adequate basis. You've got everything that's involved in the federal rules before you ever file a lawsuit like this that all of the lawyers have to do in this case.

And then there's early client vetting and filtering for class representatives. Because you've got to first verify that the clients are proper clients. And that means you can't just run an ad; you can't just open a website. You've got to have checks and crosschecks to make sure that people actually have a valid right to complain against AT&T.

Lest, you file a case, and you get Rule 11'd, or something like that, for not having done your work right. Or you become victim at one of the MDL conferences for

refusing to do the client vetting and the filtering, that is constantly an issue at every one of those seminars and conferences that we attend.

So that goes on.  And then you've got to filter for class representatives.  Which is something else that's got to be done, based upon state to state.  Because, again, we've got 50 states that we're dealing with here.

The work is extensive.  And it's not being done simply by one law firm.  It's being done by multiple law firms who are looking to handle these cases.

Then there's not just that, because you've got the legal research involved; because you've got to try and figure out legally can you file a class action; should these be pursued individually; how binding might the arbitration provision be.

And you've got extensive lawyers, some of whom are here -- Kevin Parker I see back in the back -- who have spent an inordinate amount of time with their team doing legal research into all of the seminal jurisdictions around the country that would be relevant on something like this.

At that point, and only at that point, can you prepare and file the nationwide suits that will cover all of the different states that are in play in a situation like this.

You don't simply stop there.  You consult

cybersecurity experts.  And this is interesting, because both sides will have those experts.  So you've got to be the one to go out and get them early enough.  You've got to convince them to work on your side, because you don't want them working against you.

And so we are competing, in a very real sense, against AT&T, against Direct TV, against the other entities that are out there.  And once Snowflake 2 gets filed, we're competing against the other plaintiff lawyers up there, because they all want those experts plugged into their case and there's only a limited amount of time.

You consult with those experts.  You grab those experts.  You give them their retainers, and then you get them working.  They're able to get on to the dark web and determine what information has been put on the dark web and what hasn't.

I'm scared to death of the dark web.  I will never get on it, nor will our IT people let our computers ever touch it.  But those people have a quarantined computer access into the dark web that enables them to get this information.  And they do extensive work and they provide us with reports.

As Your Honor no doubt remembers, we've had multiple hearings here.  Those have been wonderful hearings. We had so many hearings I learned how to pronounce

Mr. Keteltas' last name.  It look three of them, but we finally got me to that point.  And I no longer have to call him Gil.

And so those hearings, Your Honor, were contested hearings.  We were always on our best behavior, because we know the demeanor you expect in your courtroom.  But until we walked in those doors, we were in fist fights in the hall, pejoratively.  I'm exaggerating there.  We've always tried to be very good professionals.  But we were clearly at odds and we were clearly jockeying.

And it was so important that you appointed various special masters to help us oversee this.  Including Craig Ball, who is seated over there in the jury box right now.  He helped us negotiate and enact an ESI protocol.

That took a lot of hard work on his behalf and everyone else's.  Because we're all arguing over the nuances of every single verb, noun, adjective, and article that's used within that.  Recognizing that it might have ramifications, and come back to either bite us or reinforce us in the next case that we have later on down the road.  But all of it's based upon lessons that have been learned from electronically-stored information in cases in years gone by.

I don't think that I am -- well, I get nothing out of saying publicly on the record that Mr. Ball is probably

the recognized authority on this in the United States of America.  And that you put him in place to do this is not only a tribute to your discretion, but also an appreciation for how rigorous the process would be when you have contesting parties.

You put into place -- we had to negotiate and enact a 502(d) order.  We had a big fuss about that at one of the hearings as to what order these things should be done in, how they should be done.  You managed to put up with us. Managed to get it done.  And you accomplished that, again, through the special masters.

The protective order that had to be in place, extremely important, even as you remind us in this hearing not to use any privileged and confidential information. It's always been seminal as part of your care of this case, and it's been something we took seriously and worked hard to do.

And so with all of that, we then had Judge Furgeson.  Now, Judge Furgeson was a task master.  He pushed us.  And, Your Honor, if there's any question about where these pictures came from, I found the La Ventana in 1963 has Mr. -- Judge Furgeson was basically Mr. Texas Tech that year.  And I selected just a few of the pictures.  But I did so because of his support for my law school, and it gave me a chance to say Texas Tech on the record.  Which I

always take advantage of.

Judge Furgeson pushed us to a mediation. I was standing in an airport in New York City -- I believe it was JFK -- at the luggage belt, when I looked at my cell phone and saw that I had a text from Judge Furgeson saying: When you get a chance, will you call me?

I called him waiting for my luggage to come out. And I had just flown in from out of the country. And they view you with suspicion if you are on a cell phone before you go through all of the customs and immigration. But I got on the cell phone and I spoke with him. And he spent 15 minutes trying to persuade me that I should consider going to mediate this case.

I think my reputation in this courthouse -- I have tried three -- four cases in this courthouse that stretched into three months. Started a fifth before it settled. I think that I can affirmatively say that my reputation is one of always antagonism to the other side; pushing for the best settlement I can, and looking for any excuse to try a case.

And so Judge Furgeson, with some reticence, said: Lanier, I know it's contrary to your nature, but I believe you should consider trying to mediate this case. And I said I would consider it, but only if we had an A-plus mediator; which meant either Judge Furgeson or someone JAMS quality.

And Judge Furgeson said he would be glad to do it,

but it might put him in a predicament in terms of his position as special master, because he would then have privy information with others.  And I said:  Then let's find someone with JAMS.  He -- I don't know how, but he approached AT&T; got them to do it as well.

And so we then started exchanging confidential information back and forth with AT&T, with the others as well.  We put together detailed mediation briefs.  All of this work was done before we reached an agreed settlement.

Now, that agreed settlement, Your Honor, was one that had a recognition of hurdles that we would have to clear in order to win this case.  And I think these hurdles need to be put on the record.

First, this is a case where there are arbitration provisions that have to be legally fought to see if they're enforceable or not, to see whether or not there can be a class waiver of those.  And we as a class were going to be fighting those arbitrations provisions.  Fighting them under various state laws, because we've got various states associated with it.

Texas will have one view of an arbitration provision; New Mexico will have another; Alaska will have a third.  And you can go to 50 states and find 50 different cases that talk about arbitration provisions and how much deference is given to those provisions.  The fight itself

would have been a monstrous hurdle for anyone to clear.

We also would have to cross the hurdle of 12(b)(1) standing. A motion to dismiss under 12(b)(1) would certainly be something that would be litigated vociferously before Her Honor. And then we would also have the 12(b)(6) motions of failure to state a claim.

Now, these aren't just incidental. These motions are being heard in cases that are data breach cases around the United States right now. And not all of the plaintiffs are successful in these motions. These are very real hurdles that we would have.

Then we would have the issue of a contested class certification. And a contested class certification means that the plaintiffs that are class reps are going to be deposed. Others will be deposed.

And the whole issue of the adequacy of class representation, again, filters into a number of categories: Is there an argument made that the class representatives need to be for the different states, with the different levels of recovery. There are all sorts of hurdles that we had. We were ready to try to jump those hurdles, but we recognized these going into the mediation.

We also had an interlocutory appeal issue that's going to sew time into this under 23(f), should we succeed with class certification. We recognize we would face

summary judgments.  And all of that's apart from all of the discovery, the Daubert motions on our experts; and the ultimate trial of whether or not we win liability, whether we win causation, and whether we win damages.

Let me pause for a moment on causation, because this is particularly thorny.  We live in 2026.  Our breaches in 2024 are different -- and even the 2019 -- are different than a lot of the breaches that have already been litigated.

When you figure how many people in America we represent through these classes, the odds are someone's had a data breach somewhere else before.  Because data breaches are ubiquitous.  They are like Texas Tech alumni; they're everywhere.  And those data breaches, Your Honor, means how do you trace your damages back to this particular breach as opposed to another breach.  So causation, a real issue in these cases.

And then ultimately, of course, damages as well.  And damages will include your -- whether or not you stepped in and tried to do anything about the breach.  Did you change all your passwords.  Mitigation of damages is always also an issue part and parcel of that.

Then we've got a motion for judgment as a matter of law.  That's assuming that we win.

So all of these are the hurdles that we had to face, not counting appeals.  And I would suggest that this

was a very difficult case.  And we took that into account as we went into the mediation process.  I'm not saying we couldn't climb that wall.  I'm just saying that it was a wall that would need to be climbed.

Now, in the litigation risk, we know from other data breach cases what has happened.  We can look at the Maldini case, where the class certification reversed a reinstated one in the Fourth Circuit.  We can look at Juan Theus v. Brinker, that denied class certification out of Florida.  We can look at Logan, which dismissed all but one claim.  We can look at In Re: Heartland Payment Systems, that discussed the significant challenges to recovery in data breach litigation.

These are all cases that indicate, in essence, trouble.  But I'll call it double trouble.  Because we not only had all of that in AT&T 1, but all of that in AT&T 2 as well.

And so AT&T 2 faces all of the same issues, with a wrinkle.  If the good judge up in Montana doesn't send those down here to you, he's going to be making his decisions up there.  You're making your decisions down here.  We've got chances for conflicting decisions, conflicting discovery.  There's all sorts of problems that can arise, and all of that is embedded in it.

Now, I have put this slide together:  The Weather

is Not Always Pretty.  Because what I want us to recognize is the landscape changes just as the weather does.

And by that, I mean, when we look at a case like this, it's natural and easy for us to compare it to cases in the days gone by.  And some of those cases have a very different profile.  The weather was very different then.  The times they are a changin', Dylan sang in the 1960s, but it's no less true today.

So I would suggest to you that if we were in the Olympics coming up -- which I believe are in Los Angeles in 2028, but I could be wrong -- that this AT&T 1, certainly on its own, is a gold medal winner for what we were able to accomplish.  I will say the same is true for AT&T 2 as well, as I will explain in a moment.

But these cases are all before you.  They're in the record.  If you look at MGM, $45 million for 76 million members.  We've got more than that, almost threefold -- well, threefold more than that in AT&T 1 for just 56 million members.  It's crazy, for less members.

Capital One, 190 million for 98 million members.  We, again, very competitive.  I think we beat that.

Equifax, 380 million.  Now, Equifax may look like it's more for -- than us.  And understand, to approve this, we don't have to be number one.  But that part of me, that this Court knows well, always like to be number one.  And so

I don't want to be anything less.

Equifax had very different facts.  Very different arbitration issues than we've got.  Different hurdles.  And it was five years ago almost.  And the situation is -- has changed dramatically since then, the landscape.

The Yahoo! case, less money for over twice as many members.  The Experian case, less money for 15 million members.  You extrapolate it out, still less money.

Anthem, less money.  Target, less money.  Home Depot, 13 million for 61 million members.  We're almost ten times that, Your Honor.  Much less.

Class counsel is Chris Seeger, the sick man.  And in his stead we have Shauna Itri, who is certainly more suited to give this argument anyway.

So with the Court's permission, I will let her get into these details.

MS. ITRI:  Good morning, Your Honor.  It's a pleasure to be here today.

THE COURT:  Glad to have you here.

MS. ITRI:  I'm going to talk a little bit about confirmatory discovery, which occurred after the mediation.

THE COURT:  Great.

MS. ITRI:  We received about 13,000 pages of confidential information.  And we had teams of lawyers looking at that.  These lawyers were very experienced in

cybersecurity, and did a detailed review of this information that was provided by AT&T.

The information related to the data incidents that -- alleged in the complaint:  AT&T's current and historical cybersecurity policies, the training materials and elements involved in the data incidents.

Not only did we receive this discovery, Your Honor; we also received a declaration.  It was an attorneys' eyes only declaration, as stated in the settlement agreement, from AT&T's deputy chief information officer, Jason Hamilton, detailing AT&T's security enhancements and steps it had taken to further secure its customer data.  And we had an interview with a person at AT&T about the documents, who responded to both data incidents.

And, Your Honor, this is set forth in our declaration at 356-2; and it's confirmed by Mr. Keteltas in his recently-filed declaration at Docket Number 434.

Your Honor, Mr. Lanier spoke about the Preliminary Approval Order, which is at Docket 298, and the dates were amended at Docket 342.  Your Honor already preliminarily stated that the settlement is fair, adequate, and reasonable.  Mr. Lanier will be going through those factors later on in the presentation.

The order also stated that it would likely certify settlement classes at final approval, because the settlement

satisfies Rule 23(a) and 23(b)(3).  I'll be talking about that a little later in this presentation.

The Preliminary Approval Order also said that the Notice Program satisfies Rule 23.  It's the best notice practical under the circumstances.  It approves the claim form and the process.  Appoints Kroll as a settlement administrator.  And later on, appoints Special Master Arsenault as an administrator -- or as an oversight of the administrator.  It sets forth the terms of the opt-outs and the objections, and it directs distribution of notice and opens up the claims period.

Talking a little about the appointment of Kroll. Class counsel, prior -- after the settlement, vetted some administrators and decided on Kroll.  Kroll has been performing great during this time period.

You will see later on in the declarations that they have consistently updated the website.  There's about 13 million visits to the website; about 18.54 million website pages viewed.  There was a significant amount of call volume during this matter.  And they fielded about 1 million calls, and about 138,000 callers have been connected to live operators.

Class counsel is in constant contact with Kroll. Weekly calls, talking about some of the claims that have been submitted and any issues that arise.

And later on, Your Honor appointed Special Master Arsenault as a special claims administrator to supervise and monitor the settlement. And those are at -- the description of the -- his duties are at CMO 15, at ECF Number 326. And he was appointed at CMO 17. That's docket Number 335.

Talking a little about the Notice Program components. Also, as stated and approved preliminarily in your preliminary order at ECF 298, the program -- the Notice Program is a very robust program. At first, the first thing that happened in the program is AT&T provided the class list, which consisted of names, addresses; both e-mail and physical addresses if they had it, and the tiers of the -- of the data breach, to Kroll on June 2024.

The CAFA notice that Mr. Lanier spoke about was disseminated on June 9th. Then the Notice Program officially commenced on August 4th. And true and correct copies of the e-mail notice are attached to the record at the Kroll Dec. at Exhibits 3 to 5. That's 356-3.

For direct notice, it began, again, on August 4th. Kroll had disseminated e-mails to class members. Later on, in December 1st, they disseminated reminder e-mails. And I'll talk a little bit about numbers later on in the presentation.

The settlement administrator performed physical

address traces for e-mail notices that were undeliverable. For those notices that were undeliverable, Kroll sent out postcards -- double-sided postcards. The claimants were allowed to submit claims online or could submit claims back via postcard. There was a business reply; so they didn't have to pay for postage.

There also was a significant social media campaign. At the Kroll Dec. you can see the details of it. It's 283-4. There was an online display banner advertising, a Google keyword search advertising, a press release. A neutral informational settlement website that was consistently updated and reviewed by class counsel. And a toll-free telephone number line.

The substance of the notice, which is required by Rule 23, had material terms of the settlement, how to submit a claim form; the claim deadline; the last day to opt out; the last day for objections; the final approval date. And the settlement website gave access to this agreement and other important information.

Talking a little bit about the benefits of -- to the class members. There are two non-reversionary funds. That's -- the one for AT&T 1 is about 149 million to about 56 million class members. And for AT&T 2, it's 28 million to about 36.5 million class members.

And as stated in the Keteltas declaration, there

is enhanced security provisions that AT&T has undertaken to further secure its customers' information since 2019.

Talking a little bit about the payment structure for AT&T 1.  There are -- first option is the documented loss payments.  And those are for individuals or claimants that have -- can verify documented losses, to send those receipts in to Kroll to examine those receipts.

For AT&T 1, the cap is $5,000 per documented loss. And for AT&T 2, it's 2,500.  And Kroll is in the process of reviewing those claims to see which ones are valid and which ones are fairly traceable to either incident.

The overlap class members can submit claims to both, but they have to have separate and unique information that is traceable to either event.

The payment structure.  If the claimant does not want to choose documented losses, and they just want a cash payment, there is three tiers of payments they can receive. Tier 1 is -- for AT&T 1, Tier 1 is for those class members who have information, including Social Security numbers, that were disclosed or a part of the incident.  Tier 2 is -- for AT&T 1, those class members that have anything but Social Security numbers that were a part of the incident. And for AT&T 2, it's -- that's a Tier 3.  So as an AT&T member, they have -- they can receive a pro rata distribution of the settlement.

I should say, for AT&T 1, if the Social Security number was exposed, you get five times the amount as the other two tiers.  And that just accounts for the sensitivity of the information.

Your Honor, talking about Rule 23(a) and Rule 23(b)(3) that you outlined this morning, the class certification we submit are required -- that's required is satisfied here.

First off, numerosity.  The data incidents that are affected were about 92 million individuals for AT&T 1 and AT&T 2.  And we believe that satisfies numerosity requirement under 23(a).

The commonality requires common questions of law and fact.  And here, that is readily satisfied as -- in our briefing we set forth.  The main questions are, you know, whether Defendants had a duty to protect the private information; whether they breached those duties; whether the security systems were adequate, and so on and so forth.  So there's multiple issues that are common here.

The typicality.  The plaintiffs' claims, are they typical of the class.  Here, we do submit that, yes, they are.  The claims arise from a single similar course of conduct and they share the same legal theory.

Here, the personal information that was involved in the AT&T 1 data incident, and/or call information that

was involved in AT&T 2 data incident, are -- is typical of a class for class members.  And the cybersecurity protocols that Defendants had or didn't have.  And they all arise out of the same events.  So we submit that typicality is achieved here.

The next 23(a) factor:  Adequate representation. There's no conflict of interest.  The interests are aligned with the settlement classes, as they seek the same relief as the class, arising out of the same data incidents.  And settlement will make them all eligible for the same benefits.

And we believe that we are adequate counsel.  And I think Mr. Lanier will talk about that a little bit later.

For 23(b), we also submit that those elements are satisfied here.  The predominance element requires showing that the questions of law and fact common to the class predominate over the individual questions.

Here, the central common question in the action are whether Defendants had a duty to protect the members' information, and whether the settlement class members were harmed as a result.  These predominate over any individual issues of the class.

For 23(b)(3), the superiority, is class action a superior benefit to adjudicate the controversy.  We submit, yes, it is.  The individual actions would be inefficient.

And class treatment will conserve judicial resources, and individual actions are impractical under these circumstances.

We further submit under 23(c)(2)(B) that the Notice Program satisfies due process.  It's the best notice practicable under the circumstances.  It's reasonably calculated to apprise the settlement class members of the action, the settlement terms, and the effect of the proposed settlement, including the releases and their rights to opt out and their rights to object.

The notice informed the class members about these items here.  And you'll see on the left quadrant.  And we believe that this satisfies requirements of Rule 23 due process, the rules of this Court, and other applicable laws and rules.

And as you'll see by the numbers, that class -- the Notice Program was, in fact, successful.  For the direct notice results, 87.4 percent of the class members received direct notice.  That's 87 e-mails -- 87 million e-mails were sent.  About 79 million of those were deliverable.  There were 67 million reminder e-mails sent to the class, and 18 million double-sided postcards that were mailed.

The supplemental media campaign resulted in 28 million impressions to target class members, with an overall reach for direct notice and the supplemental media campaign

was 90 percent to the class members.  And that is also set forth in the Kroll declaration submitted with our materials. And that's at Docket Number 418-1.

The class response has been overwhelming.  Again, I'll say, we were on calls weekly.  Kroll was fielding a lot of calls.  And then class counsel ourselves were fielding a lot of calls from claimants.  4.38 million claims were filed.  That's a 4.8 claims rate.  Potential opt outs is 9,575.  Potential objections is 48.  And you'll see some of the stats.  It's really a small amount of people, based on the large class size.

So the overall class acceptance demonstrates settlement fairness, and we're very proud of the result here.

And I'll turn the mic over.

THE COURT:  All right.  Excellent job.  Thank you, ma'am.

MR. LANIER:  Thank you so much, Ms. Itri.

So in the last little bit that remains here, I will be arguing the following, Your Honor:

This settlement does satisfy 23(e).  The square peg is actually going into the square hole, the triangle in the triangle hole, and the round one into the round hole. We've got them in the right places.

There is adequate representation by counsel.

That's presumed.  But aside from the presumption, if counsel had not adequately represented the plaintiffs in this case, I think the first person to have brought it to your attention would have been the Honorable Royal Furgeson.

And here's where I do think that it's important that the record reflect.  He had us on every-other-week calls.  His handprints and thumbprints are not only on the settlement, but on the timing of when we would do the settlement.  His fingerprints are on every aspect of our behavior and this case.

He has been there to mediate between our fusses.  He has been there to give us guidance.  He has been there every step along the way.

And I think that he would -- candidly, he would have -- you know, look.  He was on the Federal Bench.  He's had clerks.  He knows what good lawyering is and he knows what poor lawyering is.

And he doesn't countenance fools.  And he would quickly try to -- I won't say upgrade.  But I have no doubt at all that we would have known if he felt like we weren't doing our job right.  And instead, he told us each step along the way that he thought that this was being handled in a really good way and he was appreciative.

And, candidly, that compliment went on both sides of the "v."  Because the defense counsel in this case were

nothing less than ethical, upright, and stellar in their representation of the defendant.

So adequate representation by counsel, it can be shown by the fruit. Because the fruit is apparent in this settlement. But it can also be recognized by the fact that, until this accusation of fraud came in at the ninth hour, I -- all we were hearing from the entire Plaintiffs' Bar, it seems to us, was: Wow, wow, wow. So adequate representation by counsel.

Arm's length negotiation. This was absolutely an arm's length negotiation. We negotiated over who the mediator would be. And the mediation of -- in essence, three different mediations took place. But it took place over three days. It wasn't: You get a day, you get a day, you get a day. It was: You're first. And if I can't find resolution with you, I'm not even going to bother going to the next one.

And so we fought long and hard. We went back and forth. We were in separate rooms. The mediator was shuttling back and forth. We have experienced counsel. This is not the first data breach case that Mr. Keteltas has handled. This is not the first data breach case that the plaintiffs have handled.

You have put together an all-star team of people who have handled these cases before. And it's a very

technical part of the law.

And so we went into the negotiations knowing what we wanted to achieve, and we would take no less. And I'm sure AT&T knew what they were willing to pay, and no less. But all the negotiations were done at arm's length. And we're proud of the result, because the result is adequate relief to the class.

We've got people who will be getting 40-plus bucks in this, all around America. That's -- that may not seem like a big deal to some people. But to some people, that's a huge deal to get that kind of money back. Not a coupon. Not a, hey, we'll give you a discount on your next AT&T contract. But, no. Substantial changes to the way AT&T treats its information, plus real money back to those who want it.

You give opt-outs. Those who don't want it, here's very clear steps of how, if you want to opt out and go your own way, God bless you. Go do it. But for those who want the treatment of the class, we have them better relief than they could ever dream.

The equitable treatment of class members is there. We do have the service awards that I will bring out, but those are appropriate. And they max out at, I think, $1,500 a person on the service awards. But the equitable treatment of class members is true for AT&T 1, and it's true for

AT&T 2.

Now, remember, if you look at the numbers of AT&T 1 and AT&T 2, the settlement numbers may look different.  But that's because there's some more that was -- more information that was private, personalized, put on to the dark web in AT&T 1 than there was in AT&T 2.  At least to our understanding at this point.

So based upon our understanding, both results are gold-medal results.  And within both AT&T 1 and AT&T 2, all of the class members are being treated equitably.  So we've got the 23(e) factors met.  And then I think we also have the Reed factors met as well.

Was it an arm's length negotiation?  Yes.  You've got the declarations.  You've got declarations of all sides, including the mediation side, to testify to the arm's length negotiation.  All you have opposite that is conjecture and suspicion and creative writing.  I don't know what else to say.

The complexity, the expense, and the likely duration.  This is a case that we were able to bring to fruition early because of the way you run your court.  Because of the procedures you put in place.  Because of Judge Furgeson, because of Special Master Ball.  And, ultimately, as it's worked through, because of Special Master Richard Arsenault.  Though he's not technically a

special master.  I don't know what title he's got.  But Richard Arsenault has certainly given a level of security to what we've been about as well.

But the complexity and expense and likely duration, if we had not been able to find a good resolution early, we'd have been in your court for seven years, when all was said and done.  And you should be commended for moving through an MDL with speed and alacrity, and just -- I think it was done well.

The probability of success on the merits is another Reed factor that we've got.  I never like to say that I'm not going to be successful on the merits.  But the probability of success on the merits is difficult, for all the reasons that I gave you before.  There are a lot of hurdles that would need to be cleared.

The range of possible recovery is another Reed factor.  And this is one -- candidly, almost all of these cases settle.  So nobody really knows what a jury might do in a situation like this.

So I'm not able to say what the top end might be.  I am able to say what the bottom end might be.  The bottom end might be zero.  And lawyers for the plaintiffs are accorded the costs to reimburse AT&T because the plaintiff lost this case.

So the range of possible recovery stems from the

plaintiffs' lawyers being in a deep, deep hole, with all of their expenses gone and everything else, because this, as I'll get to later, was only on a contingent fee.  There was nobody paying an hourly fee, nobody paying expenses.

So it's from a deep hole to the range of something that might have been high.  We don't know what the top end would be.  I would be conjecturing, and I don't want to do that.

The stage of the proceedings and discovery.  We certainly had done enough work to be able to assess not just the likelihood of the recovery, but the difficulties associated with it.  We did want some confirmatory discovery after the settlement.  And we made the settlement contingent upon that confirmatory discovery, because there were some things we had not yet seen.

We argued those back and forth in front of Judge Furgeson and Special Master Ball.  And they helped us get into a position to get some confirmatory discovery.  But that discovery, and the affidavits and the information given by AT&T, confirmed what we already understood from our experts to be true.  And so we were able to do that and satisfy that Reed factor as well.

And finally, Your Honor, I get to the point of attorneys' fees and costs being reasonable.  And these are the Rule 23(h) and the Johnson factors that you assessed.

First, time and labor required.  I filed a supplemental affidavit just because -- or a supplemental declaration just because I wanted it clear.  We have tried to estimate, to some degree, the amount of hours that might be involved in appealing this.  Because obviously we don't come back to you and ask for more money when all is said and done.  So that's part and parcel of what we've done.

But the time and labor required, we have done exactly what you wanted.  We kept hourly billing records.  I will tell you that they were submitted to my firm; that we personally kept track of those records.  We have all the expenses, kept track of all the expenses.  We have all of those, should the Court ever desire to see them in camera.  Though, candidly, I don't think that it's part of the requirements here.

But I can even tell you, down to Shauna Itri and Chris Seeger.  If they were going to be three days late sending me their monthly time reports, they would e-mail: Can we have an extra three days?  And I would say, yes, you can.

But everybody was very careful to keep their time and labor.  The time and labor required is extensive.  And certainly, certainly within the ambit of what these fees are requested.

The novelty and difficulty.  You know, in a way,

because there are these other data breach cases out there, you can say, well, this isn't very novel.  But they are novel.  Every data breach case, in its own way, is novel.  Because you've always got the question of liability.  And that means who the hackers are and how the hackers got in.  And they're always inventing a new way to hack in.

So you've got a level where you're not just dealing with a class action; you're dealing with pretty smart computer stuff.  You're trying to assess what hackers from North Korea, what hackers from Ukraine, what hackers from Russia are doing, trying to access this data.

What are the holes they managed to crawl in to AT&T to get to the data.  Or what is the hole they got into the Snowflake cloud to get the data.  And was it reasonably protected and fenced, or was it as unreasonable as just someone at AT&T clicked on a -- a link to see if their -- you know, some Iranian emperor left them $50 million.  And in doing so, open up the door to a hacker.

It's never going to be that simple.  This involves extensive look at computer -- not just networks, but computer structure and architecture, and the protection architecture.

So the novelty and difficulty with this is brand new with every one of these cases.  And the lawyers were willing to take it on.

The skill requisite.  This is fascinating.  And I'm excited to get to talk about this.  And I want to commend the team here.  Because we do have a broad team.

We've got people -- Tom Loeser is not here.  But Tom Loeser, for example, he didn't come in because he says, I'm of no use at the hearing.  No point in running up time for it.  That's the mentality.  But when you need him, he's right there and he's doing it.

Jean Martin, right there doing it.  She's handled countless of these cases.  She's involved in drawing up not just the class complaint, but she's involved in trying to figure out how to navigate through all of the different states that are involved; and put it together in a class context that will not only pass muster with you, but all the way up to those nine folks in D.C.

We've got a host of people.  And now I'm in trouble, because I'm calling out names and not others.  Not the least of which is Sean Modjarrad from Dallas, who has been here every step along the way, making sure that we don't trip on our own two feet in the Dallas County -- Dallas federal courthouse, because he knows his way around here so well.  And he was over the ESI protocol, and his office was jumping in and doing that.

We have so many lawyers.  We tried really hard. We tried -- Your Honor, you placed me as lead and liaison

counsel, and I did not take that lightly.  And I took it as my responsibility to try to find the best of the best to be on this team.  And I tried from all over the United States of America to assemble a team that had the requisite skill. And I think the proof is in the pudding.  The proof is in the results, and the skill requisite is intense.

Four:  Preclusion of other employment.  Well, I'll tell you, Chris Seeger got appointed in Snowflake.  And he had to back out of the Snowflake because of an arguing conflict of interest.  There are a number of us who were not in a position to take on other cases.

This has been one where -- I thank you for the hearing date today.  I pick a jury in the social media addiction case in Los Angeles -- the first one to go to trial -- not this coming week, but the following week.  So I'm about ten days out from that.

And between that and this, I have had my hands cuffed.  And I don't want to say this was only one of the handcuffs.  This was one of two right now that have precluded other employment opportunities for us as well.

The customary fee.  These are done in this manner, in this fashion, over and over and over again.  This is absolutely there.

Again, this is a contingent fee.  None of us had this case on a fixed fee.  None of us had anybody paying

expenses.  All of us were betting that we could bring this home at the end of the seven-year fight, or earlier if it worked.

Time limitations.  That's not a factor in our case, so we disregard factor number 7.

Factor number eight, the amount involved in the results.  Again, those speak for themselves.  I won't be redundant beyond what we've already put in front of you.

Nine:  Experience, reputation, and ability.  My mom is still alive.  And she will not appreciate it if I sit here and say, let me tell you about my experience, reputation, and ability.  So instead, I won't.  I will rest upon the -- what the Court is aware of.

But I will say that the people that were on this team -- and Mr. Ostrow, who I've gotten to work with in this case for really the first time in anything extensive -- their work has been top-flight.  A1.  It should never be besmirched.  It should never be brought into question.  It should be applauded and appreciated and held up as a model.

Number 10:  Undesirability of the case.  Oh, there's a boatload of people who want these cases, but that boat doesn't hold a lot of people.  The people who do this niche work would have enjoyed being in this case.  But the vast majority of lawyers flee this information -- these types of cases.

They don't want to understand computer architecture.  They don't want to understand the world of hackers and the dark web.  They don't -- most lawyers don't even want to understand the intricacies of a 50-state class action.

Most don't want to get into an arbitration fight over arbitration clauses.  Most don't want to corral and work in a team atmosphere, when most of us are typically lone rangers; and yet we're all coming together in a kind of make-up law firm of sorts.

So with that factor, 10, number 11:  Again, nature and length of relationship with the clients is not an issue here.  So 7 and 11 do not apply in our case.

Awards in similar cases.  We've set that before you.  Others can testify to that.  But these are very typical percentage attorneys' fees.  And when we weigh them against the Johnson factors, that certainly works as well.

So with that, Your Honor, the service awards are reasonable.  We believe the costs are reasonable.  Those have been sat down before you with declarations.  Those are the details.

And I will sit down for the objections, because that's not my job.

Thank you, Your Honor.

THE COURT:  Thank you.  Why don't we take a short

ten-minute break.  Everybody take a stretch break.

And with said, Court's in recess.

(Recess taken.)

THE COURT:  That was an excellent presentation.

MR. LANIER:  Thank you, Judge.

THE COURT:  Defense?

MR. KETELTAS:  Your Honor, I think I will hold off.  I think I've seen everything we need to see from Mr. Lanier.  And we will respond to Objectors if there's a need to.

THE COURT:  Fantastic.

Objectors, let's turn to you now, please.

MR. MCCORMICK:  Good morning, Your Honor.

THE COURT:  Glad to have you here.

MR. MCCORMICK:  Thank you.

Again, my name is Seth McCormick.  And I represent LaTonia McClain, Ms. Acosta, Susan Barrow, and Mike Von Lunen.

We're -- really wanted to hit on one topic related to the substance of our objections.  And, you know, there are few people who are as gifted as a lawyer as Mr. Lanier.  And his reputation precedes him.  And I did pay attention to everything he said.  And some of the stuff -- I think what is more striking is what he did not say.

He talked about how some of these claimants will

receive as much as $40.  But what he didn't talk about is that 1.75 million claimants will receive zero dollars.  This is a matter of arithmetic; it's not a matter of an opinion of mine.

It's borne out in the affidavits from Kroll, who is just reporting results of the claims that were filed, both in terms of the Tier 3 -- cash documented loss claims and the Tier 3 cash claims.

He also talked about the range of possible recoveries.  And he said that, you know, there's maybe no upper limit -- or the upper limit is not known because none of these have been tried, but the bottom is zero.

And so, again, this settlement cannot be approved. Because there's a structural issue with the Tier 3 class claims, in which 1.75 million, which is 40 percent of the class, of the entire class, is going to receive zero dollars.  And they were provided no justification of why that's appropriate.

So this is a model that I created.  And this is based on the evidence in the record, based on the testimony of Kroll that --

THE COURT:  Sorry, sir.  If I can pause you for just a moment.

(Brief interruption.)

THE COURT:  Thank you.  I now have that.

MR. MCCORMICK:  Okay.  And so you can see from the demonstrative that essentially you have the makeup -- on the top section, you have the makeup of both the class tier, with the overlay -- or the overlap claims, both for the documented loss claims and the claimants seeking cash payment claims.

So in the aggregate -- and this is based on the most updated numbers, which is the date -- I think it's December 18th.  And I think there's citations to the record in here.

That, in total, there's been -- between overlap and just strictly Class 2 claims, there's been 104,327 documented loss claims.  And then there's been 1.75 million Class 2 cash payment claims.  So that's roughly 40 percent of the 4.38 million people who filed claims.

The settlement payment for Class 2 is $28 million. The administrative costs, as of the date of Kroll's last affidavit, was $2.8 million.  The attorneys' fees requested is $9.3 million.  The service award is $10,500.

And the only disclosure we have so far is that as of November, which is prior to the most recent declaration from Kroll, was that between -- was that just strictly Class 2 documented loss claims -- that does not include the overlap claims -- there were $42 million -- or $42.7 million of documented loss payment claims filed at that point.

And so that -- in November -- so November 3rd, which is when this was, at that point there were only 17,926 Class 2 documented loss claims.  As of the last affidavit, where the number wasn't disclosed, there were 101,000.  So we've had 20 times that -- or five times that file documented loss claims.

So this number is based -- this is based on kind of bad numbers, but it still demonstrates the point.  And it's telling that --

THE COURT:  Let me pause for a second.  What are the bad numbers?

MR. MCCORMICK:  So in other words, this $42 million is the right number as of November 3rd.  The number only could have gone up.

THE COURT:  Okay.

MR. MCCORMICK:  Okay?  And so -- and then if you also include the -- the overlap documented loss cash payments, that is another $9 million.

And you can see that based on kind of the waterfall and flow of funds, the settlement payment of $28 million, when you -- after you subtract the administrative costs and the other fees that come out first, and then you just start to pay the documented loss claims, then all of the Tier 3 -- of the Tier 3 claimants who actually filed claims will receive zero dollars, as a matter

of arithmetic.

And if you -- and we did some assumptions here. So especially the -- in the red bar below, the distribution -- actual distributions to Class 2 and overlap documented class claims, even though there's five times more claims filed, we don't know the dollar amount -- the actual dollar amount.

So we assumed three times is the dollar number of the claim. And that would be $137 million. So 42.7, which is the number we know, times three, that's 137 million.

So that means that for Class 2, if you actually offered evidence of your documented loss, which was capped at $2,500, then you would receive $0.12. And if you didn't -- if you just submitted a claim, but you didn't do a documented loss -- you didn't document the claim; you just filed a cash claim, you would receive zero dollars.

And that means that the maximum anybody could receive in Class 2 is $0.12. And the lion's share of the people -- in fact, 1.75 million of them -- will receive zero.

And there's been no justification in the record. And no demonstration of this Court why the amount these people might receive is at the low range of reasonableness. Is zero dollars. Mr. Lanier said that the sky is the limit on how much they could get. But the bottom, the absolute

bottom, is zero.  And Class 2 has been settled for zero dollars.

So grinding that into, you know, Fifth Circuit case law, what they're required to demonstrate, and which the Court is -- must itself satisfy, is if there's an irrational basis for the allocation among the class, that the explanation of the settlement and the allocation of the settlement is tied to the claimant's strength or risk, and that a zero or reduced allocation is supported by evidence or reason.  None of that is present.

Reed told us that allocations will be upheld only where record -- the records showed fairness relative to entitlement.  And in Katrina, the Court emphasized that the allocations must be equitable to the class as a whole. That's not present here, and they haven't demonstrated how that could even be possible.

And they -- they argue that, well, the amount -- you know, the claimants are exhausted, and they didn't accept -- we didn't anticipate that this many people would have participated in the class.

But that's not an excuse.  Because there has to be a rational basis type for their reasoning of the settlement and the allocation to it.  Just the fact that there were so many claimants is not a justification for getting zero dollars or $0.12.

When you have to -- the explanation tied to the claim strength or risk, a settlement cannot be approved where the distribution appears mechanical or unexplained. Courts must be able to articulate a rational basis, grounded on the record, for the allocations.

A case relied heavily by the -- both the defendants and the plaintiffs is the Deepwater Horizon case, where they did accept differential treatment. But that was upheld only because the records showed causation that could prove differences.

And Cotton v. Hinton, which is another case relied on by these -- by both parties is, is their probability of success and range of recovery information, relative to allocation, present in the record. None of that is present in this record.

There is absolutely no evidence tying this Tier 3 zero-dollar recovery to weaker claimants. The only allegation is they may have more damages. The claimants are the same. And they've admitted that the claimants are the same.

And then when there's a zero recovery, where a settlement provides for a zero recovery to a subset of classes, approval is proper only if the record explains why those claimants lack recoverable value. There is no indication in the record why somebody, just because they

didn't submit a documented loss claim, would be entitled to zero dollars in exchange for their releases.

And there can't be an assumption here.  There can't just be Mr. Lanier's argument.  There must be actual evidence in the record, which is not present.

So we haven't seen a damage model, which I argued in my brief.  And they're not required to provide a damage model.  But it would be supportive, and it would demonstrate how they got to the result that they got to.

They didn't provide you with any expert analysis. They've said they've hired experts, but they haven't given you -- there's no expert cited related to damages or allocations.

There's no qualitative framework, except for it stated that if someone's Social Security number was taken then they'd get five times more than the Tier 2.  And there's no explanation of why some claimants are receiving zero, and that the documented loss claims for Tier 2 are going to receive $0.12.

And this, in a sense -- this has a domino effect, as it relates to your analysis under Rule 23(e), right? Because, you know, we've already discussed kind of the range of possible recoveries.  And there's no explanation of why zero is the appropriate settlement number, even based on all the other risks.  They haven't talked about the claims for

Tier 2 -- or for Class 2.  They haven't talked about all those risks associated with, you know, the second data breach versus the first data breach.  They're just justifying it as zero, with no support.

Also, I think -- it's very doubtful to me, because the notices don't state it, but it's very unlikely that any person who filed a claim or a documented loss claim knew that they were going to get zero.  Or they thought a possible outcome would be that they would get zero.  Because it's not in the notices.  The notices talk about getting $2,500, not getting nothing.

And so I think this could go further into like notice issues.  Because the possibility of getting no money, because too many people participated, was not disclosed to any person who could file a claim.

There's also no consideration at that point for the releases being provided, because there's no other relief contained in the settlement agreement besides money.  And if a person's receiving zero dollars, and there's a proportional disconnect between the releases they're providing, which is everything, and the compensation they're receiving, which is zero dollars --

(Court instruction.)

MR. MCCORMICK:  Okay.  And, you know, the Katrina court said that a settlement is not fair where class members

surrender claims without receiving some benefit in return. Here, they're receiving no benefit. 1.7- -- so, you know, 40 percent of the class is going to receive no benefit at all, okay? And then another 104,000 people are going to receive $0.12, at most. And it could be far, far less. We just don't know, because they haven't told you. And they're the only people that know.

And not only are they releasing the claimants that are actually filed, they're releasing their state law claims. There's much discussion in the briefs about the variations in state law. And I won't go too far into it.

But they're -- in California -- and there are California named plaintiffs -- these people would be entitled to statutory damages of a minimum of $100, and up to $750.

In Illinois, they would be permitted to bring a Consumer Fraud Act claim. And I think there's 11 states that have their own data privacy statutes that provide for some level of control or some level of claim. And a -- and there's more than 11 states. There's 11 named -- the states where 11 named plaintiffs live provide for that relief.

And that's not -- that's -- they didn't have to incorporate that into the settlement concept. But the fact that there's relief available to those claimants, and then the -- is a relevant factor related to the consideration of

the releases, especially when they're releasing their claims for zero dollars.

So the bottom line is that, you know, Black Letter's Fifth Circuit law states that, you know, zero recovery is only permissible if their records shows claims are worthless. And that's Reed. There's been no showing that these claims are worthless.

Diverted -- under -- under adequacy of the settlement, divergent interests requires structural protection. And that's the Amchem case. That hasn't been provided or demonstrated.

Weaker claims might justify a lower recovery, but not a zero recovery, absent proof that those claims are worthless. That's from Reed and Deepwater Horizon.

And the relief scope here is incredibly broad. It's all claimants. It's all claimants. And that's from the Katrina case. Without demonstration of why these people should receive -- after participating in the class, after filing a documented loss claim, or actually, you know, filing a claim for cash payments, why they are still going to receive zero dollars in exchange for release.

Now, there are ways that this could be cured, right? They don't want to discuss it. But you could narrow the releases. You could narrow the releases to allow the claimants who are receiving zero dollars to not release

claims, or to release only the claims asserted in the lawsuit.

You could enhance the notice to notice -- notify all 1.75 million people that their claims are worth zero dollars, and give them an opportunity to opt out.  That hasn't happened, and it hasn't been suggested.

You could restructure the settlement, similar to the way that Class 1 is structured, to were there's a threshold amount -- or that the -- the documented loss claims are capped.  I think you'd still have a problem, then, with the documented loss claims receiving zero as opposed to the cash payment claims receiving zero.  But it -- there's something that can be done.

But the settlement as is has a structural defect that can't be overcome.  And they haven't even discussed that it exists, much less that it bars this Court's approval of the settlement itself.

So, you know, in the Fifth Circuit, a settlement that gives a class nothing is presumptively unfair, unless the record affirmatively proves that the claims are worth nothing.  And that has not happened.

The settlement can be cured, but it hasn't been discussed and it hasn't been proposed.  So it must be denied.

THE COURT:  Thank you.

MR. MCCORMICK:  Thank you.

MR. LANIER:  Your Honor?

THE COURT:  Please.  Any response, sir?

MR. LANIER:  Yes, Your Honor.  A two-part response, if we -- with the Court's permission.

First of all, one of the challenges of class actions frequently are people who have become -- I won't say professional objectors, but I will say that there is certainly a strand of folks who believe if they can find an angle and make an objection, they can cut themselves a sweeter deal.  And it's not inappropriate, I guess, for people to try and do the best they can.  But there is a line.

And in this case, these objections, as set forth by Mr. McCormick, are meritless.  Now, I want to explain why.  But I'm going to have Mr. Ostrow defend -- he is Class 2, he's AT&T 2.  So I'll have him defend it.  But I do want the record to be clear on this.

The leak in AT&T 1, which is the case that was originally before you that you set me on, was a leak of people's names, their Social Security numbers, their date of birth, their addresses, their account information, their telephone numbers, and their e-mail addresses.  That's what's leaked.  That's what put on the web, the dark web.

AT&T 2, it leaked their telephone numbers and

their call log data.  Who did they call.  In some small subset, which cell tower was in use; how long did the call last.  That's it.

There's a huge difference between the two that is reflected in values.  But this idea that 1.7 million get zero dollars, I think Mr. Ostrow deserves to put that on the record.

THE COURT:  All right.  Good morning.

MR. OSTROW:  Good morning, Your Honor.  Thank you for allowing me to speak.  Kind of jumping out of my seat there for a few minutes.

THE COURT:  Take your time.  There's no rush.

MR. OSTROW:  And I'm going to talk slow.  But I'm jumping out of my seat by the allegation that we would present a settlement, with the lawyers in this room, where 1 point -- well, if one person who rightfully filed a claim wouldn't get paid.

I've handled more class action data breach cases -- maybe Jean Martin's got me beat -- than anyone in this country.  I'm appointed lead counsel probably more than anyone in the country.  In cases not as big as this always, but with judges just like you.  If I ever presented a settlement, and after the fact, people who had duly filed claims got nothing, all right, I think we'd know where I'd be.  I wouldn't be standing at a podium like this again.

So there's a lack of understanding of the settlement.  And I thought our papers properly addressed it. Everybody who filed a claim for doc'd loss, that had the proper support, is going to get paid.  Every one of the people in Tier 2, Tier 3 are going to get paid.  Everyone. It's a fundamental misunderstanding, because clearly Counsel doesn't get how claims processes work.

There are $105 million of claims that were submitted by 4.5 million people, perhaps, if they wanted, and they thought they could get the 2,500 or the $5,000.  We all know most of that unfortunately doesn't qualify.  And I don't want to say they're fraudulent claims, but they just don't have the proper support.

I will tell Your Honor, because I do have the information, that there's going to be several million dollars paid out right now, and they're still withering them down.  And this is a process that happens in every one of these claims-made settlements; where you go to final approval, and you don't know the exact number, but you get close to it.

We're about $5 million right now that's going to be paid out of actual damages that people were able to prove.  The people that elected to go for the other tiers, who don't have documented losses; which is set up in every one of these cases before I started this, perhaps when

Ms. Martin started -- not because she's older.  We're the same age -- but they did it for a reason.

The allocations made perfect sense.  If you have true losses, you get paid those back.  And then you'd get to participate and get something, all right?  Even though you can't show that you were necessarily damaged.

I can tell you that people are going to get mid $50, and some are going to get $9, and some are going to get $17.  But every one of those people are getting paid, all right?  It's a fundamental lack of understanding.  And it costs this Court and these lawyers a lot of time and a lot of money to defend an excellent settlement.

I'm going to go back, because I wrote a note earlier, even though that was an unbelievable presentation.

He said 4.5 million people support this settlement.  99.99 percent of people support this settlement.  There are only 45 people, and two law firms, that decided not to support the settlement.  Which others will talk about in a minute.

But this is an outstanding settlement.  AT&T 2, we come from -- I come from -- actually, from Florida.  But I'm with the Montana crew back there, handling the Snowflake MDL.  Our case is -- as Mark said, is incredibly different.

They have the gold standard of data when it comes to these types of cases.  We got the bad bucket, right?  Our

case came.  They got breached.  We thought it was going to be similar information.  It's not even who was called.  It's what phone number, if you could identify, you know, an account and phone number to another phone number, and how long it was.

I'm not going to stand here and create a record in front of the entire Plaintiffs Bar and Defense Bar saying that those aren't good cases and there's not standing there.  But where you saw all those hurdles, ours are double the height.  And I'm not certain that AT&T 2 settles absent AT&T 1.

So when I say that this is an outstanding settlement, AT&T 1 is being dragged down a little bit by AT&T 2.  And if it was a standalone, you're looking at about $3 a person.  When we settle these cases, we do it based upon the person.  $3 is not what they get; they're going to get more.

That is outrageous of a result in this day and age.  And ours is closer to $1 for our people.  The fact that our class of people are going to get $28 million, if you approve this, is also outstanding.

So as it relates to that, it's a fundamental lack of understanding, and a critical one.  The Court probably -- you probably wanted to throw up when you heard that.  I know I did.  Because it really goes against -- it attacks the

integrity of the entire process.  All the parties.

I'm not going to talk about the collusion.  But I settled my own case.  Mr. Lanier didn't settle my case. Mr. Seeger didn't.  All right?  I negotiated with the -- these folks over here separately.  None of those allegations are true.

I don't think we need to talk about the state law variations and all those things.  They're well documented in the papers.  But we have an allocation that pays everybody the same based upon tiers.  That's all you need.

So none of that -- the fact that in some perfect world, where no one's actually ever tried it in California, but we allege it; and it's a legit statute to get additional damages, none of that matters when you get to the settlement stage and your allocation process is fair.

That's all I have to say about that.  And I guess there will be more objections or Mr. Keteltas.

THE COURT:  Thank you so much.

Sir?

MR. KETELTAS:  Your Honor, I'll just be brief here.

Two points.  We would not expect documented losses at a significant level.  There may be a significant number. But once they are vetted, you know, you're not going to expect them to be that significant, because of the data.  I

think I -- I'm thankful that Jeff added that information.

These are numbers interacting with numbers. There's not a name.  You don't know who is behind those numbers.  And I'll say what Mr. Ostrow wasn't willing to say:  He does have a big hurdle.

There's a Florida case that dismissed just these kind of cases.  It's Baron v. Syniverse, 2022, WL 6162696, from 2022.

THE COURT:  Can you give me that one more time?

MR. KETELTAS:  I will.  2022 WL 6162696, involving billions of call records and message data.  And what did the judge say?  Not actionable.  We're not -- this isn't the kind of data that's protected.

The second part of that I'll just very briefly address is the state law issue.  The state -- there are no state laws that protect this kind of data.  You're not going to see a California claim with California statutory damages. If you saw one made, you wouldn't see it survive a motion to dismiss stage.

So that's a long way of saying that I support this position, this viewpoint.  This is a very fair settlement for the type of data at issue.  And I agree with Mr. Ostrow that it might not have happened if we didn't have both of these matters.

THE COURT:  Thank you.  That's very helpful.

MR. MCTIGUE:  Just very briefly, Your Honor.

THE COURT:  Absolutely.  Glad to have you here.

MR. MCTIGUE:  Thank you.

We're in the unfortunate world now of a lot of fraud in connection with class action settlements.  A lot of press on this, a lot of courts examining this.  Especially when you see a potential sticker number of 2,500 or $5,000 with documented losses.  And that's why that these need to be vetted carefully by the claims administrator.  And they haven't been done yet -- that hasn't been done yet.

Some preliminary analysis has been done.  And with that preliminary analysis, we know for sure that there will be compensation for those that submitted claims and for those that have legitimate documented losses.

I just wanted to make that clear.

THE COURT:  I appreciate that, thank you.

MR. MCTIGUE:  Thank you.

THE COURT:  Is there anything further from this table?

MR. MCCORMICK:  Yes, Your Honor.  And just briefly.

So we now have a representation of the actual number.  It's not 137 million; it's 105 million.  And then there's a representation to you from an attorney argument that that number's going to be whittled down to nearly

nothing.  But if it's not, then these people still get zero dollars.  And you're still approving a class settlement where somebody's releasing a claim for zero dollars.  And they're representing to you that they're going to get $1.

I think the Court is going to need to hear from Kroll once these numbers are finalized in order to approve a settlement where there's a risk that these people receive -- will receive zero dollars.  I mean, they have clear structural issues that they're unwilling to address.  And they're just telling you that, oh, well, that won't be a problem, Your Honor.  Don't worry; just approve it.

Well, that's not how this works.  They have to provide evidence that these people are not going to receive zero dollars; that they're not going to receive their -- release their claims for nothing.

You have a kitty of $105 million.  Is it really true that that's going to be whittled down to less than $15 million for Class 3?  We just don't know.

And the evidence before you, the actual evidence, which is testimony from Kroll, is telling you that, as of November 3rd, when 17,900 people had submitted documented loss claims for Tier 3, that there was $42 million of claims filed.  Now, there was no disclosure that those weren't accepted.  But without evidence demonstrating that these people are not going to receive zero dollars, this

settlement is unconfirmable.

THE COURT:  All right, thank you.

Any response?

MR. LANIER:  I'll try and put a bow on it.

It's just wrong.  I mean, the numbers are simple math, but the terms are simple as well.  It's simple English.

Everybody who has a loss is going to be entitled to their share of the pot.  There's nobody who's in a category where we say, we're taking those of you with odd Social Security numbers and giving you zero.  Or we're taking those of you who filed -- you know, if they've got a legitimate claim and they have filed it.

And the number of people who get paid will affect the dollars that go out to each.  But it's not where, oh, well, we're just going to give 1.7 million people zero.  That's not there.  And we don't have to come forward with affirmative proof, assuming that the record itself shows what the settlement is and who it goes to.  That's complete in the records.

This is just -- it's a misunderstanding, is the polite way of saying it.

Thank you.

THE COURT:  Thank you.

Any response from AT&T?

MR. KETELTAS:  No, Your Honor.  Thank you.

THE COURT:  Anything further from the objectors?

MR. MILLER:  Yes, Your Honor.

THE COURT:  Good morning.  Glad to have you here.

MR. MILLER:  Thank you, Your Honor.

My name is Kyle Miller.  I'm here with my law partner, Amanda Taylor, and our co-counsel, Maury Udell, representing the objectors Scott Gherman, Bradley Johnson, Brittani Kaye, Rob Caruso, and Brittany Bonner.

We've got two overarching issues here.  From our objectors' position, the Court should not certify this class for final certification.  And the reason being is that the class representatives lack typicality and lack representativeness.

In the alternative, if the Court believes that the class can be certified, there's several pieces of this settlement that should not be approved.  Specifically, the benefits that are going to the members are unreasonably low, the attorneys' fees being requested by Plaintiffs' counsel are unreasonably high, and the opt-out procedure is unfair.

With Your Honor's permission, my plan today is that I will cover all of those topics except for the attorneys' fees piece, and Ms. Taylor will cover that.

So to start with, I want to talk a little bit at kind of a big picture of what we're doing in relation to

class certification, right?  We're all familiar with the general standard that the Court -- whenever a class is in front of them, is that the Court needs to apply a rigorous analysis.

And when it comes to conditional certification for settlement purposes, what the Supreme Court instructed in Amchem is that not only should it be a rigorous analysis, as it normally would be, but that all of the pieces and components of class certification that are in place for the purposes of protecting absent class members, that scrutiny should be heightened.

The only thing different about a class certification request for settlement purposes is that the requirement on manageability is lessened.  Because there's not going to be a trial, so there's not really a need to consider whether a trial will be manageable.  But the other pieces, the components that are there to protect the absent class members, scrutiny should be heightened for them.

And the Supreme Court further instructs that when a class is put in front of a court for the purposes of settlement, the Rule 23(a) and 23(b)(3) factors should not be viewed as these impediments or barriers to certification. But really should be viewed through the lens of, these are here for protection for the absent class members, or people that are not in front of them.

The Supreme Court further instructs that when it comes to a class certification for settlement purposes, fairness is not a substitute for the 23(a) and 23(b)(3) factors.  That is, no matter how fair anyone believes the settlement may be, the 23(a) and 23(b)(3) factors are required to go through.  That is also from Amchem.

So why?  Why do we need to have this increased scrutiny when we've got a class that is in front of a court for settlement purposes?

Well, in the Seventh Circuit case, Eubank v. Pella, 753 F.3d 718, the Seventh Circuit, in a, I'll say --

THE COURT:  I'm sorry, was that 753?

MR. MILLER:  753 F.3d 718.

THE COURT:  Thank you.

MR. MILLER:  It was a pointed, but perhaps honest discussion of class certification and settlement.  The Seventh Circuit explained that the issue that we have is that courts are used to adversarial proceedings.  We're used to being in a situation where the plaintiffs are against the defendants; and all sides and all information is being presented so that the Court has the opportunity to weigh that information and make a decision.

But when we're in a position of a class settlement, the problem is the dispute's already been resolved.  The plaintiffs are on the same page.  The

defendants are on the same page.  And, in particular, individual interests start to creep in.

So the named plaintiffs, the class representatives who would be looking out for the class, they've got a settlement that they want and the potential for a service award.  The class counsel, they're now here looking for their attorneys' fees.  The defendant obviously wouldn't have agreed to the settlement unless they thought this was a favorable term.

And so there's no one left that has an interest to specifically look out for the absent class members.  And that's where, as the Seventh Circuit says, come the objectors.

That when a settlement and a class is being put forward, and something doesn't seem right about it, the objection window is the opportunity for those absent class members to come in and explain what is wrong with this settlement, what is wrong with this class, and why it shouldn't be certified.  And that's where we are today.

So in addition to, kind of, the general statement of, whenever we've got a class that is before the Court on certification for settlement purposes needing heightened scrutiny, this particular case, on its face, has a number of caution flags that should be saying, this needs some very specific attention.

First is the timing.  This case went from original complaint to settlement in 12 months.  If we consider that class -- the A1 counsel didn't get appointed until August, it went from leadership being appointed to settlement in six months.

During that time there was no discovery.  No interrogatories asked.  No requests for production shared. No documents coming in.  No depositions taken.  Nothing. What we've heard is that, after the fact, there was a little confirmatory discovery.  But no work on the front end that you would traditionally see to determine the value of a case to be able to assess its liability.

The mediation.  We weren't there for it. Obviously, Your Honor, not getting in any details of it. But the fact that a case of this size and this magnitude, involving this many people, got settled in a single mediation session, is pretty remarkable when it comes to classes.

Then we look at the value of the settlement as compared to similar cases.  So we've heard a little bit from Mr. Lanier about some other data breach cases and what may be out there.  But the one that they stop short of talking about is the one that we fully briefed.  And I won't go into the level of detail that we did in our papers.  But it's the T-Mobile settlement.

A telecom company who got breached.  The same type of information, including Social Securities, names, addresses, date of birth, ends up on the dark web.  It was a slightly smaller class than this.  It was 76.6 million people.  And there, the results were $350 million in damages to the class members, plus a $150 million commitment by the company to upgrade its security, plus two years of identity theft protection for the class members.

Here, what we have is 96.7-or-so million class members, and their cash amount is about half of what we saw in T-Mobile.  No commitment for security upgrades.  We've heard that AT&T did some security upgrades, but it doesn't sound like that was actually part of the settlement.  It was just something AT&T did on their own, and then later gave assurances that they'd done it.  And no data monitoring for any of the class members.  Which is generally regarded as the gold standard in these data breach cases.

So half the cash.  When you consider the total financial commitment of T-Mobile, this is one-third of the cash commitment.  And when you consider the data monitoring, this case is about one-fourth of what T-Mobile was.

But we also need to look at the value of the settlement as compared to what the liability was to AT&T. We're going to talk a little bit in a moment about the class waivers that are contained in this contract.  But I do want

to bring to the Court's attention something that has not been discussed in much detail.  And that is the arbitration side of this.

What AT&T did, in relation to their customer service agreement, is they drafted what is admittedly an incredibly customer-friendly agreement.  Presumably because they want to make sure that it gets upheld whenever someone wants to challenge the enforceability of the arbitration agreement.

But it calls for -- and the arbitration agreement is in our -- or the full customer service agreement is in our appendix, which is Docket 365.  It calls for -- the arbitration -- that it will be administered by AAA.  And that as long as it's a nonfrivolous claim, AT&T would pay the filing fee, the administration fee, the case management fee, the hearing fee, and any arbitrator fee.

If you go to the AAA website, they'll provide you an estimate and say that, on a per-arbitration basis, that's about $2,000 in fees that AT&T agreed that they would pay.

We cite in our briefing the Abernathy v. DoorDash case.  It can be found at 438 F. Supp. 3d 1062.  And that was a situation where DoorDash was in a similar spot.  That they had a arbitration agreement that called for DoorDash to pay the filing fees, and they ended up with 6,250 claimants filing arbitration.  And when they got the bill for

$12 million to pay the arbitration fee, that's when DoorDash tried to walk away from their arbitration provision.

So -- and that case was in 2020.  They were doing AAA arbitration at the 6,250 claimants; $12 million.  That was about $1,920 per claimant.  So the estimate that AAA is now providing on the website indicates that it may be right.

So at $2,000 a claimant, the filing fee alone, before any liability is paid out, was going to be enormous for AT&T.  If the 4 million claimants that filed in this class had filed for arbitration, that's $8 billion in arbitration fees before a single claimant gets any recovery.

It would take fewer than 90,000, so one-tenth of 1 percent of the people involved in here, to file for arbitration to eclipse the value of this settlement.  One-tenth of 1 percent.  Less than 90,000 people.  If they had filed for arbitration, the filing fees would have eclipsed the $170,000,000 that's at stake here.

Then we go on.  Still within the customer service agreement.  If the arbitration award is greater than what AT&T last offered to their customer, then the customer gets the greater of the arbitration award or $10,000, and two times their attorney's fees.

So the status quo, before this class existed, was that AT&T was under an incentive to pay a 100 cents on the dollar for every claim that was below $2,000, which would

have been the arbitration fee.

The amount of exposure that they were facing was enormous, so it is unsurprising that AT&T wants this deal. And it needs to be looked at with that perspective of what they were being confronted with if this didn't go through.

Now, I will not belabor the proposed fee award fees, but -- because Ms. Taylor is going to cover that. But that is another piece that needs to be considered, in terms of the cautionary flags about this class.

So, Your Honor, where we stand is that you're the absent class members' last hope to make sure that their rights are protected. So the Court is being asked today to determine both should this class be certified; and if it is, is the settlement fair. We're asking you to find that it is -- that it should not be certified. But if it is, that this is not a fair settlement.

And to the extent that there's been any suggestion, either in the filings or today in the presentations, that somehow the Court's preliminary approval of the certification or the settlement means that the Court should provide any less scrutiny today, that's simply not correct. That is not what the law is.

And, frankly, this is the manner in which the Court created the process for us to do, which is 100 percent right. Which is, there's an opportunity to object. Now is

the day for the absent class members to be heard on these issues.

Mr. Udell filed at least two motions attempting to bring these to the Court's attention earlier. And the Court, as is within your discretion, said: No, it's not now. We're going to deny these without prejudice. Bring these issues up at objections. So that's why we are here now.

And so all options are on the table for the Court: Deny the certification; can modify the certification order. Obviously there are limitations in terms of what can be forced upon the parties in terms of settlement. But certainly suggestions can be made about how a settlement could be reconfigured to protect the interests of these absent class members.

So let's turn to it. Why shouldn't the class be certified? Well, the issue is typicality and representativeness. And specifically due to the class action waiver that exists in the customer service agreement.

So in -- and the important thing here is that the class waivers that exist in the customer service agreement are mutual waivers. The customer waived their right to assert a class action against AT&T. And AT&T agreed to the customers that they would not participate in a class action.

At Section 1.3.1 of the agreement, it says: You

and AT&T agree that arbitration will take place on an individual basis.  Class arbitrations, class actions, and representative actions are not permitted.  This means that you and AT&T will neither file a lawsuit in any court other than a small claims court, nor pursue or participate in an action seeking relief on behalf of others.

And again, it's Section 1.3.2.1.  So it's 1, 3, 2, 1.  It says:  By entering into this agreement, you and AT&T are each waiving the right to a trial by jury or to participate in a class action.  The mutuality:  You and AT&T will not participate.  You and AT&T are each waiving the right to participate in a class action.

Those terms should get their plain meaning. There's no special definition to the term "participate." Participate means to take part, to have a part or share in a thing.  Even if it was somehow ambiguous as to what participate means, AT&T drafted that document.  So it would need to be construed against them in favor of the customers. And there can really be no argument that AT&T is not here participating in a class action.

So the question then becomes, and what -- what both the named plaintiffs and AT&T had raised:  The question of waiver.  So let's talk about waiver for a second.

All right.  Clearly, AT&T cannot waive its customers' right to individual litigation.  Okay?  Whether

AT&T wants to waive its right to individual litigation, that may be up to AT&T. But they don't have the ability to waive it on behalf of the customers. And, frankly, they're estopped from being able to do that.

They've gone all around the country arguing that their customers cannot waive the right to arbitrate and cannot waive the class action waiver in the provision as to them. They now cannot be heard to say that somehow AT&T has the right to waive those provisions on behalf of their customers.

And even if they weren't estopped, that would just be inconsistent with how courts deal with waivers.

In Forby v. One Techs., which is at 13 F.4th 460, from the Fifth Circuit, there's a good discussion about waiver and how it goes. But you look to the conduct of the party that is alleged to have done the waiving, not to the party that wants to get around the provision.

So in this case, if AT&T wants to say, well, the class action waiver, the right to individual litigation that's found in the agreement has been waived, we don't look to AT&T's conduct to see if the customers have waived it. You need to look at the customers' conduct to see if the customers have waived it.

So let's turn to the customers. What we hear from the named plaintiffs is, well, we waived it. We're the

named plaintiffs.  We filed this lawsuit.  We said we wanted to have a class action.  Certainly it's been waived.

Here's the problem with that.  Up until the moment of certification, a named plaintiff does not speak on behalf of the class.  The named plaintiff gets no representative authority just by filing a lawsuit, by being involved in litigation, by saying they want to have a class.  The representative capacity only comes about when the Court certifies the class.

So any waiver or thing that the named plaintiffs want to do before certification they're doing in their individual capacity.  Not on behalf of the class.

In Standard Fire Insurance Co. v. Knowles, the Supreme Court case, 568 U.S. 588, there's a good discussion about that.  Not in relation to a class action waiver, but in relation to a stipulation that a named plaintiff wanted to make to try and get around CAFA jurisdiction.

That is, the named plaintiff in Standard Fire, they filed suit in state court as a class action.  Got removed under CAFA.  And wanted to argue, well, we'll stipulate that we won't seek more than $5 million, in an effort to try to avoid the minimal diversity that CAFA provides for removal.

And the U.S. Supreme Court said no.  Precertification, Plaintiff, you can't do any -- you can't

make that type of stipulation on behalf of the class.  You don't have the authority to speak on behalf of the class at this point, because you've not been certified as the class representative.

So up until the moment of the preliminary certification, the 35-or-so named plaintiffs in this case, when they waived their right to individual litigation, it was for them and them alone.  They were not doing that on behalf of anyone else.

And I'm sure Plaintiffs aren't citing, and I don't even think they're necessarily arguing, that somehow the individual decision of the named plaintiff should provide a waiver of the absent class members.  But what they are saying is, that what you should do, Your Honor, is skip over adequacy, skip over typicality at class certification, and we'll just waive it for them after the fact.

And this is where the problem is, okay?  Because at the point of certification, we've got named plaintiffs who are now holding contracts in which they have waived their right to individual litigation.  And we've got absent class members who hold contracts with the individual right to litigation.

And at that moment, the named plaintiffs' claims are no longer typical of the absent class members' claims. They have given up an important and bargained-for right that

the entire class has.

And when this scenario presents itself in case law, as we cited in our brief, when the named plaintiff does not have an arbitration or a class waiver in their contract, but the absent class does, courts have routinely found that that creates a typicality and representativeness problem.

Specifically, that's Johnson v. BLC Lexington, Ralon v. Kaiser Foundation Health Plan. And I'm going to mispronounce this -- Tschudy v. JC Penney.

Now, the difference in those cases was that when the Court was making its adequacy determination, it was a contested class. So the defendant was coming in and saying: No, no, no. This -- these named plaintiffs are not typical of the class. They're not representative of the class, because they don't have the arbitration and class waiver, and the absent class members do, okay?

But the decision doesn't hinge on the fact that it was the defendants raising the issue, okay? The -- the fact that it was being brought up as a, well, as a defendant, I may choose to defend my case on the base of these waivers, that wasn't the issue. It is, there is a difference between the two of them.

Now, in those cases, that's probably how it was going to come about. But the reality is that when we're looking at -- and what the law says when looking at

typicality and representativeness, you're not just looking at what are the defenses, but you're looking at the claims and the defenses.

And here we've got a situation where the claims of the absent class members is now different than that of the plaintiffs -- of the named plaintiffs, because the named plaintiffs have waived that right.  They no longer have those provisions.

That throws this case directly in line with those that we've cited, that says:  When you've got a named plaintiff that doesn't have these provisions, and the class does, they lack the typicality.  They lack representativeness.

This is also where The Rules Enabling Act problem comes in.  Because what we've heard from the Supreme Court in American Express and Italian Colors, is that if the class procedure is going to be used to read out a contract clause for class action waiver, that would likely be a violation of The Rules Enabling Act, right?

It's a bit of an irony, that what we're talking about is a contract provision for class waiver, and that it is the use of the class action rule that is attempting to read that out of the contract.

But that's what's happening here.  And American Express v. Italian Colors suggests that would be a violation

of the rule, and that's a step too far.

That is what is being argued here, is that the plaintiffs are saying:  Let us be the class representatives, even though our contracts are different than theirs.  And as soon as we get in, we'll use that authority to rewrite the absent class members' contracts.  We'll take those class certification waivers and we'll read them out of the contract.

That is now removing a contractual right that has been bargained for, that exists for all of the absent class members.

The arbitration provisions, class certification, class action waivers are supposed to be on equal footing with any other contract provision.  And in what other scenario would we allow for a difference in the contracts to just be waived off, when named plaintiffs have one contract and the absent class members have a different contract?

Outside of the class action waiver, outside of the -- when would we allow the named plaintiffs to come in and just say:  Let's go ahead and just rewrite the absent class members' contracts so that we can make them on equal footing?

What the plaintiffs want to do, is they want to skip over typicality and representativeness, to then use their authority to cure typicality and representativeness.

So what we've heard from both sides is, well, Judge, this isn't really a problem.  And the reason is because there's an opt-out right.  And so because there's an opt-out right, you can just waive all of this off, all of these problems.  Opt out is not the answer here.

Here's the first thing.  So as -- as a -- as a matter of logic and procedure, we can't get to opt out until we get through typicality and adequacy.  Opt out is always after those two things take place.

And as the Seventh Circuit informed in Eubank v. Pella, right, we should be real suspicious of this argument of:  Let's get on and skip over adequacy and typicality now, and we'll just cure it with an opt-out, okay?  We don't get to opt out because they're -- we're never there, we're never at settlement.

And the other -- the more fundamental issue becomes, if that's what we're going to do here; if we're going to say opt out is the cure for an adequacy and typicality problem, then when is opt out not the cure to an adequacy and typicality problem?

Any time there's a (b)(3) class that gets certified there is an opt-out opportunity for the class members.  Whether it's settlement or we take it through to trial, there's a chance for the class members to get out.

So why should opt-out be the means to circumvent

the adequacy problem, if it is a thing that exists, and is ripe for abuse; if what we say is, well, when you're not quite typical and you're not quite adequate, it's okay. Because you'll get a chance later to opt out, and we'll be able to go ahead and clean all that up.

Also, opt out, as the answer, doesn't work, because it doesn't line itself up with what traditional waiver law is. We're talking about AT&T's inability to waive on behalf of the customers. That's who we should be looking to to see, hey, was there or was there not a waiver. We should be looking to the conduct of the absent class members.

And typically what it requires is an overt act. What they're asking here is to say, well, no, you need to make an overt act not to waive. Here, if you don't act, then you do waive. That is wholly inconsistent with how waiver law works. It requires an action. Here, they're trying to use silence. It also ignores the reality of, unfortunately, just the nature of class actions.

We've talked a little bit about that today. We heard from AT&T about the potential for not necessarily fraud, but creative claims that get made. Things of that nature. There are problems with just the overall class action process.

And one of the big problems is the fiction of the

opt-out.  And in Eubank v. Pella, there is a very good discussion about the fact that, in all classes, the opt-out is very rarely used.  And I suppose it raises the question of, we don't even really know if consumers understand what opt out means and what that entitles them to.

We can look at the notice that went out in this case.  The amount of time spent talking about what you might get if you filed a claim is huge in comparison to saying, well, what happens if you opt out.  And what was estimated, relying on some treatises in the Eubank case, was that it's one-tenth of 1 percent.  That's typically what you see in relation to opt-outs.

And so the idea that, well, folks are sitting around, and they're going to receive this notice and they're going to understand, if I want to maintain my right to an individual action, then opt out is the thing to do, there's a serious question as to whether that's actually something that is understood by the general public; and should that be the thing that is creating waiver, when normally we would require an overt act.

The other piece of it is the -- just the practical effect of it here.  The contract between AT&T and its customers very specifically called for a mutual waiver of class actions.  If the argument is, well, right, but you can opt out, then the mutuality part of that agreement is

rendered a nullity.

There is never going to be a situation in which the customer gets to take advantage and have the benefit of the class waiver. It's only AT&T, right? They get to decide, well, this one can be a class and this one can't be a class. But any time anyone files a class against AT&T, they get to look at it and go, well, I'm not going to enforce it here. And the named plaintiff here hasn't chosen to enforce it, so this doesn't count.

And so, basically what they're saying is they've put a meaningless provision into their contract, that they never intended to provide any benefit to their customers, because there's no way to enforce the mutuality if what you are being told is correct.

THE COURT: Let me pause for just a moment. I think we're just needing a little stretch break. I certainly am not trying to -- would now be a good time to --

MR. MILLER: It would actually be a great time, Your Honor. I was about to say that that's what we have on the class action piece of it. We would like to talk about the fairness piece, but that's a great breaking point.

THE COURT: Fantastic. I appreciate that.

Why don't we all take a ten-minute break and come back.

Thank you.

(Brief pause.)

THE COURT:  Everybody's done such a good job.

Why don't we take a recess and come back, how about, 1:30.  Give everyone enough time to eat and everything.  Okay.  So you're court ordered to have a wonderful lunch, and calories don't count.

I see a gentleman raising his hand.  Yes, sir?

MR. HEBERT:  Yes, ma'am.  I'd just like to introduce myself.  I'm Nathan Hebert.  I had a formal objection.  And I just wondered, maybe after lunch, if I could get a few minutes to talk.

THE COURT:  So I tell you what we'll do.  If you'll hang out here, I'll let my assistant visit with you.  But I appreciate you letting us know you're here, and we will communicate with you here shortly.

MR. HEBERT:  Yes, ma'am.  Thank you.

THE COURT:  Absolutely.  Glad to have you here.

Anyone else?

(No response.)

THE COURT:  Okay.  In that case, court will be in recess until 1:30, and calories do not count.

(Lunch recess.)

THE COURT:  On the record.  This is the resumption of the fairness hearing.

And, Counsel, at your convenience, I look forward

to further presentation.  It's very interesting, thank you.

MR. MILLER:  Thank you, Your Honor.  Good afternoon.  Again, Kyle Miller.

THE COURT:  Afternoon.

MR. MILLER:  So as we -- right before lunch, we were finishing up.  What we had done was cover the arguments in relation to why the class should not be certified.  And so I'd like to now turn to, in the event the Court believes that this class can be certified, why this settlement should not be approved.

So again, three issues that we have here.  One is the value of the settlement, the attorney fees award that's been requested, and also the opt-out provisions that are contained in it.

I'm going to briefly touch on the value of the settlement itself, because I think my earlier presentation covered the points, as well as what we have in the papers.  And so there's not much additional to add on there.  Other than that we would like to, again, emphasize that the settlement does not contain the fraud-monitoring provision, which is typical in these types of data breach cases.

And then, in addition, to join Mr. McCormick's argument from this morning about the lack of evidence that is before the Court in terms of the reasonableness, what we've heard is lots of arguments about why this is

reasonable.  But what we have not seen is any evidence to be able to put forward showing that it is.

And that would echo his points; that, in terms of what evidence is in front of the Court, in terms of what Kroll's reported in relation to the claims that have been made, it would appear that it is unreasonable.

Turning now to the opt-out provisions.  So our argument has been, and position is, that if we're going to have a settlement of this type, there needs to be a reasonable method of opt out; so that the absent class members who do not want to be bound by this agreement, who want to continue to have their contractual right for individual litigation, have an easy and fair way to do so.

At the outset, let's separate the issue.  Because I think it's been conflated a little bit.

What we are not asking for is a right to mass opt-outs.  And Your Honor's preliminary approval made clear that that was not going to be a thing that was going to be allowed.  That we would not have mass opt-outs where an individual could opt out on behalf of their entire client --

(Reporter instruction.)

MR. MILLER:  Where they could opt out on behalf of their entire client base, or some large number of people. We're focused on the electronic signature component of it. And those two are not the same.  And, in fact, Your Honor's

order distinguishes between the two.  It, one, says no mass opt-outs; and, two, says wet-ink signature.

And that is -- while there may be some level of relationship between the two, in that mass opt-outs are likely to be done electronically, those are two separate things.  And what we are focused on is the lack of electronic submission that is available to the absent class members.

So let's compare just quickly what individuals who wanted to make a claim in this case had, in terms of their benefit.

They had the website portal to be able to make their claim.  They could submit their claims electronically and they could submit their claims in paper copy.

They received their claims form.  That was as simple as sign, date, put your name on it; check the box; sending it in.  When we look at what the opt-outs got, though, they got no opt-out form.  They got no claim portal in which to opt out.  They couldn't submit electronically.  If they wanted to submit an opt-out, they needed to mail it to two separate locations in order for it to be valid.  And there wasn't an opt-out form.

It was:  Take the Judge's order, take the settlement agreement, go through and figure out on your own -- get a piece of paper, and run through the list of

things that are to be required in order for you to validly opt out.

What this settlement agreement does is it makes it as difficult as possible for an absent class member to opt out. While simultaneously making it, frankly, as easy as possible for a claimant to assert a claim.

Then what we hear is: Look at how everyone enjoys this settlement. We've got 4 million claimants and only 9,000 opt-outs. Well, you made it a lot easier in the settlement agreement for those people to make a claim. And made it very difficult for the opt-outs to be able to do so.

When it comes to the electronic process, it is good enough for almost everything for AT&T and the named plaintiffs in this case. The main form of notice, the thing that was going to check the box for due process for the absent class members was an e-mail. E-mail notification was the main way through which class members were put on notice.

Making a claim, you can do that electronically. Submitting your claim's information, you can do that electronically. For AT&T, you want to transact business with us in any way: Open an account, close account, pay your bill, you can do all of that electronically. But when it comes to saying, hey, I'd like to honor the contract and not be part of this class, we're told electronic is not good enough.

And the argument that is being put forward behind it is:  Well, what we really want to do is, if someone's going to exercise their opt-out right, we want to make sure that that person is really using the right amount of deliberation before they opt out.

That makes sense in a world when we're dealing with -- like the case we cited to in the Volkswagon settlement, where the -- the claimants were getting $27,000, $50,000.  They were basically getting a buyback of their vehicle.  It lead to the question of, why would someone want to opt out of that type of settlement.

Here, on its face, if all of the class members made a claim -- which, of course, we know wasn't going to happen -- we're talking about a $2-per-class-member settlement.  More realistically, if we boil it down to, hey, we've got 4.3-or-so million people that have made a claim. If they were to be able to take advantage of the full $177 million, that's $41, okay?  They're not going to, because some fee award's going to be given.

If we get -- if the plaintiffs' counsel gets the fee award they want, it goes down to an average award of about $27.  It's probably going to be less than that, when we consider the administrative costs that aren't factored into those calculations.  And as Mr. McCormick demonstrated, if these claims stand up, there are going to be people that

get nothing.

And so the question becomes, what level of deliberation do we really need for individuals to go through to figure out whether they're going to get a dollar or $9 or $20. Are we really saying that we need a wet-ink signature to make sure that someone really thought long and hard about whether they wanted to opt out of their $20 settlement, or they wanted to maintain their right of action and proceed on?

It's essentially the same on the claims side, right? Individuals would be going in and making a claim -- some of whom have some level of value -- and they are potentially giving up rights, giving up value to their claim by participating in the settlement. We're not worried about those people compromising their claim, settling their claim using an electronic format. Why not require them to use a wet-ink signature? If what we're worried about is individuals passing up on the claims that they have, it should go in both directions.

So when it comes to the wet-ink signature, it's actually kind of interesting that -- in going through the pleadings the other day, both sides -- or I say "both sides," AT&T and Plaintiffs' counsel, they both cited to the TikTok settlement. We have also cited to the TikTok settlement on the issue of the opt-outs.

Now, what Plaintiffs and AT&T cited to was the preliminary approval.  We cited to the final approval order.  But it's a good example of why settlements of this type should allow for some type of electronic opt-out.

There, the Court specifically prohibited mass opt-outs.  That was an issue that the Court addressed, in relation to a group of about 800 claimants that did opt out.  But were able to recognize that, in opting out, they each had done so in a way that was able to verify that they were independent decisions, made by these people, by the fact that it came from their own IP address.

And if I can, to borrow a phrase from Mr. Lanier: Times they are a changin', right?  There was a time where electronically opting out, it was going to be hard to figure out the identity.  In a post-COVID world, think of all the things in our daily life that we're doing electronically.  From signing pleadings in court, to being able to sign up and subscribe to services.  Being able to attest to things electronically.

It -- the world has changed.  And the wet-ink signature is an outdated thing, in terms of being able to assure that something has happened, to assure that we've got the right identity of an individual.  There are -- there are ways to make this happen.

The reason that Kroll and the claims administrator

uses electronic notice and electronic claims submission and electronic portals is because that's the gold standard.  And that's how we get things done efficiently in this world.  So why would we say, okay, if you want to participate, you get to take advantage of the gold standard and the efficient thing.  But if you don't want to participate, you're stuck with this outdated model, where we're not going to provide any assistance for you to preserve your rights.

At a minimum, the opt-out should be able to exercise that right on a level that is equal to the people who are making claims in this case.

And so if the Court is going to allow for this class to be certified, and the settlement to move forward in any way, we would urge that, under 23(e)(4), there be an additional opportunity for opt-out.  And that the opt-out process be revised to allow for electronic submissions.

With that, Your Honor, that is all that I have. Ms. Taylor has attorneys' fees to discuss.  But I think we had discussed addressing my issues first.

THE COURT:  Yes, thank you.

MR. MILLER:  Thank you.

THE COURT:  Gentleman, any response?

MR. KETELTAS:  Thank you, Your Honor.

Mr. Lanier would like the last word, not surprisingly.  So I'm going to go first.  And I hope you'll

permit me a little choreography, because we have the real experts on arbitration here.  And I'm going to say my piece, but I think they're going to back me up a little bit.

THE COURT:  Absolutely.

MR. KETELTAS:  I'd like to start -- I'm going to go in the order of presentation you heard, starting with this question -- or this point that we moved too fast. 12 months is too fast.

Well, you heard about the gold-standard case -- or at least we'll talk about that in a moment -- but T-Mobile. That was seven months, Your Honor.  Seven months from inception of the MDL to resolution.

I wouldn't focus on the calendar.  Because I will tell you, that 12 months felt like three years.  And we had quite a lot of people working hard on this matter, in ways that I think you've already seen.  So I think that's a nonissue.

Second point related to this was what was described as the absence of discovery.  I want to remind this Court of Judge Higginbotham's words in the Union Asset Management case, where he says:  Formal discovery is not a prerequisite for settlement.  Especially where, as here -- and these are his words -- the parties in the district court possess ample information with which to evaluate the merits of the competing positions.

I'm not going to go through everything Mr. Lanier did. There were slides on the incredible amount of work that the plaintiffs did. I will tell you that the confirmatory discovery was also a quite significant process.

I think you've read 13,000 pages were exchanged. Experts were made available. Absolutely, the Court and the parties have ample information to make this decision today.

The second point I'm going to talk about is T-Mobile. And I'm going to wrap into this the concept of value, too. Because I think it came up twice. It came up just T-Mobile, not enough; and the value's not right because of T-Mobile.

We were not counsel to T-Mobile. And we're not privy to information about T-Mobile and its exposure. These cases are cases -- there are reasons -- different reasons people think about settlement and think about how to resolve matters.

But we do note that the final approval motion -- and these are the words in that motion -- describe the relief as unprecedented and high-water mark. In defense counsel language, that means an outlier, right?

We are not at this table because we enter unprecedented and high-water mark settlements. This is a fair settlement. It is squarely in the range of settlements that have been presented to you. If you look at -- I would

direct you to Plaintiffs' papers where they list the range of settlements.  This is squarely within that range.  And that's what should be the focus of the Court.

But one other question is, when you look at a settlement like T-Mobile, and you start to think, what factors could have driven numbers like they settled for?  I will point out that it is reported that T-Mobile was impacted by eight security incidents in that time period: 2015, 2017, 2018, 2019.  Two attacks in 2020 and one in 2021.  And then one in 2023.

So if you want to look for differences, there are differences.  And there might be a reason you might try to resolve a case in a different range.

Also, more sensitive data was in place there.  I know you were told that the numbers were higher.  But this is really an AT&T 1 issue.  We are talking about the -- the only case that involved the same type of data.  And in T-Mobile, there were 47.8 million Social Security numbers. Millions higher than at stake in this case.  There were also driver's license numbers.

And so this is just a place where I'll remind the Court we shouldn't be cherry-picking the top number.  I'm not here cherry-picking the low number.  We look at a range, and we're squarely within that range.

Now I'd like to deal with the arbitration class

waiver issues. And I want to just bring this Court -- this issue had been briefed, I think, now in front of the Court two or three times. It's been briefed on discovery motions. I think there was some briefing on emergency motions. We're going to talk about all that. But I'm going to hit the high points.

The right to arbitrate, like any contractual right, may be waived. Mutually waived. Which is what was done here. AT&T and the parties that chose to participate in the settlement have mutually waived the right to arbitrate.

Actually, Your Honor, let me back up just a bit.

It was talked about how we agreed not to participate in class litigation. If you think we chose to be here, you know, we did not choose to participate in class litigation. Other people made that choice for us.

THE COURT: Let me pause you for just a minute.

Sir, your actions are distracting the Court.

MR. HEBERT: I was agreeing. I apologize.

THE COURT: I want to welcome you to be here, but please don't be distracting.

MR. HEBERT: Yes, ma'am. I apologize.

MR. KETELTAS: And so, you know, we're here because cases were filed. And the question is, then, can we try to resolve those class cases. And the case law is

pretty clear that we can.

This isn't a novel argument that requires the Court to stretch.  In fact, I'm going to make the point time and again today, that if you follow the arguments we've made and accept them, you are in good company with other MDL judges who have done exactly what we're asking you to do.  And, frankly, we wouldn't ask you to do anything different than that.

This is not a novel argument about the right to waive a contractual right.  The Fifth Circuit declared this legal proposition, quote, well established, more than 50 years ago in that Rio Grande Pickle Co. case.

And Rio Grande Pickle Co. doesn't exist anymore, but this rule that you can waive a right to arbitrate, or any contractual right, that's still going strong.

AT&T, and more than 4 million class -- more than four and a half million class members have opted to forego the right to arbitrate, and instead claim benefits under the agreement.

And, by the way, those who have decided -- and those -- those who have decided that they do not want these benefits, and would like to continue on with arbitration, have opted out.  And those include dozens of individuals represented by counsel who are objecting.  Dozens of Mr. Udell's clients have, in fact, submitted opt-outs in

this case.

So it just undercuts this notion that it's difficult; it wasn't possible; you can't preserve your arbitration rights.

Second point here, courts routinely approve class settlements notwithstanding class waiver and arbitration provisions.

We've all talked about the TikTok case.  What's interesting about the TikTok case is, the objectors you just heard from cited for the unremarkable proposition that settlements have to be fair, reasonable, and adequate.  But what they don't tell you is that the case covers their estoppel argument.

The reason:  Because in the TikTok MDL, Judge John Lee ruled that the class waiver and mandatory arbitration provision created, quote, significant litigation risks that, quote, weighed heavily in favor of approving settlement.  That's the TikTok case.

I'm not going to go through all the case law.  It is all very well briefed.  And I'm sure you're going to hear the same from Mr. Lanier.

Next point, though, the Udell objectors -- and that's how I refer to that group, because they have common counsel -- cite no authority for the proposition that a party is prohibited from entering a class settlement because

it has an enforceable class waiver and arbitration provision.

The case law here that is cited by Objectors, it doesn't involve class settlements, nor arbitration.  And, indeed, the key cases they cite couldn't be further away from these contexts.

Zedner case.  It's a criminal case finding no judicial basis for estoppel based on Speedy Trial Act arguments.  New Hampshire v. Maine.  This is a case that could only exist between New Hampshire and Maine.  A debate about the boundaries of the Piscataqua River made in 1740.  They were debating whether those boundary arguments still hold.

And the Davis case, which does -- stands for the unremarkable point that a party can't claim the same judgment is both valid and invalid.  These are not class cases.  They're not MDLs.

But that brings me to the most important argument they make, and the least supported.  It is the loneliest paragraph in the Udell objection.  The one at Page 5 that says:  The existence of an opt-out provision is meaningless, because requiring those with an arbitration provision to opt out would violate The Rules Enabling Act.

That paragraph, why is it lonely?  There's not a single citation.  There's -- you don't even get an "Id.,"

Your Honor.

This is not a tough issue.  There are, however, cases that recognize our position.

The Farmers Group case, Eastern District of Pennsylvania, quote:  Neither the defendants' nor the plaintiffs' class insisted on arbitration.  If individual plaintiffs choose arbitration, they may do so at the cost of opting out.  Choose to opt out, they will have their day in court in the form of their choice:  Arbitration.

And dozens of Mr. Udell's clients did just that.  So this arbitration class waiver issue -- again, many more cases in the brief -- super clear.

And bottom, I think you heard -- there was an undercurrent of an argument that the rules should be different for AT&T.  AT&T -- you know, because they have been so successful with arbitration in the past.

These objectors are not the first people to make those arguments.  As you saw in our briefing, they were made in In Re: AT&T Wireless Data, the Northern District of Illinois case we cite.

And just as here, a small number of class members objected to the settlement as inconsistent with arbitration and class waiver provisions.  The Court said the objectors are mistaken in asserting that an arbitration agreement prevents the parties to the same from ever reaching a

subsequent agreement.  Class members who wish to enforce their right to arbitration could have done so by opting out.

The last point -- and -- and I just give this for color, Your Honor.  We made many trips through the JPML with Mr. Udell's clients.  Every single one that we tried to transfer there was an objection to.  And the objection is: I never agreed to participate in a class lawsuit.  My claims are individual.

And this is what the JPML said not once, not twice, maybe five or more times:  This argument misunderstands the nature of the MDL.  This MDL, like many others, includes both individual and class-based actions.  Transfer does not force a plaintiff to litigate his claim as a class action, as we've previously upheld in this MDL.

Before I move on to the opt-out, I'm going to give -- do we -- Mike or Meredith, would you like to speak to the arbitration questions?

I'll be right back, Your Honor.

THE COURT:  Sounds good.

MR. MCTIGUE:  Good to see you again.

THE COURT:  Nice to see you again.

MR. MCTIGUE:  Very briefly, before I turn to my partner who will talk about AT&T's arbitration agreement.

Heard a lot of talk about wet signatures.  A lot of focus on wet signatures.  We've cited for you, you know,

the case like the In Re: Deepwater Horizon case, which is directly on point.  Fifth Circuit has said there's no problem with wet signatures.  But why is it particularly important here?

You heard something about mass arbitration.  Well, mass arbitration's a relatively new phenomenon out there.  And the way that mass arbitration works for these lawyers, is that they try to gather as many claimants as possible, as quickly as possible, to put pressure on a defendant.  Typically that's through social media campaigns and the like.

And typically folks purportedly sign up in two or three minutes, because they're enticed through these advertisements, through Facebook and the like, to jump on a campaign, potentially.  Oftentimes, they have no idea that they're signing up for something.  They have no idea that their names are potentially being used in demands seeking arbitration rights.

And that's why it's critically important to make sure that these people understand their rights and understand what they can potentially get in a class settlement.  And not have lawyers quickly amass opt-outs and send them in to -- in connection with class settlements.

This has all been documented in a recent Chamber paper that we cite on Page 16 of the omnibus brief,

Footnote 4, that you can look at some of these tactics.  The attorney general is looking into these tactics because of consumer protection issues that the A.G. of Georgia is looking at here.

I do want to make one additional point.  There were mass opt-outs that were sent in a connection with this.  And what I mean by that is, some of these lawyers who want to seek mass arbitrations collected a whole host of opt-outs and sent them in to Kroll all at once.

We have discovered, in connection with one of those mass opt-outs, that there are six deceased individuals who purportedly submitted opt-outs.  Three died before the these opt- -- before the -- the so-called electronic signatures were added to the opt-outs.

THE COURT:  That's in this case?

MR. MCTIGUE:  That is in this case.  We've already discovered that.  That shows you why we need to make sure these individuals know what their rights are, and know what they're potentially signing up for.  Because we can't always trust this situation.  Especially in connection with mass arbitration.

So we submit that the law is clear on this point.  That we're entitled that -- to seek wet signatures.  And here, especially, it's so important.

I'll turn it over to my colleague, my partner,

Meredith Slawe.

THE COURT:  Thank you.

MS. SLAWE:  Hello, Your Honor.

THE COURT:  Hello.  Good afternoon.  Glad to have you here.

MS. SLAWE:  Thank you so much.

Just a few very brief points, if I may.

THE COURT:  Please.

MS. SLAWE:  First, Objectors raised the specter that AT&T could hypothetically face some massive number of mass arbitration filings absent this type of class settlement.  And they cited some astronomical figures about the types of AAA arbitration administrative fees that AT&T might, under that circumstance, owe.  I think they said something into the billions of dollars, which is obviously staggering.  But that's not accurate, and I'll tell you why.

First, Counsel relied on an older, and highly distinguishable case:  The Abernathy v. DoorDash case, as purported support for that pronouncement.  They also cited several provisions in AT&T's arbitration clause, pointing to fee provisions and AT&T's obligations under that agreement.

But Counsel apparently stopped reading AT&T's arbitration agreement about midway through.  Because in the very same agreement, there's an entire section: Section 1.3.2.7 of the AT&T agreement, that outlines

specific procedures that the parties agree to when there is a mass arbitration.

That is, when there's 25 or more substantially similar claims, noticed or filed by the same or coordinated counsel. And at that moment, these fees become diluted substantially, because the parties have agreed to streamline procedures for how those matters will proceed and how fees will be assessed.

And so, they agree in those scenarios to substantially limit the types of fees. There's no potential exposure for the types of fees that Counsel wanted to make this Court believe might be at stake here.

And in addition, Your Honor, since the DoorDash decision, the AAA, on its own, has implemented what they called supplementary rules for mass arbitration filings; that they themselves contain procedures for staging certain fee obligations, as well as an updated fee schedule, all designed to mitigate against the very type of fee leverage that gets used in these types of matters.

And so, I would ask Your Honor to disregard the notion that somehow some staggering arbitration fees, you know, created some, you know, activity on AT&T's end. Because that's just not the case whatsoever.

Second, under the objectors' theory, the only way that individuals could seek relief against AT&T on these

claims was to file individual arbitration demands.  In other words, each person would have to affirmatively initiate an independent legal action, potentially obtain their own counsel and the like, in their own name.

Here, because Plaintiffs chose to initiate punitive class action litigation in court, AT&T has offered, in this specific context, the opportunity for folks to secure relief without having to go through their own individualized process, with a strong likelihood that they would ultimately recover nothing on these speculative claims.

The settlement is highly beneficial.  But if folks want to pursue arbitration, by all means.  You've heard there is an opt-out process; that the Court preliminarily approved.  And many did.  And many, as the record will reflect, complied with the procedures, complied with the wet-signature requirement.  And they go along and arbitrate their claim.  And AT&T looks forward to arbitrating legitimate disputes with legitimate customers that did so.

Thank you very much.

THE COURT:  Thank you.

MR. KETELTAS:  Your Honor, I'll be brief.  The wet-signature point was dealt with, which was one of the other points I was going to address.

I do want to just now back up one last time and

point out that this team was not assembled to settle this case. We, too, got a call from Judge Furgeson. And Mr. Lanier put up, you know, a picture of a wall. We were going to be that wall.

We did not coordinate on this. He put up a list of four cases that went very badly for plaintiffs. The lawyers at this table were involved in three of those. One of those cases, Marriott, Ms. Ghannoum and I are co-leads. And that is still going on, after six years, two trips to the Fourth Circuit, and class certification reversed twice. So these are not easy cases. This is a very good settlement.

I may not see you again up here. I don't know. In case I don't, I did want to express AT&T's appreciation for the Court's careful oversight throughout this case, through the team that you put together and the special masters: Judge Furgeson, Craig Ball, and Richard Arsenault. You fostered an environment here where zealous advocacy could coexist with cooperation and candor among the parties. And I think it has benefited the class here and resulted in a very good agreement.

THE COURT: Well, thank you.

MR. KETELTAS: Thank you, Your Honor.

THE COURT: I appreciate that.

MR. LANIER: May it please the Court.

THE COURT:  Please.

MR. LANIER:  I would accuse Mr. Keteltas of brown-nosing with the Court but for the fact that I agree with him.

Your Honor, much of what I was going to say has been said.  I won't rehash.  98 percent of the argument that was made is in the papers.  And so I thought I would just take these two notebooks that have all of the other arguments and read them to you on the record right now, but decided against that as well.  So I'll let the papers speak where the papers speak, knowing the thoroughness of you and your lawyers, to deal with that.

I'm a checklist guy.  So I looked at the checklist that I've made of the arguments, and I just want to make sure everything's covered.

THE COURT:  Uh-huh.

MR. LANIER:  Typicality and representation.  It's covered in the papers and it's been covered by counsel for AT&T.

The benefits being low.  I want to rejoined on that; because there's a mistake that's been made on the record and I'd like to clarify it.

What the objectors have done is combined AT&T 1 with AT&T 2.  AT&T 2 did not have the data breach we had.  Didn't have the Level 1 critical information we had.  And

did not get the same amount of money per plaintiff that we got per class member.

So if we isolate out AT&T 1, and not dilute it down, we're looking at something around $2.66 per potential claimant.

Now let's compare my 2.66 to MGM:  $0.59.  Capital One:  $1.99.  Equifax:  2.60.  Real good, but still not up to our 2.66.  Yahoo!:  $0.60.  Experian:  $1.47.  Anthem:  $1.45.  Target:  A dime, $0.10.  Home Depot:  $0.21.

Our AT&T 1, at $2.66 a head, it's good.  It's great.  It is gold medal winner this day and age.

The next argument they made -- and it was put in just in the middle of things, but it stuck out in my mind.  He said you are the last hope for these people.  That's wrong.  They all had opt-out opportunities.  Every one of them.  The law firm that's making this complaint had dozens opt out, with wet-ink signatures.

They absolutely know how to opt out.  Their five objectors that they have in this case did not opt out.  Okay, that's fine.  But you're not their last resort.  They have legal counsel.  They can't say, yeah, but we couldn't understand how to opt out.  They have lawyers and they chose not to opt out.  Those lawyers represent people who have opted out.

When we negotiated this, Chris Seeger and I were so clear in our negotiations with AT&T:  We must have the right to opt out.  We've got to have that right for anybody who wants to enforce their arbitration provision.  We've got to have that right.  It's got to be a blanket right.

Now, wet signatures, absolutely in this case.  I won't always say in every case wet signatures are necessary.  But in a case like this, it's absolutely necessary, because it forces the lawyers to talk to their clients.

You can't send out, with the push of a button and an algorithm on a computer, something that goes out to everybody in your database.  You've got to talk to them and explain to them why.  If you don't do that, people won't understand what benefits they're waiving by opting out.  And they need to understand that in this case, because there is a huge wall that they've got to cross.

And so that's what we agreed to.  It's the law.  It's Deepwater Horizon.  That -- you can't get more Fifth Circuit than Deepwater Horizon on this stuff, speaking as a lawyer who had plaintiffs in Deepwater Horizon.

The timing issue.  That's been dealt with.  I don't need to rehash it, but I do have to say that the timing on this settlement was entirely Judge Furgeson.  Love it or hate it, he gets all the credit.  Or he gets the blame for bringing us to the table.

I never would have come to the table if he hadn't called me.  But he's the reason this whole train came into the station in the timing that it did.  And I applaud him for it.  I don't condemn him for it.

Opt-outs have been dealt with.  The bottom line is, there is -- we're going to have four and a half million people, if you certify this, who benefit from this directly, by cash money back to them.

Lots will benefit because of the changes AT&T has made.  Everybody.  But four and a half million, there is no way those four and a half million people would have found lawyers and filed arbitrations.  They only get that benefit because of what you've done in your court with this.

Thank you, Your Honor.

THE COURT:  Thank you.

Anything further?

MR. MILLER:  Briefly, Your Honor.

Four and a half million have made a claim.  And 90 million sat home and, in silence, got their contract rewritten.  That's what this settlement agreement does.

Let's focus on the opt-out.  We've heard a couple different things.  We heard we need the wet-ink signature because we need these folks talking to their lawyers; because we don't want to just push a button and have a decision made.

That's what the claimants did.  That's how we got the four and a half million claimants.  They got an e-mail, and they pushed a button and they got to be part of this class.  Why do the opt-outs need to be treated differently than that?

We were told that we need to have the opt-outs do a wet signature because -- to be clear, no one that I'm representing; not Mr. Udell's people -- the deceased and the whatever else that that came in:  Well, we got told this morning the claimants are turning in fraudulent claims.  Okay?

So we need to vet the claimants who submit electronically, and then we'll figure out which one of those are fraud.  But watch out for these opt-outs, because we got six that came in that were kind of shady.

What's different about them?  Why can't they be vetted in the exact same way that the claimants get vetted?

Again, trying to put -- as part of the settlement, they are trying to put the claimants at an advantage; the opt-outs at a disadvantage.  All we're asking for is an equal playing field for those two.

In terms of the novelty, the argument that we heard from AT&T was this is not a novel provision.  And what I would encourage, Your Honor, as you look at these cases, look for the mutuality.  Look for the mutuality issue in

terms of when that was actually litigated. That the issue was that not only did the defendant have a right to arbitration; not only did the defendant have the ability to go ahead and waive class actions, but that the individuals had an individual right. And it needs to be specific.

What AT&T has done here is drafted a very customer-friendly agreement. It's great. I like to see that. But in doing so, by including the word "participate," it broadened the circle. This is not a situation -- they could have drafted the contract to say: Customer, you will not initiate a class action lawsuit against us. And, AT&T, we will not initiate a class action lawsuit against you.

That would be a different story. We'd have something different to talk about. Maybe nothing to talk about. But that's not what they wrote. They said: We will not participate in a class action with you. And that is what they're doing.

Rightly or wrongly, they got here. I -- sure, they didn't ask to get sued. They didn't ask for the data breach to happen. They didn't want to be here. But they made the conscious effort not to file the motion to dismiss based on their class waiver.

They made the conscious decision to engage in class settlement. They have joined in the request to have this class certified and to get the settlement approved.

It's the mutuality of the right that was given to the absent class members. That is the -- to the extent that there is a novel piece, that is the thing that is not covered by the case law. And what you don't have are cases saying: Okay, when you've got that, it's okay to rewrite the contract of the absent class members.

There are cases that say: Sure, you have an arbitration provision, and you can opt out and still exercise your arbitration provision. That's not directly what we're dealing with. I think there's been some conflating of the arbitration issue and the class waiver issue. Because those are two separate things.

Here, they have turned the class waiver, the individual right -- the right to individual litigation on its head. And basically put it in a position to say: Customers, you never have the opportunity to actually exercise this contractual right.

Because of that, the contract should be enforced. Should not use Rule 23 to rewrite it.

And in this situation, what we have here, these plaintiffs, these named plaintiffs, they are not typical. They are not representative of the people who are holding on to individual rights to litigation. These named plaintiffs, their contract is now different. And for that reason, they cannot represent the absent class members.

Thank you, Your Honor.

THE COURT:  Thank you.

MR. LANIER:  May I?

THE COURT:  Please.

MR. LANIER:  Thank you, Judge.  I want to make sure I said something right on the record.

Our 2.66 is per class member, not per claimant. The per-claimant amount is more, because not everybody made a claim.  That's one.

And then I'll answer his question of why should the opt-outs be treated differently on electronic signature. Because if you opt out, you've got risks that you don't have if you take the money.  If you take the money, you get the reward.  If you're going to refuse the reward, a lawyer or someone needs to explain the risks.  That's the difference.

THE COURT:  Thank you.

Anything further from Objectors on that point?

Oh, I'm sorry.

MR. KETELTAS:  No, Your Honor.  I was just going to say nothing further.

THE COURT:  Thank you.  I know we have an individual who'd like to speak.  Is there any other attorney -- I'm so sorry, I forgot about you.  I've been looking forward to it.  Please take your time, and I apologize.  Glad to have you here.

MS. TAYLOR:  Good afternoon.

THE COURT:  Good afternoon.

MS. TAYLOR:  May it please the Court.

I am Amanda Taylor, with Butler Snow, on behalf of the Udell objectors:  Mr. Gherman, Mr. Johnson, Ms. Kaye, Mr. Caruso, and Ms. Bonner.

THE COURT:  Glad to have you here.

MS. TAYLOR:  Thank you, Your Honor.

As I believe you know, I'm going to address the attorneys' fee issue in this case.  My co-counsel, Mr. Miller, made clear that our baseline position is that we respectfully contend the Court should deny certification and, in any event, should deny approval of the settlement. Both of those would lead to no approval of the fees at all. So that is the primary position.

I am going to move on from that and assume, if the Court were to certify and approve settlement in some form, then it is imperative that the Court take a rigorous analysis of the fees and ensure that they are reasonable.

So just high-level points.  The class counsel here are seeking to deplete an already inadequate fund with a $59 million fee award.  That is a huge award of fees, and we're going to talk about some comparators to that.

This would be windfall profits, based on what has happened here and the value that has been attained here.

And class counsel simply have not provided this Court the information that you need, the supporting documents that you need, to be able to undertake the test set out by the Fifth Circuit.

So we all agree that the governing standard, as this Court opened this morning reiterating, the governing standard is Union Asset Management Holding case.  But we disagree, apparently, on what that case says.

I think it's pretty clear, Your Honor.  It is you can use a percentage method, but only if you meticulously analyze the Johnson factors in the context of the percentage being requested.  This has been referred to as a blended method in the Fifth Circuit.

Class counsel has admonished us for saying:  Well, you should do a lodestar check.  It's semantics, Your Honor.  You are well aware that Johnson looks at the same factors as are used in lodestar.

So we're going to go through those factors, each one, and talk about them.  But I don't want the Court to be confused that we are trying to get away from Union Asset.  We are seeking the Johnson crosscheck, which, again, relies on the same factors as lodestar.

So the case that I think provides very helpful guidance, in just terms of practically, as a district judge who has to make these really hard decisions, how do you walk

through this, is the In Re: Vioxx case.

That's been cited by both sides.  It's a fellow district court.  It's Eastern District of Louisiana, 2018. But the Court there gives us a very clear three-part analysis that I think is instructive.

First, you determine the value of the benefit received by the claimants and you set a benchmark.  That's your starting line, the benchmark percentage.  Then you apply the Johnson factors to determine whether that benchmark should be adjusted up or down.  And then you conduct a, quote, rough lodestar analysis to crosscheck the reasonableness.

So again, three parts:  Benchmark percentage, Johnson analysis, which requires rigorous and meticulous insight and analysis, and then the rough lodestar.

So starting with the benchmark.  In Vioxx, which, of course, was a pharmaceutical company class action, there was ultimately a $23 million settlement.  And the class counsel requested 32 percent.

To determine whether 32 percent was the appropriate benchmark, the Court started with the policies, saying:  The Court shall not simply rubber stamp the percentage requested by class counsel.  The Court must scrutinize and attempt to independently arrive at a justified and reasonable percentage, that is appropriate

under the specific circumstances.

That is an excellent statement of how this test works.

The Court then went to empirical data; citing both Mr. Fitzpatrick, the class counsel's expert, and the Eisenberg and Miller paper, which is the other notable empirical data.

Under those two papers, including Mr. Fitzpatrick's, the averages cited for the relevant time periods in the Fifth Circuit are between 23 and 25 percent. So we're already nearly 10 percent lower than what the class counsel seek here, just, just looking at empirical data.

Then, in Vioxx, the Court goes on to talk about scaling. Or what you know maybe as the mega-fund rule. And we are all familiar, that as the settlements increase in size, there are good policy reasons for the percentage, the starting benchmark, to come down.

Because it's a law of diminishing returns. And the policy, the class action, they are supposed to benefit the claimants. It is not supposed to be a windfall to counsel. And at some point, the settlement amount becomes so big, and the class counsel have not done as much work, dollar for dollar, that it just makes sense to bring that number down accordingly.

THE COURT:  Do you have anything to quantify that?

MS. TAYLOR:  Well, in Vioxx -- and I was actually about to get to that exact thing, exactly how that worked in Vioxx, because I think it provides a good example.

So we've talked about the four things the Court did.  First, under this mega-fund rule, to answer your question, they said, well, the overall settlement there was actually pretty low at 23 million.  So in Vioxx, that would be a factor that justifies a higher percentage.

Here we have the opposite.  We have 177 million, a mega-fund case, so that's a downward.  So just starting from where they're at, the -- the scaling factor in Vioxx would support up; in this case, supports down.

Then in Vioxx -- and this one's really important here -- the Court looked at the fact that any remaining funds not paid to class counsel would go back to the defendant.  And so it would benefit the malfeasor in that case, and it would have no impact on the plaintiffs' recovery.

Well, here, whatever you award to the class counsel comes out of the pockets of the claimants.  AT&T has no dog in the fight.  That's why we don't have a real adversarial process on fees at this point.  They're not getting any of the money back.  The money either goes to the claimants or it goes to class counsel.  And so they are asking you to dilute the value of the settlement fund to pay

them.

Again, in Vioxx, that supported, if anything, an upward adjustment. Here, it supports a lower one.

In Vioxx, similar to this case, the Court noted there were no depositions; there was limited motion practice, and there was no trial. It was almost all clerical work. So in both cases, that's lower. Something that supports a lower percentage. We're now Vioxx two up, one down. In this case, all three factors down.

And then the Vioxx court noted that the true value of what class counsel added there was the settlement. They achieved a settlement. That is also true here. And we don't deny that they've done that. But in Vioxx, it came after 12 years of litigation and several years of negotiation.

This case is different. On the timeline, you've heard a lot about the one year, six months. Undeniably, this was a swift process. And I'm going to loop this back why that timing matters, really, to another factor.

But in Vioxx, again, fourth factor supported up; here it would support down. We say all four of the Vioxx factors would support down. And yet there, after a request in the 30s percentage, the Court arrived at 18.5. Even though three of those really would arguably support higher. But the Court said: I've really got to be critical about

what's being asked of me here.  And 18.5 was the number.

Given the factor-by-factor analysis, our position is we must be at a lower number than that.  In our objection we've said 15 percent would be a more reasonable benchmark, a more reasonable starting place.

And the Northern District of Texas in the Chung case notes -- it's, I think, Footnote 51 of Chung -- that 15 percent is right within the reasonable amount used as benchmark percentages in the Fifth Circuit.

I also want to note at this point that the argument you've heard from Mr. Lanier about the differences between AT&T 1 and AT&T 2 are important.  You have now been invited to analyze those separately, and have been told that AT&T 2 did worse than AT&T 1.

And so the global request --

THE COURT:  Did I hear worse?

MR. LANIER:  No.

THE COURT:  Okay.  I don't think I heard that.

MS. TAYLOR:  I'm sorry if I misunderstood their argument.  I understood their argument to be our AT&T 1 is really being dragged down because of these bad claims in AT&T 2.

THE COURT:  Gotcha.

MR. LANIER:  No, no.

MS. TAYLOR:  I will let you respond to that, for

sure.

But to the extent they have invited you to consider them separately, and you have to set a benchmark percentage for AT&T 1 and AT&T 2, I do not think you have to accept their invitation that we just both get 33 percent no matter what. I think they should be analyzed for the value attained in each separate class.

We've -- you've already heard a lot about the value attained. And our -- you know, Counsel obviously disagree on the comparisons of T-Mobile and some of these other settlements. We've briefed that. I'm not going to rehash that, other than to say, in T-Mobile, you know, it is important to remember the percentage was only 13.08. 13. That's even less than what we've said in our objection could be a reasonable starting place.

The fees there awarded were 45 million. Again, less than the 59 sought here. They proved up over 11,000 hours of time. We're going to talk about the fact that we really have no evidence of time in this case. And they say the breaches and the risk was even worse than AT&T, yet they took lower fees when they had higher expectations.

When you compare not necessarily the settlement value of T-Mobile, but the fee award, the fee award there is much more conservative for a much larger settlement. So that gives this Court a really good comparator that 59

million is not reasonable.  And as you know, responsibility of the award is the name of the game.  That is what the guiding star is.

So after you set the benchmark -- again, our position is 15 is a reasonable starting place -- then, of course, you go to the Johnson factors.  And this is where -- I'm a law lawyer.  Some people just, you know, call us nerds, in a shorthand.  But I really do believe that sticking to the case law, and what the Fifth Circuit has told us under that case law, is the best place to be.  And so I'm going to try to anchor my argument to what we know from the cases and the law.

Starting with the first Johnson factor of the time and labor required, there's been a lot of vague statements about a lot of time was required.  It would be imperative to see the billing records, that this Court ordered from the outset be maintained in this case, in order to establish the accuracy of Counsel's argument.  Johnson said, quote:  Hours spent -- not just we were busy -- but the hours spent are a necessary ingredient of the analysis.

And so the way that we know the hours spent is to look at their billing records.  Courts do not just accept counsel at their word of saying:  We promise it took a lot of time.  You must engage in a rigorous analysis.

Vioxx, again, provides such a helpful example.

There, the Court appointed a Fee Committee.  A separate committee to analyze the fees.  And the Court also appointed a CPA named Philip Garrett, who was monitoring and reviewing all of the billing records that were submitted on a monthly basis.

Ultimately, after the CPA and the Fee Committee analyzed, in detail, all of that supporting documentation, they actually called before the committee the counsel to come be examined in support of their fees.  They had rigorous analysis.

And at the end of all of that, the Fee Committee reported to the Court:  Yep, we think 32 percent is okay.  We think 7.14 million.  And we think a total of 14,000-plus hours have been incurred.

Even after that, the Judge said:  I'm not convinced.  The Court did its own rigorous analysis and said:  No, it's not 14,000 hours; it's 10,200 hours.  And, no, 32 percent is not a reasonable starting place; it's 18.5 percent.

And so that shows you the level of detail that is being done by other courts to make sure that we are arriving at a reasonable number.

Both sides have also cited cases like McCumber and Jones.  Those are briefed.  Class counsel cites these and others as examples of, look, they got 30 percent.  They got

30 percent, with no explanation that the cases show, when you go to the opinions, of what the Court did to arrive at that number.

And, for example, in McCumber they has 2,485 hours at 905 an hour.  They did a lodestar crosscheck.  That supported a $2.25 million award -- far lower than here -- at a 30 percent.

So, sure, you can say 30 percent.  The case isn't at all the same.

Similarly with Jones.  And we've got all this in our briefing, so I'll move on.

But in terms of the time and labor required, you are not going to find anything in class counsel's original declaration or supplemental declaration, or in Mr. -- Professor Fitzpatrick's declaration, that tell you anything real about the hours.  We had original declaration in November.  It was:  Thousands.  That's it.  Thousands. 9,000?  2,000?  What does "thousands" mean?  We have nothing in the declaration.

Now, suddenly, in January, we get a supplemental declaration that says up to 16,000.  With no breakdown.  How did we go from thousands -- maybe, let's say, 3,000 -- in November, to 16,000 in January, with no supporting documentation, no breakdown in the declaration?

One thing they say is:  Well, we're going to have

an appeal.  Well, Judge, I'm an appellate lawyer.  You don't get appellate fees unless you win on appeal.  So it's a bit presumptuous to say you should tack on 10,000 extra hours for an appeal that we may or may not prevail in.  They also didn't cite any case that supports that analysis.

Again, without any supporting documentation, we have no idea where they're starting on the amount of hours incurred, allegedly, or what would be reasonable for this Court to consider.  Or any ability for the objectors or this Court to analyze:  Well, he's -- these hours actually supported the benefit of the class.  These didn't.  These were merely clerical.  These were duplicative.  All of the things that were required for a fee analysis.

I'm trying to see what I can skip that's been covered, Your Honor.  I'm sorry for the pause, but I'm trying to save time.

THE COURT:  No, I appreciate your advocacy.  And take your time.

MS. TAYLOR:  So at a minimum, our request is that the Court would hold off.  Even if you were to certify the class, and even if you were to approve some version of the settlement, that you would hold off on making a fee decision until you first require that class counsel produce the supporting documentation.

I'm sure you've seen some discovery squabbles

about us attempting to get that information, and them refusing. I will say, because they include in their supplemental declaration that that somehow has added to their fees, I think it should be clear, from what we have filed, that we attempted to confer before there was ever a need to do anything. And that didn't pan out.

But we have sought that information. They have refused to provide it to us. There's been a light touch of: If the Court demands, we'll give it to you in camera.

Our request is that it be produced to the objectors so that we, too, have a meaningful opportunity to review and analyze. As we've said, because there is no true adversarial process on the fee award between AT&T and class counsel, the objectors' counsel are here, on behalf of the absent claimants, and we do think that is part of our task, to make sure that the fee award is reasonable and to help the Court in arriving at that number.

Moving on to some of the other factors. The one that Johnson says is most critical: The amount involved and results obtained. I couple that with Number 12: The awards in similar cases. And Number 5: The customary fee for similar work in the community.

Again, we've already discussed how valuable is this really. As our objection sets out, and you've heard multiple times today, we do not believe that this settlement

is anywhere close to the value of T-Mobile, or the several other data breach class action settlements that we've put before the Court.

But at the end of the day, when you look at what their declaration says, they've said this is very valuable. And there are all these other cases, and they get this percentage.

But what they don't do is break down some of the things we've been talking about:  About how much work was actually required, what were the hours, what were the rates, how long did the litigation go.  You know, and actually do a meaningful comparison.

And so we can't say, quote, similar cases.  Or similar work done in other cases, when we don't have an apple-to-apples analysis of any of those other factors.

And this is really where Fitzpatrick's declaration falls short.  If you go through the entire declaration, as I've done more than once, it will -- really boils down to the single factor of this is a contingency fee case.  And because it's a contingency fee, 33 percent is reasonable. That's the analysis.  That's the Alpha and Omega of his opinion.

That's not enough if you don't know what led to the 30 or 33 percent in any of these other cases.  And he cites a big-string cite of cases, and the only parenthetical

information given is the percentage.  That is completely meaningless when you don't know the circumstances that led to the percentage.  It's directly contrary to what Johnson requires.

I'll quickly address Factor 4:  Preclusion of other work.  Today we heard some argument about that.  Some alleged cases that they couldn't take because they were working on this and another matter.  There's just nothing in the record.  There is no evidence to support that factor.  No basis on which to increase the percentage based on that factor.

We've heard about the novelty and difficulty of the questions.  As this Court knows, there have been many data breach class actions before this one.  I understand that some changes in technology are going to require some new fact patterns to think about.  But this was not issues of first impression, setting new law.  That's the type of thing that Johnson talks about when looking at the novelty and difficulty.  And again, there's no actual evidence in the record to support that analysis.

The undesirability of the case.  I want to make sure we talk about this one.

I heard from Mr. Lanier:  Yes, I agree.  Lots of lawyers would love to have this case.  And I agree with him. There are lots of plaintiff's lawyers that would be thrilled

to have had this case and be asking the Court for $59 million.

This was not an undesirable case. I don't even think they really contend it was undesirable. What he said is some lawyers don't want to do hard work. Some lawyers don't want to have to look at data and computer stuff. That's not the standard.

What Johnson refers to is -- is this: Are you taking on a social hardship. Are you in a unpopular civil rights posture.

Chung gives the example of: Are you Atticus Finch and there's a warlock coming after you for being the hero when you're representing an unpopular party.

That is what's undesirable and could be a reason to reward counsel. Not this case is on a fast-track to settlement. I know that there's really very low risk of a zero-dollar payout. Because essentially, by the time I'm involved, we're going straight to settlement. And that's where the timeline is important.

How long is it that Counsel lived with, quote, this big risk in this case? They didn't take on years and years and years of litigation and expenses, never knowing would there be a favorable outcome at the end.

Thanks to Judge Furgeson. I won't disagree with that. He did a great job. He got this to settlement

quickly. But what that means for Counsel is, in terms of the undesirability or the risk that they took on, it was a very finite period of time. And then they knew that no matter what they did, we were heading towards a settlement where they were going to get paid. It's not a zero-dollar payout.

I will just say one other note in the mega-fund cases, was that even Mr. Fitzpatrick recognized 17 to 18 percent as the typical number. He doesn't think you should follow it, based on inflation. But it's undeniable that mega-fund cases have seen lower percentages. And again, we urge you to start the benchmark lower and then look at these factors.

Under Vioxx, the third step I mentioned is the rough lodestar. Because we don't have any documentation here. Not a single page. There is no way to conduct that. We have no idea what the hours are. We certainly have no idea what the even claimed rates are.

But if you looked at Vioxx, which approved a $417-an-hour rate, and you say: Let's double it. Let's say $800. All the people involved from, you know, law clerks, and all the way up to Mr. Lanier, we're going to average it at $800. And even if you took their 16,000-hour number and you said, I -- I think that's real, 800 times 16,000 hours would be 12.8 million.

That pales in comparison to the 59 million they are seeking.  That is a lodestar multiplier of 4.6.  That is excessive, Your Honor.

So without any supporting documentation to do any kind of crosscheck against what is actually being requested here, whether it's under Johnson or lodestar or a combination, they have not met their burden.  It is their burden to prove reasonableness, and they have not done it.  We strongly encourage the Court to require that they provide the documentation to allow for that analysis to happen.

I will just -- I wanted to close with the holding in Bluetooth.  Which comes from the Ninth Circuit, but the holding is instructive nonetheless.  Because what we don't want here is to skip over this important step, go all the way to the Fifth Circuit to reassert this argument, and then find ourselves back here in two years.

What the Court in Bluetooth said was:  We agree with Objectors that the District Court needed to do more to assure itself and us that the amount awarded was not unreasonably excessive, in light of the results achieved.

Notably, the District Court made, one:  No explicit calculation of reasonable lodestar; two:  No comparison between the settlement, attorneys' fees, and the benefit to the class, or degree of success in the litigation; no comparison between the lodestar amount and a

reasonable percentage.  On this record, we lack a sufficient basis for determining the reasonableness of the award.

The Court said:  We encourage courts to guard against an unreasonable result by crosschecking their calculations.  And in the absence of an adequate explanation of the award, we have no choice but to remand the case to the District Court to permit it to make the necessary calculations and provide the necessary explanations.

That is the opportunity we hope this Court will take today.

Thank you.

THE COURT:  All right, thank you.  Appreciate hearing from you.

MR. LANIER:  May it please the Court.

THE COURT:  Please.

MR. LANIER:  Thank you, Judge.

Lodestar and Johnson are different.  The Ninth Circuit case she just cited was lodestar.  While she has read Professor Fitzpatrick's report, evidently -- declaration several times, she may have missed or disregarded the language where he explained the difference between lodestar and Johnson.

In fact, on Page 9 he said that:  Courts came to dislike the lodestar method because it's difficult to calculate the lodestar, is what the Ninth Circuit was saying

to do in that old case.  Said:  Courts had to review voluminous time records and the like.

That's what happens under lodestar.

Then it says:  Second, and more importantly, Courts came to dislike the lodestar method because it did not align the interests of class counsel with the interests of the class.  Class counsel's recovery did not depend on how much the class recovered, but rather on how many hours could be spent on the case.

Certainly, if we were lodestar lawyers, that's the way cases don't resolve for a long time, without a whole lot of work.  Because that's the way legal fees are determined. But if, in fact, as Judge Fitzpatrick has said, we've got an opportunity to see a number of other cases, where the fees far exceed one-third, that we're asking for here; 40 percent fees in cases all over Texas:  Northern District, Southern District, Eastern District, and more.  And those are on Pages 14, 15, and follows of his report.

So the Johnson factors are here.  We put in the hours that have been spent, and reasonably anticipated to be spent.  Candidly, I don't know any of us that, in 2026, are working for $400 an hour, in major litigation in the United States of America.  Because that's just not the way this stuff is done, with all due respect.

Maybe Butler Snow.  But I doubt even Butler Snow's

partner billing rates are at $400 an hour.  I'd be interested to know if they are.

Next point:  Vioxx, really?

In 2005, I tried the nation's first Vioxx case. Carol Ernst was my client.  Her husband Bob had died taking the drug.  I hit Merck for $258 million.

Chris Seeger, my co-counsel here, tried the nation's second.  Chris Seeger, my co-counsel here, was also one of the co-leads in the MDL in front of Judge Fallon. While I was fighting in state courts, Chris was fighting both in the MDL, and as one of the leaders in the state court litigation in New Jersey in front of Judge Carol Higbee.

Chris Seeger and I together tried the two Vioxx cases that were combined up in New Jersey.  We know Vioxx and we know it cold.  Let me supplement some things that were not on the record.

First of all, the 12 years of litigation, we were the ones doing the litigation.  We were the ones that deposed the president of Merck, the president of Merck's research arm.  We were the ones who deposed the vice president of Merck.  We were the ones who tried at least 5 of the 15 cases or so that were tried.

We certainly know Vioxx.  And that settlement that came at the end of her, quote, 12 years was nothing more

than the third-party payor's settlement, where they didn't take one single deposition; they didn't do diddly-squat, in my opinion.  Now, that's my opinion.  And if they're my friend, I apologize for saying that on the record.

But I'm just telling you, Judge Fallon put that off and put that off and put that off.  And then finally, at the end, that settled.  But he had already awarded over 300 million in fees, in one situation, with one group and another.

He had already awarded people getting their retainers, because they were also getting retainers in those situations.  It wasn't simply the fee.  And even the third-party payor case was a case where they had retainers, I believe, at least.

But regardless of whether they did or didn't, it was a situation with no trials, no depositions.  And it was a residual settlement at the end of a $5 billion-plus settlement, where well over a billion dollars, I believe, had gone out in fees, whether through retainers or through MDL-assessed fees.  It's a very, very, very different situation.

As for the Fee Committee, the Fee Committee was set up to do that.  Chris Seeger participated and oversaw some of the Fee Committee.  I had to deal with the Fee Committee as well, at one point as well.  I was actually a

designated state court lawyer to serve in that regard.

That is as different from this case as the United States is from England.  I mean, I guess we speak the same language, but that's about it.  And that may be in debate with some people.

THE COURT:  I was thinking, kind of.

MR. LANIER:  Yeah, exactly.  They said:  Don't you know the Queen's English?  And I said:  Of course she is. What else would she be?  And that was what we had in common.

Your Honor, the hours here are important.  I'm not disregarding that.  That's why we put those hours in front of you.  We're not ashamed of them.  We're not ashamed at all.  We think that we're very reasonable in what we're asking for here.

And I do want to clarify her misunderstanding about what I said of AT&T 1 and 2, lest that misunderstanding exists on the record.

AT&T 1 is a gold-medal-standard settlement.  We got an incredible result.  And I dare say -- maybe I'm speaking out of school -- but I think that the legal team we had assembled is one of the reasons we got such a gold-medal result in such a time.

AT&T 2, for what they -- cards they held in the their hand, they got an A-plus settlement, too.  They're gold medal as well.  And it's because Jeff Ostrow, John

Heenan, and others saw that opportunity to help AT&T put everything to rest. And they jumped out of Snowflake to come in and do it.

And it was a brilliant move on their part. I have heard it said that: Otherwise, they're just the hair on the tail on the dog.

Quote/unquote, Gil.

MR. KETELTAS: I don't remember that one.

MR. LANIER: But they seized the opportunity to wrangle an amazing gold-medal settlement. And they did a heck of a job. And the idea that we're supposed to say, oh, well, the better job we do, the less money we should get, is not the capitalism in America. But it's also just not the way we want to enforce the idea of motivating people to do good litigation work. And that's the goal here.

The goal here is, how do we get to the best justice we can in our system. And that's not to abuse clients by an overabundant fee. I don't believe that that is just. And I don't want the Court to do that.

But that is to say that we will reward good advocacy, good legal skills accordingly, so -- and within the confines of the law, and what's proper and everything else. But we will do that because we want to reinforce good advocacy with our lawyers.

We don't want lawyers who say: I'm going to spend

ten years in front of the Honorable Judge Ada Brown, so that at the end of ten years, I'll have 50 gazillion hours; that she can assess at an hourly rate, and award me 90 percent of the settlement fee, so that everybody else can have a coupon of buy one cellphone, get one month free from AT&T.

That is not what we're about.  We've got a gold-medal result.  And that gold-medal result is one that we're asking just to be treated what the law says we should be treated under.

And I don't know, Mr. Ostrow, if I have accurately expressed your desires on AT&T to her.  If you have something to add, since you're involved in this as well.

MR. OSTROW:  Briefly.

(Brief technical interruption.)

MR. LANIER:  I think her rate is 700 bucks an hour, not 400.

MR. OSTROW:  Judge, Counsel said she's a law lawyer.  I think she was a selective law lawyer.

There is absolutely no benchmark in this circuit. I want to be very, very clear.  You are sitting in a very powerful position, thanks to the Fifth Circuit.  It's all your discretion.  Percentage of fund or lodestar.

We're asking clearly for percentage of fund. We're not afraid of the lodestar, but it's much easier for the Court and everyone else.

There's no reversion in this case. I don't know why that was brought up. These are two settlements brought together for approval in one time. So although we're talking about one case, it's 149 and it's 28. So we are asking for a third of each of those. And I think it's important, all right? And we would like you to award the same percentage for both.

The law could not be any clearer. The way it works is -- and it's so beyond briefed in this case. You choose percentage of fund, you look at the Johnson factors. There is absolutely no requirement to submit billing statements, and have this Court, or anybody, go line by line. It's absurd to argue otherwise, all right?

Union Asset is very clear. By the way, the benchmark case that we've cited is In Re: Apache. It's very important.

So we don't start at a 15 percent. You award the percentage you want. Whatever you think is fair. And I do believe that they're two gold-medal cases that were brought before you, so I won't repeat that.

Awards in similar cases. Johnson doesn't require this Court, or anybody on the plaintiffs' side, to go and brief every detail of what happened in the myriad of cases we've cited. That, too, is absurd. We gave you an ample amount of cases. And they're being awarded not just in this

courthouse, not just in this circuit, across the country, a third.

You don't penalize lawyers for doing good work and doing it efficiently. If we went to trial -- and there's no one else we'd rather have than this group try a case with us, all right, we're -- we'd go before you. And it is years later, and it goes on appeal and comes back. Guess what we'd be asking for: A third.

We wouldn't be asking for more. We got the good result early. We happened to do an incredible amount of work. And this Court, when it analyzes the time and labor -- it doesn't mean billing statements, again -- this Court knows what has been done. The record is filled with it. We have listed a million items of things that have been done that the Court knew about or didn't know about.

Special masters. It wasn't every two weeks; it was several times a week sometimes. There were dozens and dozens of conferences with the settlement administrator. Unbelievable amount of work went into this, all right?

So the fact that the case is resolved in a year, give credit to everybody here for doing really good work, but a lot of work was done.

So I just wanted to clarify some of the points, because -- oh, and one other thing. The desirability of the case. You know, they're talking about what's righteous;

what's not righteous.

I'll tell you what's not desirable.  A data breach case that we've been trying now for -- or litigating for the last two years:  35 depositions in.  Fully briefed class certification.  Daubert motions.  And we're going to trial.  That's undesirable.  This case would have been the same way, but we would've had these guys.  Which are as good as they get in this space.

So we're asking for a fee that is reasonable; it's fair; and the Court should award it for both cases.

THE COURT:  Thank you.

Anything further on that?

(No response.)

THE COURT:  I'd like to take a quick break, come back, and we'll wrap things up.

Court's in recess for ten minutes.

(Brief recess.)

THE COURT:  Back on the record.

Thank you all so much for your time and your attention and your excellent advocacy.  We now have a gentleman who would like to come speak.

Mr. Hebert, if you'll come forward.  Please, come on up to the podium, sir.  Glad to have you here today.

MR. HEBERT:  Thank you, Your Honor.

THE COURT:  Yes.  How are you today?

MR. HEBERT:  I'm tired.

THE COURT:  Are you?  Okay.

MR. HEBERT:  Yeah, I worked 16 hours, until about 8 o'clock last night.  And then I drove from South Louisiana to make it here --

THE COURT:  Oh, my goodness.  Well, I'm --

MR. HEBERT:  -- because -- a few different reasons.

Hi, I'm Nathan.  I'm a blue-collar, hardworking fence-building young man.  I own the number-one fence company --

THE COURT:  Can I pause you for just a moment.  Because I do want to hear all of that.

MR. HEBERT:  Yes, ma'am.

THE COURT:  I noticed, though -- if you don't mind -- whenever the hearing started, I think you came in a little bit tardy.  And I don't mean that in a judgmental way; only that you missed sort of my opening remarks, I believe.  Is that right?

MR. HEBERT:  Yes, ma'am.

THE COURT:  If you don't mind, I'd like to give you just a really high level, kind of a -- just a quick movie trailer to recap on sort of what I'm looking at today.  And then I look forward to hearing from you.

MR. HEBERT:  Yes, ma'am.

THE COURT:  So give me just a moment.

So we're convened today for a Rule 23(e) final approval hearing to consider whether the proposed class action settlement in the AT&T Inc. Customer Data Security Breach Litigation is fair, reasonable, and adequate; whether the settlement classes should be finally certified; and whether the applications for attorneys' fees, costs, and service awards should be approved.

Notice of the hearing's been issued in accordance with the Preliminary Approval Order and the Notice Program, which was earlier approved by the Court.  And the hearing date, time, and logistics were communicated to the settlement classes through the approved notices and website.

The proceedings have been, and will continue to be on the record.

You should understand this is a fairness hearing rather than a trial on the merits.  The question is whether the settlement falls within a range of reasonableness, in light of the risks, costs, and delay of continued litigation, the methods of distributing relief, and equitable treatment of class members.

Under Fifth Circuit law, I'm not required, and nor do I intend, to permit live testimony for the cross-examination of witnesses.  Instead, I'll rely on affidavits, declarations, reports, arguments of counsel, and

other materials in the record to inform my decision.

It is also within my prerogative to appropriately limit this hearing to whatever's necessary to aid me in reaching an informed, just, and reasonable decision.

As a general rule, sir, I am to consider the settlement as a whole rather than its component parts.  And so in that regard, just know that I do not have wide latitude to modify or change various sections of the settlement.

I know you'll do this.  I say this to everyone. You must conduct yourself with professionalism, and confine argument and examination to the matters relevant to this hearing.

Please avoid speaking objections, and limit objections to concise statements of a legal ground.

The Court also expects you to avoid revealing confidential, personal information of class members beyond what's necessary for the record, and to maintain the integrity of the proceedings.

With that being said, Mr. Hebert, I look forward to hearing you share your legal objections to this class action settlement and in this final approval hearing.

MR. HEBERT:  All right.  Well, I only had an hour to get together my little legal part.  But then I got to watch quite a few different things while I was in here.

So I'll start with the 14th Amendment. Due process. The objections, that deadline was on November 17th. Right next to Thanksgiving. We had Christmas, New Year's, you know.

And so with the claim deadline extended mid December holidays, the timing, crunching, right around when -- the national holidays. The mail was slowing down. The offices were closed. Like, I actually closed my shop down. You know, like different things. We went on vacation. Mails weren't passing, for one.

You know, the -- how is someone going to get that mail, you know, on time? Because I had -- personally, I have three mailboxes. Because I have two businesses and I moved to a different apartment. I have two apartments, so.

Personally, in my mailbox, I had four different people's AT&T piece of paper after the deadline to file.

THE COURT: Okay.

MR. HEBERT: So that is against AT&T's -- are you guys AT&T?

Oh, you're AT&T. Hi, how are you doing?

MR. KETELTAS: Good.

MR. HEBERT: I run a company called Earth Shield Initiative, LPC. And it's to help the future of humanity. It's to help the children of tomorrow.

We are in an ever-changing technological age right

now, with AI taking over and all these different technological things. I'm not out to say, like, any kind of -- anything with money. Or I don't -- money's the root of all evil. The love for money is the root of all evil. At the end of the day, I've spent all of my money trying to do good. And --

THE COURT: If I can pause you for just a moment.

MR. HEBERT: Yeah, I apologize. I'll get back to the --

THE COURT: No, no. I appreciate your passion, but just to kind of keep us in the lane.

MR. HEBERT: All right. So the timing crunch right around the national holidays, when the mail slowed and the offices closed; people are traveling, spending time with their families. Which, in turn, put these critical deadlines in a distracted period, where many people were preoccupied with families, kids. Nor is anybody else -- nobody's a lawyer. Not everybody's a lawyer. I'm not a lawyer.

You guys are all lawyers. I walk in here, I'm the only -- I'm sorry I'm not dressed in a tux. I worked all day. You know, I pay tax -- you know, I'm a citizen of the United States of America. Tax-paying citizen, right?

So not everybody can understand all of this legal stuff, when I get e-mails. And then, not only that, the

data breach caused cyber attacks.

So how can you -- the -- by pen, somebody was saying something about, got to write -- sign it, needs to be signed?  Because e-signatures, I'm sorry, there's -- there's something called a man-in-the-middle data breach.

So if -- if AT&T had -- if I send a message, AT&T's in the middle, AT&T has the option to intercept that message and alter it or not.  It goes to him first.  It goes to his server first.  Now, it's whatever server you use, when it comes to technology.

Technology is really on my nerves lately.  It's not AT&T; I just happen to be in this breach.  I'm in all these breaches, because I'm known as an inventor.

So this would effectively deprive a great percentage of the plaintiffs from the fair and meaningful opportunity to object and opt out, or even understand their rights.

Also, the notice relied heavily on electronic communication, I just said, with the -- so brings it to the Mullane case, back in the 1950s, where it's the right to a fair and a reasonable trial hearing, right?

So I object to the class action lawsuit due to those two clauses, legally.

THE COURT:  Okay.

MR. HEBERT:  And humanity-wise, 30 percent --

THE COURT:  Let me pause you there for just a moment.

MR. HEBERT:  Yeah.

THE COURT:  Let's stay in our lane.  Are there any other legal objections you'd like to share with me?

MR. HEBERT:  I'm not a lawyer.  So you can have $2, if that's what the people are getting.  Because that pissed -- that made me upset.

THE COURT:  Okay.  So hold on one moment.  Yeah, we're not going to do that.  We don't cuss in court.

MR. HEBERT:  I stopped.  I'm sorry, I apologize.  That upset me.  That --

THE COURT:  Well, because you're upset doesn't mean you get to cuss in court.

MR. HEBERT:  I didn't mean to.  I didn't --

THE COURT:  It's time for you to have a seat.  Thank you.

MR. HEBERT:  Yes, ma'am.

THE COURT:  Anything legal further?

MR. HEBERT:  So I feel that the dollar amount, you cannot put a price on a human being's data.

THE COURT:  Okay.

MR. HEBERT:  Because the most valuable thing in the world is time.  Because we are limited to it, right?  And the second most valuable thing in the world is data.

THE COURT:  Okay.

MR. HEBERT:  So for you to claim this person or that person is the same amount, that's unfair.

THE COURT:  Okay.

MR. HEBERT:  Legally unfair.

THE COURT:  I understand that's your position.  Anything further?

MR. HEBERT:  No, ma'am.

THE COURT:  All right.  Thank you for coming today.  I appreciate you.

MR. HEBERT:  Thank you.

Thank y'all for having me.

MR. LANIER:  Thank you, Mr. Hebert.

MR. HEBERT:  I apologize for the -- good luck with all this.

THE COURT:  I just want to say, as we wrap everything up --

MR. HEBERT:  I need to get some rest.  I'm sorry, it's been a long drive.

Y'all have a great evening.  Thank you.

(Mr. Hebert exits courtroom.)

THE COURT:  I just want to wrap by saying this has been such a joy and an honor.  It's my very first, hopefully not last, MDL.  And it's been an amazing and excellent experience because of the professionalism of all the lawyers

in here.

And you guys have been so well prepared, and such good advocates to one another, that it's really been a joy. I feel like this is the ideal way that lawyers should treat one another.  And so it really has been my honor to preside over this.

With that said, I think we've got everything that we need here.  The Court will take everything under advisement, and you will hear from me in due course.

Is there anything further from Plaintiffs' counsel, Defense counsel, or Objectors before we wrap the record?

MR. LANIER:  Not from Plaintiff, Your Honor.

MR. KETELTAS:  Your Honor, Mr. McTigue would like to address the Court just briefly on some wrap-up.

THE COURT:  Certainly.  I'm certainly not trying to rush you.

MR. MCTIGUE:  Just briefly, Your Honor.

We had been talking with Plaintiffs' counsel about the proposed final approval order that we had submitted, and had exchanged some potential updates to that for the Court.

In addition, as you heard me talk about earlier, there may be some issues with the opt-outs that we'd like to bring to the Court's attention.

So one of the things I think you mentioned early

on is that maybe a time period for final submissions while you're making your decision, Your Honor.  And so we wanted to alert you to the fact that there may be, in short order, some supplemental submissions from class counsel and AT&T's counsel.

THE COURT:  And I welcome that.

MR. MCTIGUE:  Thank you.

THE COURT:  Anything further from Objectors?

MR. MCCORMICK:  No, ma'am.

THE COURT:  Well, it has really been a joy to see everybody here, and to get to see such excellent advocacy. I know I said this at our last hearing.  But I feel a bit like a Super Bowl ref, getting to see everybody -- I mean, all the big cases I've read about, and all the people who did them, are right here.  And so I get to learn from you, and it's just my honor.

So you are court ordered to have a safe journey back home.  Know that this case is amazing, and it is amazing because you're here.  And so we'll give you a decision in due course.  And thank you.

Court's in recess.

(End of proceedings.)

I, BROOKE N. BARR, United States Court Reporter for the United States District Court in and for the Northern District of Texas, Dallas Division, hereby certify that the above and foregoing contains a true and correct transcription of all proceedings in the above-styled and -numbered cause.

WITNESS MY OFFICIAL HAND this the 18th of February, 2026.


/S/ BROOKE N. BARR
BROOKE N. BARR, CSR NO. 6521
CSR Expiration Date:  7/31/26
United States Court Reporter
1100 Commerce Street
Room 1376
Dallas, Texas 75252
(214) 753-2661