IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: AT&T INC. CUSTOMER DATA SECURITY BREACH LITIGATION | § § § | Civil Action No. 3:24-CV-00757-E |
| | § | MDL DOCKET No. 3:24-md-03114-E |
| *This Document Relates to All Cases* | § | |

MEMORANDUM OPINION
AND ORDER

In these data breach cases assigned to this court for coordinated or consolidated pretrial proceedings by the Judicial Panel on Multidistrict litigation ("JPML"), plaintiffs have filed a November 3, 2025 unopposed motion for final approval of class action settlement and applications for attorney's fees, costs, and service awards.[1] Judge Brown entered a preliminary approval order on June 20, 2025, and held a fairness hearing on January 15, 2026. These cases were reassigned to the undersigned on August 17, 2026, after Judge Brown recused.[2]

After considering the entire record, including the briefing, objections, and transcript of the fairness hearing, the court approves the class action settlement agreement ("Settlement Agreement") with a slight modification regarding the cy pres process, and it grants the

[1]The motion is "unopposed" insofar as plaintiffs and defendants do not oppose it. There are objectors who oppose the motion.

[2]Judge Brown recused herself on August 14, 2026, and the Judicial Panel on Multidistrict Litigation reassigned this MDL proceeding to the undersigned on August 17, 2026.

applications as set forth in this memorandum opinion and order.[3]

## I. BACKGROUND

This multidistrict litigation arises from two separate data security incidents involving AT&T Inc. customer information. The first was announced on March 30, 2024 ("AT&T 1 Data Incident" or "AT&T 1"). The second was announced on July 12, 2024 ("AT&T 2 Data Incident," "Snowflake Incident," or "AT&T 2").

Defendants in AT&T 1 include AT&T Inc., AT&T Mobility LLC, AT&T Corporation, and DirecTV, LLC. Defendants in AT&T 2 are AT&T Mobility LLC, AT&T Services, Inc., and Cricket Wireless LLC. (Defendants in AT&T 1 and AT&T 2 are referred to collectively as "AT&T," unless the context indicates otherwise.)

According to the Master Class Action Complaint ("Complaint"), sometime in 2019 AT&T 1's systems were compromised by a third-party threat actor. While the type of information disclosed for each customer varied, it is alleged to have included Social Security Numbers ("SSNs"), dates of birth, AT&T account numbers, and passcodes (collectively, the "Data Set"). The Data Set appeared on the dark web on or before August 20, 2021. Almost three years later, on March 30, 2024, AT&T announced the data breach.

On July 12, 2024 AT&T announced that a second breach occurred when certain distinctively sensitive information, including limited call log data, was illegally downloaded from its workspace on a third-party cloud platform provided by Snowflake, Inc.

[3]The court sets out in this memorandum opinion and order its findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52(a)(1).

("Snowflake"). The data included telephone numbers of current and former AT&T customers, telephone numbers with which those customers interacted, counts of those interactions, aggregate call durations for a day or month, and, for a small subset of individuals, one or more cell site identification numbers associated with the call. The data did not include text content, customer names, SSNs, dates of birth, or other personal identifiable or financial information.

After AT&T provided notice of the Data Incidents, numerous putative class action lawsuits were filed in federal and state courts across the country. The JPML centralized the AT&T 1 actions in this court as MDL No. 3114 on June 5, 2024. *See In re: AT&T Inc. Customer Data Sec. Breach Litig.*, 737 F.Supp.3d 1350 (J.P.M.L. 2024). The JPML later centralized the data breach litigation against Snowflake and various Snowflake customers—including AT&T 2—before Judge Brian M. Morris of the District of Montana as MDL No. 3126 (the "Snowflake MDL"). *See In re: AT&T Inc. Cellular Customer Data Sec. Breach Litig.*, 753 F.Supp.3d 1368 (J.P.M.L. 2024). The AT&T 2 actions were initially part of the Snowflake MDL.

On August 14, 2024, after an application process authorized under Fed. R. Civ. P. 23(g), Judge Brown appointed W. Mark Lanier, Esquire, of The Lanier Law Firm, P.C, as Plaintiffs' Lead and Liaison Counsel; appointed an Executive Committee consisting of Shauna Itri , Esquire, of Seeger Weiss LLP, James E. Cecchi, Esquire, of Carella Byrne Cecchi Brody & Agnello PC, Jean Sutton Martin, Esquire, of Morgan & Morgan Mass Tort Dept., and Sean S. Modjarrad, Esquire, of Modjarrad Abusaad & Said; and appointed a

Steering Committee composed of six members: Charles E. Schaffer, Esquire, of Levin Sedran & Berman LLP, Joseph P. Guglielmo, Esquire, of Scott+Scott Attorneys at Law LLP, Larry A. Golson, Jr., Esquire, of Beasley, Allen, Crow, Methvin, Portis & Miles, P.C., Nicholas R. Lange, Esquire, of Freed Kanner London & Millen LLC, Rebecca L. Solomon, Esquire, of Tousley Brain Stephens PLLC, and Thomas E. Loeser, Esquire, of Cotchett Pitre & McCarthy LLP.

From March 17 to 19, 2025 the parties in AT&T 1 and AT&T 2 engaged in separate arm's-length settlement negotiations facilitated by Robert A, Meyer, Esquire ("Meyer"), an experienced class action data breach mediator. The mediations resulted in separate agreements in principle, subject to confirmatory discovery. Negotiations continued over the next 10 weeks about specific items, including notice and the selection of Kroll Settlement Administration, LLC ("Kroll") as Settlement Administrator. A single Settlement Agreement was signed on May 30, 2025. For settlement purposes, the parties agreed to consolidate the AT&T 1 and AT&T 2 actions in this court. Thereafter, the Snowflake MDL court authorized the transfer of AT&T 2 to this court during a status conference on June 23, 2025, documented by a corresponding minute entry that authorized this court to decide whether to approve the Settlement.

The Settlement includes two non-reversionary, all-cash settlement funds totaling $177 million: $149 million for the AT&T 1 Settlement Class, and $28 million for the AT&T 2 Settlement Class. Under the Settlement Agreement, if they have proper proof, AT&T 1 Settlement Class Members are permitted to submit a Claim for a Documented Loss Payment

of up to $5,000, and AT&T 2 Settlement Class Members are permitted to submit a Claim for a Documented Loss Payment of up to $2,500. Settlement Agreement (ECF No. 356-1) ¶¶ 128-129. Alternatively, Settlement Class Members can elect to receive a cash payment based on a specific pro rata calculation of the applicable net settlement fund. According to the Omnibus Declaration of Jeanne C. Finegan, APR of Kroll in connection with plaintiffs' unopposed motion for final approval of settlement ("Kroll Omnibus Declaration"), the amount of Tiered Cash Payments is estimated to be as follows, contingent on certain variables:

AT&T 1 - Tier 1 = $39 - $40

AT&T 2 - Tier 2 = $7.50 - $8.10

AT&T 2 - Tier 3 = $6.50 - $7.10

Kroll Omnibus Decl. (ECF No. 517) ¶ 40.

On May 30, 2025 AT&T 1 Class Counsel and AT&T 2 Class Counsel (collectively, "Class Counsel") filed their Complaint. The claims included alleged violations of the Communications Act, the Satellite Home Viewer Extension and Reauthorization Act, the Cable Television Consumer Protection and Competition Act, and claims for breach of implied contract, negligence, and declaratory and injunctive relief.

On the same date, plaintiffs filed their unopposed motion for preliminary approval of class action settlement with incorporated memorandum of law and attached the full Class

Action Settlement Agreement and Release.[4] Judge Brown granted the motion on June 20, 2025 and gave preliminary approval to the Settlement as being fair, reasonable, and adequate, and in the best interest of the named plaintiffs and the Settlement Class Members, subject to further consideration at the Final Approval Hearing. Judge Brown also found that the Settlement Agreement satisfied Rule 23(e)(2) and the Fifth Circuit's *Reed* factors. She appointed W. Mark Lanier, Esquire, Chris Seeger, Esquire, Shauna Itri, Esquire, Jean Martin, Esquire, James Cecchi, Esquire, and Sean Modjarrad, Esquire as AT&T 1 Class Counsel, and J. Devlan Geddes, Esquire, Raphael Graybill, Esquire, John Heenan, Esquire, Jeff Ostrow, Esquire, and Jason S. Rathod Esquire, as AT&T 2 Class Counsel. Judge Brown authorized the use of Kroll as Settlement Administrator to perform the Settlement Administrator's duties as set out in the Settlement Agreement, including to supervise and administer the Notice Program and oversee the Claims Process. Kroll's estimate of the cost of administration has varied, and these costs will be addressed later in this memorandum opinion and order.

On October 3, 2025 Judge Brown granted the parties' joint motion to amend preliminary approval order to extend certain deadlines. The order extended the opt-out and objection deadlines to November 17, 2025, the deadline to respond to Objections to December 18, 2025, and the deadline to submit claim forms to December 18, 2025.

To decide whether the Settlement is fair, reasonable, and adequate, as required by Rule 23(e)(2), Judge Brown held a hearing on January 15, 2026 to consider the unopposed

[4]Unless otherwise noted, the defined terms used in this memorandum opinion and order are the same as those in the Settlement Agreement.

motion for final approval of class action settlement. While the motion was under advisement, Judge Brown recused herself. The JPML then transferred this MDL proceeding to the undersigned on August 17, 2026.

Having considered the entire record, including the briefing, objections, and transcript of the fairness hearing, the court now considers the merits of plaintiffs' unopposed motion for final approval of class action settlement and applications for attorney's fees, costs, and service awards. As noted, *see supra* note 1, the motion is not opposed by plaintiffs and AT&T, but there are objectors who oppose the proposed Settlement.

## II. JURISDICTION

### A. Subject Matter Jurisdiction, Personal Jurisdiction, and Venue

This court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2), and supplemental jurisdiction under 28 U.S.C. § 1367(a), because all of plaintiffs' claims form part of the same case or controversy. The court has personal jurisdiction over the parties before it. Venue is proper in this district pursuant to 28 U.S.C. § 1407 and the transfer order of the JPML in MDL No. 3114, and under 28 U.S.C. § 1391, because AT&T regularly transacts business, and may be found, in this district.

### B. CAFA Notice Compliance (28 U.S.C. § 1715)

The Class Action Fairness Act ("CAFA") requires that, within 10 days of the filing of a proposed class action settlement, the defendant must provide notice to "the appropriate State official of each State in which a class member resides and [to] the appropriate Federal official." 28 U.S.C. § 1715(b). As required by law, on June 9, 2025 Kroll provided CAFA

notice to the Attorney General of the United States and the Attorneys General of all 50 states, the District of Columbia, and United States territories. Kroll Omnibus Decl. (ECF No. 517) ¶ 4.

The CAFA notice package identified the matters required by 28 U.S.C. § 1715(b) and directed the recipients to www.CAFANotice.com under the folder entitled *In Re: AT&T Inc. Customer Data Security Breach Litigation.* The 90-day waiting period required by 28 U.S.C. § 1715(d) has expired, and no federal or state official has filed an objection to, or comment on, the Settlement.

The court concludes that the CAFA notice requirements have been fully satisfied.

## III. CLASS CERTIFICATION FOR SETTLEMENT PURPOSES

For the reasons set out in this memorandum opinion and order, the court affirms that it is proper to certify, and hereby certifies, for settlement purposes only, the Settlement Class pursuant to Rule 23(b)(3). The parties have established all the requirements of class certification.

### A. Class Definitions

The Settlement Agreement defines the AT&T 1 Settlement Class as "[A]ll living persons in the United States whose AT&T 1 Data Elements were included in the AT&T 1 Data Incident." Settlement Agreement (ECF No. 356-1) ¶ 37. "'AT&T 1 Data Elements' means "AT&T 1 Settlement Class Members' information that may have been accessible in the AT&T 1 Data Incident, and includes some combination of names, addresses, telephone numbers, email addresses, dates of birth, account passcodes, billing account numbers, and

Social Security numbers." Settlement Agreement (ECF No. 356-1) ¶ 30.

The AT&T 2 Settlement Class is defined as "AT&T Account Owners or Line or End Users whose AT&T 2 Data Elements were involved in the AT&T 2 Data Incident." *Id.* ¶ 50. "'AT&T 2 Data Elements'" means telephone numbers of current and former AT&T customers, including, but not limited to, Account Owners or Line or End Users, which may have been accessible in the AT&T 2 Data Incident, along with the telephone numbers with which those customers interacted, counts of those interactions, aggregate call durations for a day or month, and for a small subset of individuals, one or more cell site identification numbers associated with the interactions. *Id.* ¶ 43.

Excluded from both Settlement Classes are: (a) AT&T, any entity in which AT&T has a controlling interest, and AT&T's officers, directors, legal representatives, successors, subsidiaries, and assigns; (b) any judge, justice, or judicial officer presiding over this Action, and the members of their immediate families and judicial staff; (c) any persons who have Released Claims relating to the AT&T 1 or 2 Data Incidents and/or the AT&T 1 or 2 Actions prior to Final Approval; and (d) any persons who timely opt-out of the AT&T 1 or 2 Settlement Classes.

Overlap Members are individuals who are members of both the AT&T 1 Settlement Class and the AT&T 2 Settlement Class. The Settlement provides specific provisions for the treatment of Overlap Members, including the ability to submit claims for both Settlement Classes, subject to certain limitations.

The court confirms the class definitions as set forth above.

**B. Standing**

While Article III standing can present complex issues in class actions, the court finds that the Class Representatives have adequately alleged concrete injuries sufficient to establish such standing for purposes of this Settlement.

**C. Rule 23(a) Requirements**

A class may be certified only if the court is satisfied, after a "rigorous analysis," that the requirements of Rule 23 have been met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). After examining each Rule 23(a) requirement in turn, the court finds that class certification for settlement purposes is proper in this matter.

**1. Numerosity (Rule 23(a)(1))**

The numerosity requirement under Rule 23(a)(1) mandates that the class be "so numerous that joinder of all members is impracticable." "[A] class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone." 1 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 3:12 (6th ed. 2022).

The Data Incidents affected tens of millions of individuals. The total number of Settlement Class Member Records for purposes of sending Notice was 99,763,302, consisting of 57,002,042 Records for the AT&T 1 only Settlement Class Members, 36,478,626 Records for AT&T 2 only Settlement Class Members, and 6,282,634 Overlap Class Members. Kroll Omnibus Decl. (ECF No. 517) ¶ 13. "Overlap Members" belong to both classes. Settlement Agreement (ECF No. 356-1) ¶ 89-90.

A class of millions of individuals plainly satisfies the numerosity requirement. The court therefore finds that the numerosity necessary for class certification has been established.

**2. Commonality (Rule 23(a)(2))**

The commonality requirement under Rule 23(a)(2) mandates that there be "questions of law or fact common to the class." To justify class certification as to commonality, plaintiffs must demonstrate that "the class members 'have suffered the same injury,'" and that their claims "depend upon a common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 349-50 (quoting *Falcon*, 457 U.S. at 157). "Even a single common question will do[.]" *Id*. at 359 (internal citations and quotation marks omitted).

There are numerous common questions in this case, including:

> 1. Whether AT&T owed a duty to protect plaintiffs' and Settlement Class Members' personal information.
>
> 2. Whether AT&T breached that duty by failing to implement adequate data security measures.
>
> 3. Whether AT&T's conduct caused the Data Incidents.
>
> 4. Whether AT&T failed to timely notify affected individuals of the Data Incidents.
>
> 5. Whether Settlement Class Members suffered damages as a result of the Data Incidents.
>
> 6. Whether AT&T's conduct violated applicable consumer

protection and data breach notification statutes.

These common questions are capable of classwide resolution because the answers depend on AT&T's conduct, which was uniform with respect to all Settlement Class Members in both AT&T 1 and AT&T 2.

The court finds that commonality is satisfied for purposes of class certification.

**3. Typicality (Rule 23(a)(3))**

The typicality requirement under Rule 23(a)(3) mandates that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Typicality is satisfied when "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)).

The Settlement Class Representatives' claims are typical of other Settlement Class Members' claims in both AT&T 1 and AT&T 2 because they each arise from the same alleged event or course of conduct. *See DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174-1175 (8th Cir. 1995). The conduct at issue in AT&T 1 is the same for all AT&T 1 Class Members. The conduct at issue in AT&T 2 is the same for all AT&T 2 Class Members. The conduct in both is the same in that, as plaintiffs allege, AT&T owed a duty and was contractually obligated to protect and keep plaintiffs' data secure, and that plaintiffs, like all other members of the two Settlement Classes, have sustained injuries and damages as a result of AT&T's uniform breach of its alleged duty and contractual obligations to adequately

safeguard their data. In addition, plaintiffs' claims in AT&T 1 and AT&T 2 arise out of the same course of alleged conduct, are based on the same legal theories, seek the same types of damages as those of the two Settlement Classes, and meet all necessary standing requirements. *See Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996).

Objectors contend that the Class Representatives are atypical because they allegedly waived their rights to arbitration by filing suit, whereas many absent Settlement Class Members may not have waived such rights. The court considers this argument in more detail below. For purposes of addressing the typicality requirement, however, the court concludes that Settlement Class Members in either AT&T 1 or AT&T 2 who want to enforce their arbitration rights against AT&T can do so by opting out of the class. Accordingly, plaintiffs' showing of typicality is not defeated simply because Class Representatives allegedly waived their rights to arbitration by filing suit.

The court concludes that typicality is satisfied for purposes of class certification.

**4. Adequacy (Rule 23(a)(4))**

The adequacy requirement under Rule 23(a)(4) mandates that "the representative parties will fairly and adequately protect the interests of the class." This requirement encompasses two inquiries: "(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1323 (11th Cir. 2008) (quoting *Valley Drug Co. v. Geneva Pharms.*, Inc., 350 F.3d 1181, 1189 (11th Cir. 2003)).

The adequacy requirement is satisfied when "the representative parties will fairly and

adequately protect the interests of the class." Rule 23(a)(4). "The adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). In this regard, the Settlement Class representatives are similarly situated to, and do not have any interests antagonistic to, absent Settlement Class Members, and they have retained lawyers who are recognized as being capable, informed, and experienced.

The 36 Class Representatives have actively participated in this litigation, consulted with Class Counsel regarding the Settlement, and determined that the Settlement is in the best interests of the Settlement Classes. There is no evidence of any conflict of interest between the Class Representatives and the Settlement Classes. The court finds that the Class Representatives have adequately represented, and will continue to adequately represent, the Settlement Classes.

Rule 23(g)(1) sets out the factors the court must consider in appointing class counsel, including: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

The court finds, for settlement purposes, that the attorneys appointed as AT&T 1 Class Counsel and AT&T 2 Class Counsel have adequately represented their respective Settlement Classes. The court has considered the factors set out in Rule 23(g)(1), including counsels' work in investigating and prosecuting the claims, counsels' experience in complex litigation

and data privacy matters, counsels' knowledge of the applicable law, and the resources counsel committed to this litigation. The court therefore confirms the prior appointments of AT&T 1 Class Counsel and AT&T 2 Class Counsel, as set out in the Preliminary Approval Order.

The court concludes that adequacy is satisfied for purposes of class certification.

**D. Predominance and Superiority (Rule 23(b)(3))**

A class seeking certification under Rule 23(b)(3) must demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members" (predominance) and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" (superiority).

When a settlement is reached before class certification, a district court need not inquire whether the case, "if tried, would present intractable management problems . . . for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620. But the court must still conduct a "rigorous analysis" of the Rule 23 requirements. *Wal-Mart,* 564 U.S. at 350-51 (quoting *Falcon*, 457 U.S. at 161).

**1. Predominance**

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "In order to 'predominate,' common issues must constitute a significant part of the individual cases." *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986). A plaintiff cannot merely point to a "common course of conduct" without also demonstrating "whether the common course of

conduct provide[s] a class-wide basis for deciding the predominant class issues of fact and law." *Galitski v. Samsung Telecomms. Am., LLC*, 2015 WL 5319802, at *4 (N.D. Tex. Sept. 11, 2015) (Fitzwater, J.) (quoting *Gene and Gene LLC v. BioPay LLC*, 541 F.3d 318, 326 (5th Cir. 2008)). Plaintiffs are not required, however, to prove that each element of their claims is "susceptible to classwide proof." *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds,* 568 U.S. 455, 469 (2013). Rather, the predominance inquiry measures the relative weight of the common questions as against individual ones. *See Amchem*, 521 U.S. at 624. And to predominate, common questions must be "definitively answered for all class members using a generalized set of facts and producing one unified conclusion." *Hancock v. Chi. Title Ins. Co.*, 263 F.R.D. 383, 390 (N.D. Tex. 2009) (Fitzwater, C.J.), *aff'd sub nom. Benavides v. Chi. Title Ins. Co.*, 2011 WL 1057567 (5th Cir. Mar. 23, 2011).

Common issues predominate here because all claims arise out of an alleged common course of conduct by AT&T regarding both AT&T 1 and AT&T 2, which "provide[s] a class-wide basis" for determining the questions at issue through generalized evidence. *Gene and Gene LLC*, 541 F.3d at 326. These questions include whether AT&T owed duties to protect plaintiffs' private information, whether AT&T breached those duties, and whether plaintiffs were harmed as a result. Plaintiffs' claims therefore raise common issues concerning the same fundamental questions of fact and law regarding the Data Incidents and AT&T's conduct. These questions revolve around common evidence that does not vary among Settlement Class Members, and these common issues predominate over any individual concerns and can be fairly resolved for all Settlement Class Members at once.

Objectors contend that plaintiffs have failed to provide a damages model that demonstrates that damages are capable of measurement on a classwide basis, as required by *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). The court disagrees. *Comcast* addressed certification of a litigation class, not a settlement class. *Id.* at 29-33. And "[a] class that is certifiable for settlement may not be certifiable for litigation if the settlement obviates the need to litigate individualized issues that would make a trial unmanageable." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 558 (9th Cir. 2019). Consequently, the court is not required to determine whether damages could be calculated on a classwide basis at trial as to either AT&T 1 or AT&T 2 because this case will not be tried. The Settlement provides a reasonable claims process that allows Settlement Class Members to receive compensation based on the type of data exposed and any documented losses. This is an appropriate method of distributing settlement proceeds in a data breach case.

Objectors also maintain that variations among the 50 states's data breach notification statutes and consumer protection laws defeat predominance. Although in some cases state-law variations can defeat predominance for a litigation class, *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 741 (5th Cir. 1996), the court need not examine this thorny issue when certifying a settlement class. The Court has explained that a district court "confronted with a request for settlement-only class certification" need not inquire whether the case "would present intractable management problems." *Amchem*, 521 U.S. at 620. And "variations [in state laws] are irrelevant to certification of a settlement class," *Sullivan v. DB Invs., Inc.,* 667 F.3d 273, 303 (3d Cir. 2011) (en banc) (quoting *In re Warfarin Sodium Antitrust Litig.*, 391

F.3d 516, 529 (3d Cir. 2004)), because a settlement "eliminate[s] the principal burden of establishing the elements of liability under disparate laws." *Id.* The Settlement provides uniform relief to all Settlement Class Members regardless of their state of residence, rendering state-law variations immaterial for settlement purposes.

The court concludes that predominance is satisfied for purposes of class certification.

**2. Superiority**

Superiority requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3). The rule identifies four factors pertinent to this inquiry:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

"[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy . . . ." 7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1779 (3d ed. 2005). The superiority requirement is satisfied here because litigating the claims of millions of Settlement Class Members would be inefficient, and a class action as to these two classes represents a superior means through which these Settlement Class Members can obtain relief.

*In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 315-16 (N.D. Cal. 2018).

Although some of the Settlement Class Members may have suffered larger documented losses, the vast majority of Settlement Class Members likely have relatively modest individual claims that would not justify the expense of separate litigation. A class action allows these individuals to obtain relief that would otherwise be unavailable.

Additionally, consolidating these claims in this court promotes judicial efficiency by avoiding duplicative litigation in courts across the country. As the JPML's transfer order recognized, centralizing this litigation was the best of all available alternatives.

The court concludes that superiority is satisfied for the purposes of class certification.

## IV. NOTICE AND DUE PROCESS

### A. Constitutional Requirements

Due process requires that absent class members receive notice that is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). In a class action for money damages, due process requires: (1) adequate notice; (2) an opportunity to be heard at the fairness hearing; (3) an opportunity to opt out of the class; and (4) adequate representation by the named plaintiffs. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985).

Rule 23(c)(2)(B) requires that notice to a Rule 23(b)(3) class be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."

**B. Notice Program Implementation**

Pursuant to the Preliminary Approval Order, Kroll implemented a comprehensive Notice Program as described in the Kroll Omnibus Declaration.

On June 12, 2025 Kroll created a dedicated Settlement Website that "went live" on July 15, 2025 with preliminary information about the Settlement. The website has been updated to provide notice of the Settlement, and a summary of the Settlement, important dates and deadlines, contact information for the Settlement Administrator, answers to frequently asked questions, and downloadable copies of relevant documents.

Kroll also established a toll-free telephone number for Settlement Class Members to use to obtain additional information regarding the Settlement through an Interactive Voice Response ("IVR") system and/or through speaking with a live operator. As of August 24, 2026, the IVR system had received 1,279,106 calls, totaling 3,365,883 minutes, and 183,868 callers had been connected to live operators, totaling 2,124,823 minutes. Kroll Omnibus Decl. (ECF No. 517) ¶ 6. Kroll also established an email address to receive and reply to email inquiries from Settlement Class Members pertaining to the Settlement. According to the most recent information available, Kroll has responded to over 576,880 emails from Settlement Class Members and others inquiring about the Settlement. *Id.* ¶ 8.

For purposes of sending Notice, the total number of Settlement Class Member records ("Settlement Class Member Records" or "Records") was 99,763,302, consisting of 57,002,042 Records for the AT&T 1 only Settlement Class Members, 36,478,626 Records for AT&T 2 only Settlement Class Members, and 6,282,634 Records for Overlap Class

Members. *Id.* ¶ 13. On August 4, 2025 Kroll commenced sending Email Notice to a total of 79,068,722 email addresses provided in the Records. *Id.* ¶ 14. Kroll also performed an advanced search to identify email addresses for Settlement Class Member Records that did not have an email address, resulting in the identification of an additional 7,847,454 email addresses to which Email Notice was then sent. *Id.*

Following the completion of the initial Email Notice campaign, Kroll began sending Postcard Notice to all Settlement Class Member Records for the AT&T 1 Settlement Class for which no email address was available, or where all Email Notices for that Settlement Class Member were rejected/bounced back as undeliverable and where a valid postal address was available. Prior to mailing, Kroll ran these Settlement Class Member Records through the U.S. Postal Service's ("USPS's") National Change of Address ("NCOA") database and updated the Settlement Class Member Records with address changes received from NCOA. Postcard Notice was sent to 17,906,765 AT&T Settlement Class Member Records. *Id.* ¶ 18.

Additionally, Kroll has made the Long Form Notice and Claim Forms available on the Settlement Website and by mail to anyone who requested them via the toll-free telephone number or other means. As of September 9, 2026 Kroll had mailed the Long Form Notice and Claim Forms to 3,635 Settlement Class Members. *Id.* ¶ 19.

As of August 24, 2026, 517,080 Postcard Notices had been returned by USPS as undeliverable as addressed, without a forwarding address. *Id.* ¶ 20. No further action has been taken with respect to these notices due to the absence of a forwarding address from USPS, and because Email Notice has already been attempted for these Settlement Class

Member Records. The following table provides an overview of dissemination results for the direct Notice Program.

| **Direct Notice Program Dissemination & Direct Breach** | | |
|---|---|---|
| **Description** | **Class Member Records** | **Percentage of Class Member Records** |
| Settlement Class Member | 99,763,302 | 100.0% |
| **Email Notice** | | |
| (+) Records to Which Email Notice Was Attempted | 86,916,176 | 87.1% |
| (-) Records to Which All Email Notices Were Undeliverable | (17,393,394) | (17.4%) |
| **Post Card Notice** | | |
| (+) Postcard Notices Mailed | 17,906,765 | 17.9% |
| (-) Postcard Notices Returned as Not Delivered | (517,080) | (0.5%) |
| **Directed Notice Program Reach** | | |
| (=) Likely Received Direct Notice | 86,912,467 | 87.1% |

*Id.* ¶ 20.

Commencing on November 21, 2025 Kroll sent a Reminder Notice to 61,172,725 Settlement Class Member Records that had a valid email address and that had not yet filed a Claim or an opt-out request. *Id.* ¶ 22.

In addition to the extensive direct notice outreach, Kroll implemented a supplemental media campaign to further increase awareness of the Settlement. Kroll Media caused a press

release to be issued through Cision PR Newswire's US1 National Newsline and National Hispanic Newsline. Kroll monitored the media for news mentions resulting from the press release and found 555 press release postings. *Id.* ¶ 24. The Internet media campaign was substantially completed by September 3, 2025. *Id.* ¶ 25. The display banner ads were behaviorally targeted to adults 18 years of age or older nationwide who are likely AT&T subscribers based on behavioral data, including visits to AT&T stores, wireless providers, or cellular carriers, website visits, and more. Approximately 25.1 million digital media impressions were planned to be served via display banner ads. *Id.* ¶ 26. The supplemental media campaign delivered over 28,075,000 impressions to targeted Settlement Class Members. *Id.*

Combined, the direct notice and supplemental media campaign is estimated to have reached 90% of the Settlement Class Member Records. *Id.* ¶ 27.

**C. Adequacy of Notice**

The court finds that the Notice Program was the best notice practicable under the circumstances and satisfied all requirements of Rule 23(c)(2)(B), Rule 23(e)(1), and due process.

The Notice Program reached the vast majority of Settlement Class Members through direct email notice and provided multiple alternative methods (postcard, publication, website) to reach those who could not be contacted by email.

The notices clearly and concisely described the Settlement, the claims process, the rights of Settlement Class Members to opt out or object, and the procedures for exercising

those rights.

The court finds that Settlement Class Members received adequate notice of the pendency of this action, the terms of the Settlement, their right to participate or opt out, their right to object, and their right to appear at the Final Approval Hearing. The requirements of due process have been satisfied, and all notice-based objections are overruled.

## V. SETTLEMENT APPROVAL UNDER RULE 23(e)

Rule 23(e)(2) provides that the court can approve a class action settlement "only after a hearing and only on finding that it is fair, reasonable, and adequate[.]" In making this determination, the court must consider whether: (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account (i) the costs, risks, and delay of trial and appeal, (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, (iii) the terms of any proposed award of attorney's fees, including timing of payment, and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other. Rule 23(e)(2).

In the Fifth Circuit, for purposes of approving a class action settlement, district courts must also consider the six factors identified in *Reed v. General Motors Corp.*: "(1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible

recovery; and (6) the opinions of the class counsel, class representatives, and absent class members." *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983).

As noted above, Judge Brown held a final fairness hearing on January 15, 2026 to consider the Rule 23(e) and *Reed* factors. The undersigned has read the hearing transcript and reviewed the briefing and objections, together with the case docket, to determine whether the Settlement is fair, reasonable, and adequate.

**A. Rule 23(e)(2) Analysis**

**1. Adequate Representation (Rule 23(e)(2)(A))**

As the court has discussed above, the court finds that the Class Representatives and Class Counsel have adequately represented the Settlement Classes throughout this litigation. The court finds that this factor weighs in favor of approving the Settlement.

**2. Arm's Length Negotiation (Rule 23(e)(2)(B))**

As the court has discussed above, the Settlement was reached after arm's-length negotiations with a respected mediator. From the beginning, each Class has been represented by well-regarded civil trial lawyers, experienced in class action litigation.

There are objectors, however, who contend that the Settlement is a "reverse auction." A "reverse auction" occurs when the defendant negotiates with those who they believe are the least effective attorneys in hopes that the court will approve a weak settlement, thereby precluding other claims against the defendant. *See Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 282 (7th Cir. 2002). This objection fails because Class Counsel cannot be viewed in any respect as the "least effective attorney." In fact, the opposite is true.

The objectors also focus, however, on separate settlements reached outside of this class action. These settlements took place with arbitration claimants before the instant Settlement was reached. In the court's view, however, these separate settlements cannot be viewed as a reverse auction. This is because whether arbitration opt-outs occurred before the Class Settlement was reached or after does not matter. The "opt-out" choices were available in each instance. A potential class member has always had the option to remain in, or opt out of, the class. It is therefore erroneous to label the arbitration opt-out alternative a "reverse auction."

As to the allegation that AT&T may have offered arbitration claimants more favorable terms than are available under the Class Settlement, the court notes that AT&T's willingness to settle individual arbitrations at varying amounts does not establish that the Class Settlement is inadequate. Individual arbitration settlements reflect different dynamics—including the costs of individual arbitrations, the specific claims asserted, and the bargaining leverage of individual claimants—that are not directly comparable to a classwide settlement affecting tens of millions of class members.

The court finds that this factor weighs in favor of approving the Settlement.

### 3. Adequacy of Relief (Rule 23(e)(2)(C))

#### a. Costs, Risks, and Delay of Trial and Appeal

Continued litigation would be complex, expensive, time-consuming, and uncertain. If the case were litigated, plaintiffs would face substantial risks and challenges at every stage of the proceedings as to both Classes. Practical considerations therefore favor approval of

the Settlement.

i. Standing. After *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), defendants in data breach cases routinely challenge plaintiffs' Article III standing, contending that mere exposure of data—without evidence of actual misuse—does not constitute a concrete injury. Although plaintiffs believe their standing arguments are strong, the issue presents a genuine litigation risk.

ii. Arbitration. AT&T's Customer Service Agreement contains a class action waiver and mandatory arbitration provision. AT&T has successfully enforced this provision in numerous cases. *See*, *e.g., AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 352 (2011). If AT&T moved to compel arbitration, plaintiffs would face a substantial risk that the class claims would be dismissed and individual claimants would be relegated to bilateral arbitration.

iii. Merits. Even if plaintiffs could overcome standing and arbitration challenges, they would face significant obstacles in proving liability and damages. AT&T would undoubtedly assert that its security measures were reasonable and that any failures were caused by third parties (such as Snowflake for the AT&T 2 Data Incident). Proving classwide damages in a data breach case is always difficult, particularly for claims based on increased risk of future harm or diminution in value of personal information.

As plaintiffs note, data breach litigation is complex, risky, and time consuming, because the laws governing data breach claims continue to rapidly evolve. *See, e.g., Kostka v. Dickey's Barbecue Rests., Inc.*, 2022 WL 16821685, at *11 (N.D. Tex. Oct. 14, 2022)

(Rutherford, J.) ("[I]n the Fifth Circuit, there is little case law on the subject of data breaches. . . . [T]he greatest costs of potential litigation are still ahead, to say nothing of potential appeals. Given the risk inherent at this stage of the litigation, the proposed settlement is more than adequate.").

Dockets across the country are filled with examples of other data breach cases failing to successfully navigate these issues. *See, e.g., Maldini v. Marriott Int'l, Inc.*, 140 F.4th 123, 138 (4th Cir. 2025) (reversing reinstated class certification). Success in litigating is far from guaranteed.

iv. Delay. If the parties tried this case, it would take years to resolve. Because the "legal issues involved [in data breach litigation] are cutting-edge and unsettled . . . many resources would necessarily be spent litigating substantive law as well as other issues." *In re Target Corp. Customer Data Sec. Breach Litig.*, 2015 WL 7253765, at *2 (D. Minn. Nov. 17, 2015), *rev'd and remanded*, 847 F.3d 608 (8th Cir. 2017), *amended*, 855 F.3d 913 (8th Cir. 2017), and *aff'd*, 892 F.3d 968 (8th Cir. 2018). The Settlement reached here eliminates the need for contested class certification, summary judgment motions, *Daubert* practice, and more, to say nothing of the years needed for inevitable (and potentially interlocutory) appeals. *See* Rule 23(f); *accord Manual for Complex Litigation (Fourth)* § 21.612 (2010) ("An early settlement produces certainty for the plaintiffs and defendants and greatly reduces litigation expenses."); *Klein v. O'Neal, Inc.*, 705 F.Supp.2d 632, 651 (N.D. Tex. 2010) (Fitzwater, C.J.) ("When the prospect of ongoing litigation threatens to impose high costs of time and money on the parties, the reasonableness of approving a mutually agreeable

settlement is strengthened.”). These obstacles further inform the Settlement’s fairness, reasonableness, and adequacy.

Ultimately, the Settlement reflects the parties’ compromise between worst-case and best-case scenarios, weighing the likelihood of various outcomes. The Settlement thus strikes an appropriate balance between plaintiffs’ “likelihood of success on the merits” and “the amount and form of the relief offered in the settlement.” *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981).

The court finds that the costs, risks, and delay of continued litigation support approval of the Settlement.

**b. Effectiveness of Distribution Methods**

The Settlement provides a tiered claims process based on the type of data exposed and any documented losses. Settlement Class Members were able to submit claims online through the Settlement Website or by mail. Kroll verified claims against AT&T’s records to confirm class membership.

According to the Kroll Omnibus Declaration, as of August 24, 2026, Kroll had received 754,263 Claim Forms through the mail and 4,163,810 Claim Forms filed electronically, for a total of 4,918,073 claims received. Master Class Action Compl. (ECF No. 281) ¶ 30. Although the number of claims rejected (fraudulent, late, duplicative, or other reasons) reduced the number of claims, the remaining participation rate supports the finding that the claims process was effective and accessible. The Settlement Agreement provides for payments to be distributed electronically or by paper check within 60 days after the Effective

Date. *Id.* ¶ 173. As discussed elsewhere in this memorandum opinion and order, the court has made efforts to ensure that the settlement funds are not consumed by attorney's fees, fraudulent claims, or administrative costs.

Some objectors contend that the "fairly traceable" standard for documented loss claims is too vague, or that the documentation requirements are too burdensome. The "fairly traceable" standard is consistent with Article III standing requirements and provides reasonable flexibility for claimants to demonstrate a connection between their losses and the Data Incidents. The documentation requirements—while necessary to prevent fraudulent claims—are not unduly burdensome.

The court finds that the distribution method is effective and weighs in favor of approving the Settlement.

**c. Terms of Attorney's Fee Award**

Class Counsel seek attorney's fees of one-third of each Settlement Fund. The fee request was disclosed to Settlement Class Members in the Long Form Notice, and Settlement Class Members had an opportunity to object. The court's evaluation of the fee request is set out later in this memorandum opinion and order.

**d. Side Agreements (Rule 23(e)(3))**

Rule 23(e)(3) requires that the parties disclose "any agreement made in connection with the proposal." The parties have represented that there are no side agreements other than the Settlement Agreement itself.

The Settlement Agreement contains an opt-out threshold provision that permits AT&T

to terminate the Settlement if the number of valid opt-outs exceeds a certain number of the Settlement Classes. The court has reviewed this provision and finds that it is a standard provision in class action settlements and does not render the Settlement unfair or unreasonable.

The court concludes that this factor weighs in favor of approving the Settlement.

**4. Equitable Treatment (Rule 23(e)(2)(D))**

Rule 23(e)(2)(D) requires the court to consider whether the Settlement "treats class members equitably relative to each other."

The Settlement's tiered structure treats Settlement Class Members equitably by providing greater compensation to those who suffered more serious data exposure (e.g., exposure of SSNs) and those who can document actual losses. This approach is consistent with standard practice in data breach settlements and reflects the reality that different class members may have been affected differently by the Data Incidents.

The Settlement treats Settlement Class Members equitably because, as the Advisory Committee Notes explain, "the apportionment of relief among class members takes appropriate account of differences among their claims." Rule 23(e)(2)(D) advisory committee's notes to 2018 amendments. Settlement Class Members who are able to document their actual out-of-pocket losses are entitled to compensation for those losses; Settlement Class Members whose damages are more intangible (*e.g.*, loss of privacy) are also compensated via Tiered Cash Payments, but only after compensating those with documented out-of-pocket losses. The different Tiered Cash Payments are structured so as to provide

greater relief to those Settlement Class Members who had more sensitive personal information exposed in the Data Incidents.

One objector contends that "Overlap Members"—individuals who belong to both Settlement Classes—are treated unfairly because they face limitations on the total compensation they can receive. The court disagrees. Overlap Members are not penalized; rather, the Settlement's structure ensures that funds are distributed equitably across all Settlement Class Members and prevents double-recovery for the same underlying harm. Overlap Members may submit claims to both Settlement Funds, subject to reasonable limitations on documented loss claims to prevent duplicative recovery.

The court finds that the Settlement treats Settlement Class Members equitably and that this factor weighs in favor of approving the Settlement. All objections to the definition, or treatment, of Overlap Members are overruled.

**B. Fifth Circuit *Reed* Factors**

In addition to the Rule 23(e)(2) factors that the court must consider before approving a class action settlement, the court must consider the six factors set out in *Reed*, 703 F.2d at 172. Each *Reed* factor is discussed below and weighs in favor of approving the Settlement

**1. Existence of Fraud or Collusion**

The court finds no evidence of fraud or collusion surrounding the Settlement, which was negotiated at arm's length through a neutral mediator. The "reverse auction" allegations raised by certain objectors are not supported by the record.

**2. Complexity, Expense, and Likely Duration of Litigation**

As already discussed, data breach litigation is inherently complex, expensive, and of potentially long duration.

**3. Stage of Proceedings and Amount of Discovery Completed**

The Settlement was reached relatively early in the litigation, before AT&T filed an answer and before formal discovery commenced. But Class Counsel have represented that they conducted extensive informal discovery and investigation, including:

- Review of AT&T's public disclosures regarding the Data Incidents;
- Analysis of regulatory filings and government investigations;
- Consultation with cybersecurity experts;
- Review of AT&T's Customer Service Agreement and privacy policies; and
- Analysis of data breach settlements in comparable cases.

"[F]ormal discovery is not a prerequisite to approving a settlement as reasonable." *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012) (citing *Newby v. Enron Corp.*, 394 F.3d 296, 307 (5th Cir. 2004); *Cotton v. Hinton*, 559 F.2d 1326, 1332-33 (5th Cir. 1977)). Class Counsel had sufficient information and experience to make an informed evaluation of the strengths and weaknesses of the case and to negotiate a fair settlement.

**4. Probability of Plaintiffs' Success on the Merits**

As already discussed, plaintiffs faced substantial risks if the case were litigated. While plaintiffs believe their claims have merit, the outcome of litigation was uncertain.

**5. Range of Possible Recovery**

The Settlement provides $177 million in total monetary relief: $149 million for the AT&T 1 Settlement Class, and $28 million for the AT&T 2 Settlement Class. Both funds are non-reversionary, so any unclaimed funds will be distributed to Settlement Class Members through redistribution, or distributed via cy pres, but no Settlement funds will revert to AT&T.

Multiple objectors—some with counsel and some *pro se*—contend that the Settlement amount is inadequate. They cite, in particular, the T-Mobile settlement, which reportedly included a total settlement fund of $350 million (vs. AT&T's total fund of $177 million); documented loss cap of $25,000 (vs. AT&T's $2,500/$5,000); compensation for lost time, two years of credit monitoring (vs. no credit monitoring from AT&T); and a $150 million security spend commitment (vs. no specific spend for AT&T). *In re T-Mobile Customer Data Sec. Breach Litig.,* 111 F.4th 849, 855-856 (8th Cir. 2024). Multiple objectors urge the court to infer inadequacy in this Settlement in comparison to T-Mobile from differences in fund size, documented-loss caps, and ancillary benefits and security commitments, based on these disparities.

The court is not persuaded by the T-Mobile settlement to disapprove the Settlement agreed to in this case. There are other settlements, found from a wide spectrum of recoveries and benefits, that reflect favorably on this Settlement. And the settlement value must be assessed in context, which includes considering the claims asserted, the evidentiary record, the defendant's defenses (including arbitration), the procedural posture, and the risks of

delay, appeal, and non-recovery. The court therefore declines to treat headline comparisons to other settlements as a substitute for the analysis required by Rule 23(e) and the *Reed* factors.

Although there are objectors who rely on the T-Mobile settlement as the appropriate comparator for evaluating the instant Settlement, plaintiffs cite other, recently approved, data breach settlements that they contend demonstrate that the Settlement compares quite favorably to, and often exceeds, similar common fund data breach settlements. *See Kostka*, 2022 WL 16821685, at *12 ("[W]hen comparing the proposed settlement to other settlements approved in other data breach cases, it becomes clear that the proposed settlement is at least in line with if not better than what any proposed plaintiff could have expected coming into the litigation."); *In re Cap. One Consumer Data Sec. Breach Litig.*, 2022 WL 18107626, at *12 (E.D. Va. Sept. 13, 2022) ($190 million for 98 million class members); *In re Yahoo! Inc. Customer Data Breach Litig.*, 2020 WL 4212811, at *10, 45 (N.D. Cal. July 22, 2020) ($117,500,000 for 194 million class members); *In re Experian Data Breach Litig.*, No. 8:15-cv-01592 AG (DFMx), ECF No. 322 at 5 (C.D. Cal. May 10, 2019) ($22 million for nearly 15 million class members); *In re Anthem, Inc. Data Breach Litig.* 327 F.R.D. at 318-34 ($115 million for 79,150,000 class members); *In re Target Corp. Customer Data Sec. Breach Litig.*, 2017 WL 2178306, at *1-2 (D. Minn. May 17, 2017) ($10 million dollar settlement for nearly 100 million class members); *In re The Home Depot Inc. Customer Data Sec. Breach Litig.*, No. 1:14-MD-02583, 2016 WL 6902351, at *7, and ECF No. 181-2 ¶¶ 22, 38 (N.D. Ga. Aug. 23, 2016) ($13 million for 61 million class members). Although individual

recoveries differed in each of these actions, just as they will here, these numbers provide relative scale and confirm that this Settlement fits comfortably within a fair, reasonable, and adequate range.

The Settlement was negotiated by able attorneys for both sides, including attorneys with expertise in data breach and other complex litigation. In many respects, this case exemplifies more generally an adversarial system of justice at its best and highest form. When, as here, each side has superior counsel, there is little expectation that one side will out-bargain the other; instead, there is every expectation that comparable bargaining power will produce a fair result, which the court concludes is what occurred here.

Accordingly, the Court finds that the Settlement amount falls within the range of reasonableness.

**6. Opinions of Class Counsel, Class Representatives, and Absent Settlement Class Members**

Class Counsel support the Settlement, and they represent to the court that they believe it provides excellent relief for the Settlement Classes given the risks of continued litigation. Class Counsels' opinions are entitled to significant weight given their experience in data breach litigation and their familiarity with this case.

The 36 Class Representatives also support the Settlement and have authorized Class Counsel to submit it for court approval.

Although various objections have been filed by approximately 45 objectors, this is certainly not an overwhelming rejection of the Settlement. Although 10,741 opt-out requests

have been received, the majority were late or non-compliant. Kroll Omnibus Decl. (ECF No. 517) ¶¶ 43-45. The low objection and opt-out rates, together with all the other factors, support approving the Settlement.

**C. Finding: Settlement Is Fair, Reasonable, and Adequate**

Having considered all of the Rule 23(e)(2) factors and the Fifth Circuit *Reed* factors, the court finds that the Settlement is fair, reasonable, and adequate.

**VI. OBJECTIONS**

Under the Settlement Agreement and Preliminary Approval Order, Settlement Class Members who wanted to object were required to file written objections by October 17, 2025. The deadline was later extended to November 17, 2025. Each written objection was required to include, among other things: (a) the objector's full name, address, and telephone number; (b) all grounds for objection; (c) a statement identifying any prior class action objections filed by the objector in the preceding five years; (d) the identity of all counsel representing the objector; (e) the number of times in which the objector's counsel and/or counsel's law firm objected to a class action settlement in the preceding five years; (f) the identity of all counsel (if any) representing the objector who would appear at the Final Approval Hearing; (g) four dates during which the objector would be available to be deposed; (h) a list of all persons who would be called to testify at the Final Approval Hearing in support of the objection (if any); (i) a statement confirming whether the objector intended to personally appear or testify at the Final Approval Hearing; and (j) the objector's signature.

The court has not considered objections made by individuals who have opted out

because they lack standing to object. *Harper v. C.R. Eng., Inc.* 746 Fed. Appx. 712, 718 (10th Cir. 2018). Class members may either object or opt out, but they cannot do both. *See Id.*

The court likewise has not considered late-filed objections, including the Objection to the Class Settlement filed by Potter Handy, LLP ("Potter Handy").

But in the interest of ensuring a fair evaluation of the Settlement, the court has elected in its discretion to consider the substance of timely-filed objections that do not strictly comply with all procedural requirements.

The court addresses below objections that have not been discussed or ruled upon elsewhere in this memorandum opinion and order.

**A. Adequacy of Settlement**

Objectors assert that the AT&T Settlement is materially worse than the T-Mobile and other data breach settlements on multiple metrics. The court has addressed settlement adequacy in detail above. This objection is overruled.

Objectors contend that the Settlement amount is inadequate to compensate for the harm suffered, including identity theft, financial losses, emotional distress, and the potential for ongoing risk of fraud. Having reviewed the filings, testimony, and declarations, including timely pro se objections, the court declines to accept these assertions. A class action settlement cannot provide individualized, full compensation to every class member. The Settlement must be evaluated as a whole, considering the benefits to the class as a whole, weighed against the risks of continued litigation. For Settlement Class Members who have

suffered documented losses, the Settlement provides for a potential recovery of up to $5,000 for AT&T 1 Class Members and up to $2,500 for AT&T 2 Class Members through the documented loss claims process. This objection is overruled.

Objectors maintain that the AT&T 2 Settlement is inadequate because documented loss claims exceed the entire settlement fund, meaning that nearly 795,000 claimants who filed valid Tier 3 claims will purportedly receive nothing. The court finds that this objection lacks merit.

Now that the administration process has sufficiently progressed, the court is able to conclude that Tier 3 claimants with valid claims will in fact recover more than nothing. Kroll has advised the court that each Tier 3 Class Member will receive approximately $6.50 to $7.10. This objection is overruled.[5]

**B. Rules Enabling Act**

Objectors contend that Rule 23 cannot be used to bind Settlement Class Members who contractually agreed in the Customer Service Agreement ("CSA") to individual arbitration and to a waiver of their right to "participate in a class action." Ex. B to Udell Obj. (ECF No. 525-2) at 2. They maintain that doing so would violate the Rules Enabling Act, 28 U.S.C. § 2072(b), which provides that federal rules "shall not abridge, enlarge or modify any

---

[5]In their response to the supplemental declarations filed in connection with final approval, the Harrer Law, P.C. Objectors continue to argue that Kroll's estimates of distributions to the Tier 3 class members are flawed. Kroll's Second Supplemental Omnibus Declaration of Andrew Perry, however, effectively addresses the issue and persuades the court otherwise.

substantive right[.]" Udell Obj. Br. (ECF No. 364) at 3.

The Rules Enabling Act prohibits procedural rules from "abridg[ing]" substantive rights, but Rule 23 does not abridge the right to arbitration. 28 U.S.C. § 2072(b). Settlement Class Members who prefer to pursue individual arbitration have the right to opt out of the Settlement Class and retain their arbitration rights. The opt-out mechanism preserves Settlement Class Members' substantive rights while permitting those who do not opt out to participate in the Class Settlement. Contrary to Objectors' arguments, AT&T is unable to unilaterally "bind millions of customers . . . to a class settlement" that includes an opt-out right.[6] Udell Obj. Supp. Mem. (ECF No. 525) at 3. Objectors have not pointed the court to any persuasive authority indicating otherwise.

Furthermore, the Supreme Court has long recognized that class action procedures may bind absent class members who receive adequate notice and an opportunity to opt out. *Phillips*, 472 U.S. at 802-15 (1985). Nothing in *Concepcion*, 563 U.S. at 333, or subsequent arbitration jurisprudence suggests that the arbitration rights of Settlement Class Members cannot be extinguished through class action procedures.

Because this objection may be raised on appeal, the court explicitly finds and concludes as follows: (1) Rule 23, as applied here, does not compel any Class Member to surrender arbitration rights involuntarily; (2) each Settlement Class Member received notice

---

[6]In a September 19, 2026 supplemental memorandum, the Udell Objectors contend that AT&T's subsequent modification to the CSA strengthens their objection because it shows that the prior version of the CSA was ambiguous. The court disagrees. Regardless of any ambiguity, Settlement Class Members still retained a right to opt out of the Settlement.

and an opportunity to opt out; (3) any Class Member who validly opted out had the right to pursue individual litigation or arbitration; and (4) the binding effect of the class judgment on non-opt-outs flows from due process-compliant class procedures, not from an abrogation of substantive rights by rule. This objection is overruled.

**C. Judicial Estoppel**

Objectors contend that AT&T is judicially estopped from participating in a class settlement because AT&T has successfully argued in prior cases (including before the Supreme Court) that its class action waiver is enforceable and precludes class treatment.

Judicial estoppel is an equitable doctrine that "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000)). Judicial estoppel generally applies where: (1) a party's position is "clearly inconsistent" with a prior position; (2) the party succeeded in persuading a court to accept the prior position; and (3) the party would derive an unfair advantage if permitted to assert the inconsistent position. *Id*. at 750-51.

Judicial estoppel does not apply here. AT&T's position in prior cases has been that class action waivers are enforceable and that plaintiffs cannot pursue class claims against AT&T. *See, e.g., Concepcion*, 563 U.S. at 333. AT&T is not taking an inconsistent position by participating in a voluntary settlement of class claims. Through settlement it has chosen to forgo taking a position that it could have taken, which is not "clearly inconsistent" with taking a different position in a case that it has chosen to contest. *New Hampshire*, 532 U.S.

at 749. Moreover, the opt-out mechanism preserves Settlement Class Members' right to pursue individual arbitration, which is not clearly inconsistent with AT&T's prior positions. This objection is overruled.

**D. Typicality/Adequacy Challenges**

Objectors contend that the Named Plaintiffs are not typical of, and cannot adequately represent, Settlement Class Members who retained their arbitration rights, because the Named Plaintiffs allegedly waived their arbitration rights by filing suit.

The Named Plaintiffs' claims arise from the same Data Incidents and assert the same legal theories as the claims of all Settlement Class Members. The fact that some Settlement Class Members may have contractual arbitration rights does not defeat typicality or adequacy, because the opt-out mechanism allows those Settlement Class Members to preserve their rights. Settlement Class Members who value their arbitration rights above the Settlement benefits have been free to opt out and pursue arbitration. This objection is overruled.

**E. Credit Monitoring**

Although several data breach settlements have provided for some period of credit monitoring, lengths of time vary, and all eventually expire, which means that the procedure itself provides uncertain and unproven benefits in most circumstances. *See, e.g.*, *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1274 (11th Cir. 2021). Therefore, it is not a required element of every settlement. The court therefore overrules the objections to the lack of credit monitoring.

**F. Claims Procedures and Opt-Out Requirements**

Objectors maintain that the claims procedures, including opting out, wet ink signatures, and the "fairly traceable" standard are burdensome and somehow suppressed participation. The court disagrees.

More than four million claims were received, which represents a 4.8% claims rate. Finegan Decl. (ECF No. 418-1) at 7. According to Kroll, this rate is higher than the majority of settlements it has administered. Without question, the reduction in the number of claims that resulted from fraud detection methods, discussed later in this memorandum opinion and order, reduces the rate to a certain extent. But even with this reduction, the court finds that the claim filing and opt-out procedures were clear. The court also finds that the procedures were neither cumbersome nor burdensome. These objections are overruled.

**G. Predominance**

Objectors contend that Class Counsel failed to provide a damages model demonstrating that damages are capable of measurement on a classwide basis, as required by *Comcast*, 569 U.S. 27. The court has already addressed this objection. Because these are settlement classes, the court need not determine whether damages can be calculated on a classwide basis at trial. This objection is overruled.

**H. State Law Variations**

Objectors maintain that variations among state data breach notification statutes and consumer protection laws defeat predominance. The court has addressed this objection above. For settlement purposes, state law variations do not defeat predominance because the

Settlement provides uniform relief regardless of state of residence. This objection is overruled.

**I. Reverse Auction/Collusion Allegations**

Objectors allege that AT&T engaged in a "reverse auction" settlement, settling with Class Counsel who were willing to accept the lowest recovery in exchange for substantial attorney's fees, while offering arbitration claimants superior terms. The court has addressed this objection in detail above. For the reasons stated there, the court finds that the Settlement was negotiated at arm's length and was not the product of a reverse auction or collusion. This objection is overruled.

**J. Plaintiffs and Their Counsel Put Their Interests Above the Interests of the Class**

Objectors contend that plaintiffs and their counsel put their own interests above the class. The court has discussed this issue elsewhere in this memorandum opinion and order and finds that there is no inadequate representation and no conflict of interest. This objection is overruled.

**K. Attorney's Fee Objection**

Objectors contend that the attorney's fee request is unreasonable for a case that settled pre-answer and pre-discovery. The court addresses attorney's fees in detail later in this memorandum opinion and order. Accordingly, this objection is overruled.

**L. Injunction Against Parallel Proceedings**

Objectors contend that the preliminary injunction against parallel arbitration and

litigation proceedings is improper. The court overrules this objection.

The court has authority under the All Writs Act, 28 U.S.C. § 1651, to issue injunctions necessary to protect its jurisdiction and effectuate its judgments. *In re Baldwin-United Corp.*, 770 F.2d 328, 335 (2d Cir. 1985); *Deaton v. Johnson*, 2026 WL 2690272, at *3 (N.D. Tex. Sept. 14, 2026) (O'Connor, C.J.). An injunction against parallel proceedings is appropriate where, as here, the prosecution of individual claims would undermine the court's ability to provide relief to the Settlement Classes as a whole.

The injunction is narrowly tailored to preserve the court's jurisdiction over the settlement approval process and to protect the court's ability to effectuate this final order. It only applies to claims and proceedings within the scope of the released claims and only to the extent necessary to implement and enforce this final order. This objection is overruled.

**M. Releases**

Objectors maintain that fairness cannot be determined without an understanding of how much each Settlement Class Member will receive, or, alternatively, that the release should be approved only as to Settlement Class Members who have been paid. The court overrules this objection.

The release scope turns on class membership and adequate notice, not on receipt of payment. In *Phillips* the Supreme Court held that, for a class member to be bound by a class settlement for money damages, due process requires only (1) adequate notice, (2) an opportunity to be heard/object, and (3) an opportunity to opt out. *Phillips*, 472 U.S. at 802-14. Nothing in *Phillips* conditions being bound on actually collecting money. *See id.*

This court has already found that the Notice Program was adequate and that parties had an opportunity to be heard, to object, and to opt out. Finality is essential to class action settlements, and limiting releases to only those who are paid, rather than those who receive notice, would destroy finality and undermine the class action logic. As to what will be received, this memorandum opinion and order resolves that question. This objection is overruled.

Objectors also contend that the Releases are ambiguous and impermissibly broad. The court disagrees. The Releases are narrowly tailored to release claims arising out of the Data Incidents. The Settlement therefore reasonably provides finality as to claims "that in any way concern, arise out of, or relate to the Data Incidents[.]" Ex. A to Mot. for Settlement Approval (ECF No. 356-1) at 49. The same can be said about ambiguity.

Moreover, the argument that there is ambiguity in what rights an opt-out retains is misplaced. Opt-outs release nothing. The law is clear that courts do not read opt-out provisions narrowly. *See Phillips*, 472 U.S. at 813 (discussing effect of opt out); *Stephenson v. Dow Chem. Co.*, 273 F.3d 249, 260 (2d Cir. 2001) (en banc); *see also In re Loancare Data Sec. Breach Litig.*, 2025 WL 895435, at *3 (M.D. Fla. Mar. 24, 2025) (opt-outs "do not release their claims"); *Cilluffo v. Cent. Refrigerated Svcs., Inc.*, 2018 WL 11374960, at *3 (C.D. Cal. Apr. 3, 2018) (same).

Objectors maintain that the Releases lack consideration because Snowflake and other third parties are released without contributing to the Settlement. Snowflake is a Released Party. The release of Snowflake was part of the negotiated Settlement and provides value

to the Settlement Classes by avoiding the costs and delays of separate litigation against Snowflake. While Snowflake did not contribute directly to the Settlement Fund, AT&T's contribution reflects the total value of the settlement of all claims against all parties arising from the Data Incidents. The court addresses objectors' concern by making an express finding that the Release is limited to claims arising from the same nucleus of operative facts as the released claims and forms part of the overall settlement consideration negotiated by the parties. The court also finds that the Release is not so broad or untethered to the factual predicate of this action as to render the Settlement unfair. This objection is overruled.

The court finds and concludes that the Releases are reasonable and supported by consideration. All objections as to the Releases are overruled.

**N. Security Enhancements**

Objectors contend that the Settlement does not adequately address ongoing data security risks or require verified cybersecurity upgrades and expenditures. While the court acknowledges these concerns, it finds that the Settlement's approach is reasonable.

Mandating specific security measures in a class action settlement raises complex technical and operational issues that may not be appropriate for judicial resolution. AT&T's attestation regarding security enhancements provides assurance of compliance, and AT&T has independent incentives—regulatory, reputational, and legal—to maintain robust security practices. These objections are overruled.

**O. Individual Hardship Cases**

The court has reviewed the individual circumstances described by pro se objectors. The Settlement cannot provide unlimited individualized recovery to every Settlement Class Member who has suffered harm. Settlement Class Members who believe their individual claims exceed the Settlement's documented loss caps had the option to opt out and pursue individual litigation or arbitration. The court finds that the Settlement's benefit structure is reasonable given the classwide nature of the relief. These objections are overruled.

**P. Cy Pres Recipient**

Objectors question the designation of the Texas Bar Foundation as the cy pres recipient of any residual funds that remain after distribution. The court sustains this objection and modifies the cy pres process.

Under Fifth Circuit law, cy pres distributions are appropriate where direct distribution to class members is not feasible. *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 475 (5th Cir. 2011). The cy pres recipient should have a "sufficient nexus" to the interests of the class. *Id.* at 473. The Texas Bar Foundation is a worthy organization that supports access to justice initiatives in Texas, which benefits the public generally.[7] Nevertheless, the nexus to data breach victims specifically is indirect. The court therefore directs the parties to recommend other cy pres recipients for consideration, in addition to the Texas Bar Foundation.

---

[7]The undersigned is a Life Fellow of the Texas Bar Foundation.

The court also recognizes that cy pres is disfavored where further direct distribution is feasible. *Id.* at 475. Accordingly, any residual distribution must first be considered for claiming class members to the extent economically feasible and administratively practical. Only if further redistribution is not feasible may cy pres be made, and any cy pres recipient must bear a substantial nexus to data privacy, cybersecurity, consumer protection, or access to justice interests implicated by the claims in this case.

Accordingly, the court directs the parties and Kroll to report the residual funds remaining after distribution, along with recommendations as to whether any redistribution should be considered. If the court decides that redistribution is appropriate, Kroll is authorized to apply for further compensation to accomplish the redistribution.

## VII. OPT-OUT REQUESTS

The Preliminary Approval Order established procedures for Settlement Class Members to exclude themselves (opt out) from the Settlement Classes. AT&T has filed its Position on Opt-Out Requests, together with supporting declarations and exhibits, addressing the validity of the opt-out requests received. Responses have also been filed.

### A. Opt-Out Requirements Under Preliminary Approval Order

The Preliminary Approval Order required that opt-out requests include: (1) the Settlement Class Member's full legal name; (2) current address, AT&T telephone number(s) associated with the Settlement Class Member's account, current telephone number, and current email address; (3) identification of any attorney or other person representing the Settlement Class Member in the matter; (4) a handwritten signature of the Settlement Class

Member (i.e., "wet ink" signature); (5) the name of this action; (6) former customer account number, or statement attesting that the class member believes he or she is a Settlement Class Member; and (7) a clear statement that the Settlement Class Member wishes to be excluded from the Settlement.

**B. Court's Authority Over Opt-Out Procedures**

District courts have broad discretion to establish procedures for opting out of class action settlements. *See In re Deepwater Horizon*, 739 F.3d 790, 818 (5th Cir. 2014). The court's authority includes the power to establish reasonable requirements designed to ensure that opt-out decisions are made voluntarily and with informed consent. *See Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 352 (6th Cir. 2009). MDL courts have particular authority and responsibility to manage class proceedings in a manner that protects the interests of absent class members. *Belt v. Emcare, Inc.*, 299 F.Supp.2d 664, 667 (E.D. Tex. 2003) (citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981)).

**C. Reasonableness of "Wet Ink" Signature Requirement**

Several objectors assert that the "wet ink" requirement is unduly burdensome and was designed to suppress opt-outs. The court disagrees.

The court finds that the wet ink signature requirement is reasonable and serves legitimate purposes. It ensures that the decision to opt out is made by the Settlement Class Member personally, with full understanding of the consequences. Opting out of a class settlement is a significant decision that forfeits the Settlement Class Member's right to receive Settlement benefits and requires the Settlement Class Member to pursue individual

claims. A wet ink signature assists in ensuring that this decision was made deliberately by the Settlement Class Member.

Objectors cite *Abernathy v. DoorDash, Inc.*, 438 F.Supp.3d 1062 (N.D. Cal. 2020), for the proposition that wet ink signature requirements are disfavored. In *Abernathy* the court rejected a wet ink signature requirement where there was no evidence of abuse and the requirement appeared designed to suppress opt-outs. *Id.* at 1067.

Objectors also maintain that the wet ink signature requirement ignores the federal ESIGN Act of 2000 and the Uniform Electronic Transactions Act, adopted by most states. Both statutes preserve a party's right to agree on, or a court's discretion to require, wet ink signatures. 15 U.S.C. § 7001; Uniform Electronic Transactions Act § 7 (Unif. L. Comm'n 1999). For various reasons, including the specific circumstances of this case and the level of fraud by digital means that has been reported in claim filings, the court finds that the wet ink requirement is necessary and reasonable. This objection is overruled.

Objectors also contend that every Settlement Class Member has already effectively opted out of participation in any settlement by signing the contract for services with AT&T, which included a class action exclusion and an arbitration requirement. This argument has essentially been dealt with in earlier discussions. In this Settlement, no Settlement Class Member has been prohibited from exercising his or her arbitration rights under contract or opting out of the claims process. But the procedure does not operate by implication. It is reasonable to require that it be done by the affirmative exercise of the right.

**D. Categories of Opt-Out Requests**

Based on the Kroll Omnibus Declaration, Kroll received 10,741 opt-out requests. Kroll Omnibus Decl. (ECF No. 517) at 12. Of these, 1,114 were determined to be duplicative and were subtracted from the total, with Kroll calculating that 9,627 remaining opt-outs were left to consider. *Id.* There appears to be a calculation problem in the opt-out numbers identified in the Kroll Omnibus Declaration, because when the 494 timely opt-out requests are added to the 6,802 opt-out requests that were late or non-compliant and to the 2,332 Potter Handy and Harrer Law, P.C. opt-outs, the remaining number of opt-outs is 9,628, not 9,627. *Id.* at 13. Regardless of this possible mathematical error, however, AT&T takes the position that the remaining requests fall into three categories.

**1. Agreed Compliant Opt-Outs**

Kroll identified 494 timely opt-out requests that complied with the requirements of the Preliminary Approval Order. Kroll Omnibus Decl. (ECF No. 517) at 12. These opt-out requests are approved. The 494 individuals identified in Exhibit 14 of the Kroll Omnibus Declaration are excluded from the Settlement Classes, are not bound by the Settlement or the Releases, and retain the right to pursue individual claims against AT&T and other parties. Kroll is instructed to take the necessary steps to implement the opt-outs shown in Exhibit 14.

**2. Non-Compliant Opt-Outs**

In Exhibit 15 of the Kroll Omnibus Declaration, Kroll identifies 6,802 opt-out requests that were late or determined by Kroll to be non-compliant. Kroll Omnibus Decl. (ECF No. 517) at 12. Of the 6,802 individuals, 5,999 were submitted by Swigart Law Group

APC with electronic signatures, contrary to the court's Preliminary Approval Order, which requires wet-ink signatures. *Id.* The 6,802 opt-outs identified in the Kroll Omnibus Declaration as Exhibit 15 are rejected and disallowed. These individuals remain members of the Settlement Classes and are bound by the Settlement and the Releases.

**3. Harrer Law, P.C. and Potter Handy, LLP Opt-Outs**

Exhibit 16 to the Kroll Omnibus Declaration identifies 2,332 individuals who submitted timely opt-out requests through Harrer Law, P.C. ("Harrer Law Opt-Outs") and Potter Handy, LLP ("Potter Handy Opt-Outs"). The court concludes that these 2,332 opt-out requests are compliant with the requirements set forth in paragraph 15 of the Preliminary Approval Order.

AT&T contends that these opt-outs were procured through misleading solicitations, and it proposes that an additional notice be sent to these opt-outs so that their decision can be verified and confirmed. Harrer Law and Potter Handy maintain in response that these individuals followed all opt-out procedures, and that they were not the victims of misleading solicitations, and they request that their opt-outs be deemed valid.

Regarding Potter Handy, AT&T asserts that the law firm misrepresented its intent to pursue arbitration by encouraging its purported clients to opt out of the Settlement. Potter Handy advised clients, "First. You can opt out. We encourage you to select this option. You will give up any funds you would receive from the class settlement and maintain your right to bring a lawsuit . . ." Ex 1 to D. Am. Position on Opt-out Requests (ECF No.463-4) at 2. It is AT&T's position that, because someone who decided to opt out could only pursue

arbitration, not a lawsuit, the representation about bringing a lawsuit was misleading and may have induced some individuals to opt out based on a mistaken understanding. Potter Handy argues in response that the language is not factually inaccurate or misleading because an individual could file a lawsuit. The lawsuit could be forced into arbitration, but it could nevertheless be filed. Potter Handy also contends that any ambiguity was cured by a second notice that included the statement that the firm is "dedicated to advocating for you through the process including possible discovery and a final arbitration hearing on the merits of your case." Potter Handy Resp. (ECF No. 464) at 3.

Potter Handy arguably misrepresented the facts when it advised its clients that they could bring a lawsuit despite the fact that they were bound by an arbitration agreement. AT&T's concern is understandable considering that the Potter Handy lawyers presumably knew the distinction between bringing a lawsuit and participating in arbitration and should have been more specific in their initial client communications. The second communication from the firm referring to arbitration did not cure the misrepresentation.

But the force of AT&T's argument is offset by language in the Long Form Notice approved by the court and used in the Settlement Notice Program that states several times that, in order to start your own "lawsuit" or to be part of any different "lawsuit," you must exclude yourself from the Settlement. Ex. 6 to Prelim. Mot. to Approve Settlement (ECF No. 283-1) at 4. There is no mention of arbitration in the Long Form Notice. *See id.* Potter Handy's initial communication was therefore consistent with the Long Form Notice, eliminating the need for curative notice. The court accordingly finds the Potter Handy opt-

outs to be compliant.

As for Harrer Law, AT&T's position is that the firm misled its purported clients to believe they would receive only $2.50 by accepting the Settlement. But neither AT&T nor Harrer Law has provided the court with information about the representations made by Harrer Law, so the record is incomplete. Under the circumstances, the court deems the Harrer Law opt-outs to be compliant .

Approving these opt-outs does not, however, leave AT&T without recourse. After the opt-outs are effective, the parties must resolve the individual claims of each opt-out in arbitration. Thereafter, AT&T will have the opportunity to argue to an arbitrator its position regarding misrepresentations. The appropriate forum in this regard is arbitration, not this class action. Consequently, the court declines to accept AT&T's position that the opt-out requests should be redone.

Accordingly, the court approves the opt-outs identified in Exhibit 16. They are excluded from the Settlement Classes, are not bound by the Settlement or the Releases, and retain the right to pursue individual claims against AT&T and other parties. Kroll is instructed to take the steps necessary to implement the opt-outs shown on Exhibit 16.

## VIII. THE KROLL SETTLEMENT ADMINISTRATION

### A. Confirmation of Settlement Administrator

Kroll is confirmed as Settlement Administrator and shall continue to administer the Settlement in accordance with the Settlement Agreement and this memorandum opinion and order.

**B. Claims Activity**

According to the Kroll Omnibus Declaration, Kroll has received 754,263 Claim Forms through the mail and 4,163,810 Claim Forms electronically through the Settlement website, for a total of 4,918,073 claims received. Kroll Omnibus Decl. (ECF No. 517) at 9. Although these numbers may change based on the final resolution of currently deficient claims, the court finds them suitable for the purpose of evaluating the overall Settlement for the Settlement Class Members. Kroll's Omnibus Declaration has further reported the following:

- 1,099,732 claims rejected as late, duplicate, fraud, released, withdrawn, or ineligible business
- 1,654,046 claims allowed as Tier 1
- 687,859 claims allowed as Tier 2
- 1,582,248 claims allowed as Tier 3

*Id.* at 11. Of the 1,099,732 rejected claims, 804,381, or approximately 16% of the total claims received, were declined for fraud. *Id.* at 9 n.4.

**C. Fraud Detection Process**

Because of the fraud issues in this case, the process to detect and identify fraud has merited scrutiny before deciding whether to grant the unopposed motion for final approval of class action settlement. Questions such as these are presented: Does the system utilized to determine fraud have substantial validity? Are there safeguards to ensure that legitimate claims are not rejected as fraudulent? Reading the declaration of Kimberly S. Morris, Esquire, in connection with plaintiffs' unopposed motion for final approval of settlement, the court concludes that AT&T and Class Counsel have asked the same questions. Morris is of

counsel to AT&T in this litigation. A review of her declaration provides the necessary insights for the court's consideration.

To begin, it is important to note that Kroll did not perform the fraud analysis. Instead, the analysis was done by ClaimScore, LLC d/b/a Covalynt ("Covalynt"), as explained in the declaration of Bryan Heller ("Heller") in connection with plaintiffs' unopposed motion for final approval of settlement. Heller is a co-founding partner and Chief Operating Officer of Covalynt, a legal technology company specializing in identity solutions for class actions, mass torts, and mass arbitrations.

Morris submitted her declaration to describe the efforts undertaken by AT&T Counsel and Class Counsel (collectively "Counsel," unless otherwise indicated) to evaluate and vet (1) the fraud-identification methodology employed by Covalynt and (2) the additional safeguards developed to protect legitimate claimants from potentially erroneous fraud determinations.

Kroll retained Covalynt at the request of the parties and Counsel, and, as contemplated by the Settlement Agreement, to analyze claims submitted to Kroll during the claims administration process for evidence of fraud. Counsel selected Covalynt because its fraud detection methodology has been used in numerous other class action settlements. Additionally, Covalynt's methodology is specifically designed for the data realities of large-scale claims administration and incorporates the same analytical tools standard in high-value financial services fraud detection—including multi-source identity verification, behavioral pattern recognition, and machine-learning-informed analysis—adapted for the unique

constraints of settlement claims processing. As outlined in the Morris Declaration, procedures allowing for claims to be submitted online have proliferated in recent years. A consequence of this change has been a significant increase in the filing of fraudulent claims. As a result, parties and courts have turned to vendors with expertise in detecting this form of fraud to perform sophisticated analyses of incoming settlement claims, with the goal of rooting out those that are potentially invalid. These analyses have routinely uncovered substantial fraud at a scale that could serve to drastically reduce the funds available for payment of legitimate claims. In an environment where online claims fraud is prevalent enough to consume nearly all of a settlement fund, measures taken to effectively expose and remove illegitimate submissions provide significant value to those with valid claims.

In her declaration, Morris reported that, in this case, after reviewing all electronic claims using its proprietary methodology, Covalynt identified approximately 804,000 claims as fraudulent and recommended that they be rejected. Morris Decl. (ECF 514-1) at 2. To support its recommendation, Covalynt provided Counsel with a detailed declaration explaining the fraud patterns commonly associated with large class action settlements and those it identified as present here, and a summary of the methodology employed to identify the claims recommended for rejection. At Counsel's request, Covalynt provided additional detail about its proprietary methodology and technology (including, among other details, data sources that were accessed in the review, analytical techniques, and detail recording Covalynt's scoring model) to enable Counsel to understand and independently evaluate the basis for Covalynt's recommendation. This additional detail could not be included in

Covalynt's public declaration without compromising the effectiveness of its fraud-detection system and revealing Covalynt's commercially sensitive information and intellectual property.

Morris was careful to note in her declaration that Counsel did not rely solely on the statements contained in the Covalynt Declaration or in the supplemental detail it provided. Instead, before accepting Covalynt's recommendations, Counsel conducted its own independent diligence into Covalynt's methodology, the inputs used, the basis for Covalynt's recommendations, and the safeguards built into its proprietary system, as described below. As part of that diligence, Counsel engaged in multiple conferences and discussions with Covalynt personnel over a two-month period, covering a substantial number of topics described in the Morris Declaration.

Counsel also questioned Covalynt about how its methodology compared with fraud-detection systems commonly used in other industries involving substantial financial transactions. Covalynt explained that its platform incorporates analytical tools standard in that sector, including multi-source identity verification, behavioral pattern recognition, and machine-learning-informed analysis, and adapts them for use in large scale claim administration processes. Finally, according to the Morris Declaration, Counsel reviewed court records addressing Covalynt's fraud analysis in other litigation where Covalynt was engaged to perform a similar fraud analysis. Counsel's review revealed that Covalynt's methodology has been disclosed to and examined by multiple federal courts, and that courts have approved settlement administration processes incorporating Covalynt's fraud-detection

and claim-validation results. Based on the Covalynt Declaration (filed concurrently with the court), and the additional information obtained during the foregoing diligence, Counsel concluded that Covalynt's methodology provides a reasonable and reliable means of identifying potentially fraudulent claims in a settlement involving millions of claim submissions and of preventing potentially millions of dollars in fraudulently obtained settlement payments.

**D. Safeguards for Legitimate Claims**

As the Morris Declaration points out, Counsel recognize that no fraud detection methodology can entirely eliminate the possibility that a legitimate claim will be incorrectly flagged as fraudulent. Accordingly, Counsel have worked with Kroll, Covalynt, and the court-appointed Special Master, retired United States District Judge Royal Furgeson, to arrive at a notice and cure process. This process is designed to protect legitimate claimants whose claims might be flagged as potentially fraudulent, while not exposing the remainder of the class to substantial additional administration fees caused by fraudulent actors seeking to bypass the administration safeguards.

Under the proposed notice-and-cure process, as outlined in the Morris Declaration, Kroll will notify affected claimants by email that their claim has been flagged as fraudulent and will include instructions on the steps available to cure the rejection. The notification will include a link to a downloadable form ("Validation Form") through which claimants can submit additional information to assist the parties in assessing the claim. Covalynt will assist in designing the Validation Form, to ensure that information requested is not overly

burdensome, but is sufficient to provide a meaningful basis for further evaluation. Kroll will also design and maintain a dedicated FAQ page on the settlement website, referenced in the notification email, which will provide information about the cure process, Validation Form, and the steps required to seek further review, as described below.

To seek to cure a rejection, a claimant must: (1) print and complete the Validation Form available through the notification email and the FAQ page; (2) sign the completed Validation Form with an original (wet) signature; and (3) mail a hard copy of the signed and completed form to Kroll, postmarked within 21 days of the date the notification email is sent. The notification email and FAQ page will also make clear that no bulk submissions will be accepted and that each Validation Form must be submitted in its own separate envelope. Kroll advises that these requirements will help deter fraudulent actors from abusing the cure process and driving up administration costs while preserving a meaningful avenue for legitimate claimants to submit additional information for review. Once the volume of cure submissions is known, Counsel and Kroll will establish a review process to determine whether each claim should be allowed.

**E. Protecting the Integrity of Claims Administration**

Taken together, these measures reflect the parties' dual commitment to protecting the integrity of the claims administration process and ensuring the fair treatment of all class members. These procedures are designed to prevent fraudulent actors from obtaining settlement funds or unnecessarily driving up administration costs, while ensuring that every legitimate claimant receives notice and a meaningful opportunity to demonstrate the validity

of their claim before any final determination is made.

Based on the information provided in both the Morris Declaration and the Covalynt Declaration, the court finds: (1) that Covalynt's methods, systems, and processes have provided reasonable protections to shield Settlement Class Members from fraudulent claims; and (2) that the procedures developed by AT&T and Class Counsel to give legitimate Class Members a process to challenge improper fraud determinations have provided appropriate safeguards to protect against potential errors in the systems.

The court finds that Covalynt's evaluation of potentially fraudulent claims mitigates the risk of allowing fraudulent claims.

**F. Further Administration**

Kroll shall continue to process claims in accordance with the Settlement Agreement, including verifying claimant eligibility, reviewing documentation for documented loss claims, and curing deficient claims and payment disbursement. Any costs in excess of the amount approved in this memorandum opinion and order must be presented to the court for approval.

**G. Distribution Timeline**

Kroll shall distribute Settlement benefits to approved claimants on the timeline and in accordance with the Settlement Agreement.

**H. Settlement Administration Costs**

Estimates for settlement administration costs have varied significantly over the course of this case. There are reasons why costs are higher than originally estimated. Although the

court will not address all of these reasons in this memorandum opinion and order, it is appropriate to address the issue overall, especially in light of the significant increase in costs.

Courts have the authority and responsibility to appoint claims administrators and generally retain oversight responsibilities even after final approval of the settlement and class action. *See*, *e.g., Parmelee v. Santander Consumer USA Holdings Inc.*, 2019 WL 2354665 (N.D. Tex. June 3, 2019) (Kinkeade, J.). Historically, courts have confirmed amounts requested for claims administration without substantial consideration for final administration costs and the impact on class members because cost estimates normally stayed within or reasonably close to the estimate provided to the court. In this case, however, the costs have not stayed within the range of the previous estimates provided to the parties in the bidding process or to the court in the preliminary approval process or motion for final approval. Additionally, in this case, claims administration costs are paid out of the common settlement fund rather than by AT&T. Every dollar that is paid for administration represents one dollar less that is available for Settlement Class Members. And although claims administration can be complex and costly, these costs must be evaluated as part of the court's consideration of whether the settlement is fair and reasonable.

In the Preliminary Approval Order, Kroll's original cost estimate for this administration was $5,453,185.00. Kroll Omnibus Decl. (ECF No. 517) at 14. The total cost estimate is now $22,161,587.09 ($18,856,175.48 billed to date and $4,008,426.50 estimated to be billed). *Id.* at 13. This amount is after a negotiated discount, but may increase based on various factors.

There are legitimate reasons for the increased costs that are outlined in Kroll's Omnibus Declaration. *Id.* at 14-19. Under the circumstances, the court approves Kroll's fee in the sum of $18,856,175.48 for services and fees rendered to date, and reserves judgment on the additional estimates pending a ruling.[8]

## IX. ATTORNEY'S FEES, COSTS, AND SERVICE AWARDS

### A. Legal Standard

Rule 23(h) authorizes the court to "award reasonable attorney's fees and nontaxable costs" in a certified class action. In evaluating a fee request in a common fund case, the Fifth Circuit has endorsed the "percentage-of-the-fund" method, so long as it is cross-checked by the "lodestar" method. *Union Asset*, 669 F.3d at 642-44. Under the percentage-of-the-fund method in the Fifth Circuit, the court is to award fees as a percentage of the settlement fund, with the percentage determined based on the *Johnson* factors, which include: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required; (4) the preclusion of other employment; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of counsel; (10) the undesirability of the case; (11) the nature and length of the professional relationship; and (12) awards in similar cases. *Johnson*

---

[8]As noted above, the JPML transferred this MDL proceeding to the undersigned on August 17, 2026. In the weeks following this assignment, the undersigned has made substantial efforts to become familiar with the record and the issues. One matter that will continue to command the court's attention is settlement administration costs. The court has included the status of claims administration as an agenda item in the forthcoming status conference being set today by Case Management Order #18.

*v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). "Even though it is apparent that the *Johnson* factors must be addressed to ensure that the resulting fee is reasonable, not every factor need be necessarily considered." *Klein*, 705 F.Supp.2d at 676 (citations and internal quotations omitted).[9]

**B. Requested Awards**

Class Counsel request the following fee awards:

AT&T 1 Class Counsel: $49,666,666.66 (one-third of the $149 million AT&T 1 Settlement Fund)

AT&T 2 Class Counsel: $9,333,333.33 (one-third of the $28 million AT&T 2 Settlement Fund)

Total: $59 million (33.33% of the combined $177 million Settlement Funds).

**C. Percentage-of-Fund Analysis Based on *Johnson* Factors**

Class Counsel contend that a one-third (33%) fee is justified based on the risks of the litigation, the result achieved, and the substantial work performed. In support of their fee request, they submit the declaration of Brian T. Fitzpatrick, the Milton R. Underwood Chair in Free Enterprise and Professor of Law at Vanderbilt University. Professor Fitzpatrick supports the fee request and provides the court an evaluation of the *Johnson* factors and a thorough review of the percentage spread that courts have considered in matters such as this,

[9]Here, the court does not address factors 7 and 11. *Johnson*, 488 F.2d at 717-19 (describing foregoing factors as the time limitations imposed and the nature and length of the professional relationship.)

including percentage recoveries set in a large number of fee decisions across the Fifth Circuit and nationwide.

**Factor 1. Time and Labor Required**

In order to evaluate the first *Johnson* factor, the court turns to the recent declarations submitted by Class Counsel. In their declaration, AT&T 1 Class Counsel confirm that they have devoted $12,841,203.00 of billable time to the prosecution of this Class Action. Lanier Decl. (ECF No. 515) at 3. Likewise, in their declaration, AT&T 2 Class Counsel confirm that they have spent $2,505,245.00 of billable time on the prosecution of this class action. Ostrow Decl. (ECF No. 516) at 4. Although the declarations do not reveal contemporaneous billing records, they nonetheless are detailed enough to enable the court to consider a lodestar cross-check. Comprehensive time records are not required because the Fifth Circuit allows "a much more relaxed analysis of counsel's time" for the lodestar cross-check. Of course, "[t]he time and labor factor turns on more than the number of hours worked. In common fund class action cases, in particular, an early settlement agreement, [as here], often signals counsel's efficiency and effectiveness compared to similar cases that unnecessarily dragged on for years." *Gay v. Mortg. Contracting Servs., LLC,* 2026 WL 1091592, at *10 (E.D. Tex. Apr. 22, 2026) (internal quotation marks omitted). Therefore, the declarations submitted by Class Counsel meet the requirements of a lodestar cross-check analysis and favor an increase to the fee award.

**Factor 2. Novelty and Difficulty of Questions**

Data breach litigation presents complex legal questions, including issues of standing,

causation, and damages. *Gay,* 2026 WL 1091592, at *10. Additionally, the technology and law in this area are constantly evolving, presenting challenges to attorneys to remain current in both areas. *Id.* According to Professor Fitzpatrick, "[d]ata breach cases are difficult to litigate because the law on Article III standing and causation is unsettled. This fact complicates proof as to class wide damages." Fitzpatrick Decl. (ECF No. 356-4) at 23. Moreover, there is added complexity here due to the existence of two separate Data Incidents, the involvement of Snowflake in the AT&T 2 Data Incident, and AT&T's arbitration clause. This factor favors an increase to the fee award.

**Factor 3. Skill Required**

Class Counsel have demonstrated skill in navigating the complexities of this MDL, negotiating a reasonable settlement, and coordinating the interests of multiple plaintiff groups. As Professor Fitzpatrick observes, AT&T vigorously contested liability and was prepared and able to challenge every issue. *Id.* With their hands full, Class Counsel needed their considerable skill to accomplish this Settlement. This factor favors an increase in the fee award.

**Factor 4. Preclusion of Other Employment**

Class Counsel devoted substantial resources to this litigation, which precluded them from undertaking other work. This factor favors an increase to the fee award.

**Factor 5. Customary Fee**

A contingent fee is customary in common fund cases. Therefore, the percentage method is appropriate in this case.

While finding the appropriate percentage can be challenging, helpful guidelines can be found in the cases and other authoritative sources. For example, the Federal Judicial Center reports that "[a]ttorney fees awarded under the percentage method are often between 25% and 30% of the fund." *Manual for Complex Litigation (Fourth)* § 14.121 (2010). "Several courts have established benchmarks, either a specific figure or a range, subject to upward or downward adjustment, depending on the circumstances of the case." *Id.* The Center cautions, however, that any single rate "is arbitrary and cannot capture variations in class actions' characteristics." *Id.*

In his declaration, Professor Fitzpatrick provides a thorough analysis of the percentage spread that courts have considered over the past two decades, including the average and median percentages garnered from Fifth Circuit decisions. He found that these percentages were 26.4% and 29%, respectively. Fitzpatrick Decl. (ECF No. 356-4) at 13. And one-third "is one of the most common fee percentages awarded in the Fifth Circuit." *Id.* (citing Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Studs. 811, 836 (2010)). In addition, Professor Fitzpatrick points to numerous cases where courts have awarded percentages greater than one-third. *See, e.g., Plunkett v. First Key Homes LLC*, 2024 WL 5075065, at *2 (N.D. Tex. Dec. 11, 2024) (Lindsay, J.) (adopting recommendation of 40% award). Furthermore, one-third is among "the most common fee percentages" nationwide. Fitzpatrick Decl. (ECF No. 356-4) at 18.[10]

---

[10]Professor Fitzpatrick's study also examined megafund cases, where settlements were between $100 million and $250 million, reflecting average and median percentages of 17.9%

These authoritative sources confirm the court's conclusion that the percentage fee in this case should be one-third, especially when considering the other *Johnson* factors. Therefore, this factor favors an increase to the award.

**Factor 6. Whether Fee is Fixed or Contingent**

The above discussion covers this factor.[11] The contingent nature of the fee favors an increase to the award.

**Factor 8. Amount Involved and Results Obtained**

The Fifth Circuit has held that the "most critical factor" in determining a fee award is the "degree of success obtained." *See Singer v. City of Waco*, 324 F.3d 813, 829 (5th Cir. 2003) (quoting *Romaguera v. Gegenheimer*, 162 F.3d 893, 896 (5th Cir. 1998)). In a megafund case such as this, a total settlement of $177 million must be considered a success. As already explained, this Settlement fits comfortably within the general range of settlements obtained in data breach cases and is in line with other data breach settlements. Therefore, the results obtained favor an increase from the typical benchmark percentage.

---

and 16.9%, respectively. Fitzpatrick Decl. (ECF No. 356-4) at 20. While seemingly applicable here due to the size of the settlement, Fifth Circuit precedent does not mandate that a district court follow this trend. Indeed, much of the data as to this trend are inapplicable to the present because of several years of sustained inflation.

[11]In some circumstances, this *Johnson* factor cannot be considered. *See Burlington v. Dague*, 505 U.S. 557, 567 (1992). But because this is a common fund case, the court is not precluded from considering it. *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F.Supp.2d 732, 791 (S.D. Tex. 2008) ("the holding in [*Dague*] that enhancement of the lodestar by a multiplier based on the contingent nature of a fee is not allowed when fees are awarded to plaintiffs' counsel under fee-shifting provisions of statutes, does not apply to common fund cases.").

**Factor 9. Experience, Reputation and Ability of Counsel**

As Professor Fitzpatrick points out, "the lawyers who worked to organize the MDLs and prosecute and defend the Actions, both for Plaintiffs and AT&T, include some of the finest and best-regarded class action lawyers in the United States." Fitzpatrick Decl. (ECF No. 356-4) at 26. His conclusion is clearly correct. Trial-tested attorneys sat on both sides of the docket and were able to check each other, move upon move. The demonstrated ability of Class Counsel favors an increase from the typical benchmark percentage.

**Factor 10. Undesirability of the Case**

It is clear that no lawyer would undertake a data breach case with a cavalier attitude. As the discussion herein shows, these cases have inherent difficulty, especially when the lawyers on the other side have the capacity to bring strong opposition to bear for the defense. This factor favors an increase from the typical benchmark percentage.

**Factor 12. Awards in Similar Cases**

Professor Fitzpatrick's Declaration provides an excellent depiction of the continuum of fee results in cases such as this, including many cases within the 30-35% range. Fitzpatrick Decl. (ECF No. 356-4) at 15-17. This factor favors an increase from the typical benchmark percentage.

**D. Approval of 33% Fee with Cross-Check**

The objectors contest a one-third contingency in this case for numerous reasons. The court has considered these objections and made its own review of the authorities and facts in this case, as shown by the foregoing discussion. The court finds and concludes that the

most appropriate legal fee award in this matter is a one-third (33%) contingent fee. The court therefore approves, as reasonable, legal fees for AT&T 1 Class Counsel in the sum of $49,666,666.66 ($149 million x 33%), and, as reasonable, legal fees for AT&T 2 Class Counsel the sum of of $9,333,333.33 ($28 million x 33%).

This result is also confirmed by a lodestar cross-check. "A lodestar cross=check helps a court evaluate whether a percentage award would result in a windfall by comparing it to counsels' lodestar." *In re T-Mobile Customer Data Sec. Breach Litig.,* 111 F. 4th 849, 861 (8th Cir. 2024). The calculation divides the percentage fee by the lodestar (or the total amount of the hourly fee) to arrive at a "multiplier," which is the multiple of the hourly rate. "[M]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 341 (3d Cir. 1998); *In re Heartland Payments Sys., Inc. Customer Data Sec. Breach Litig.,* 851 F.Supp.2d 1040, 1088 n. 52 (S.D. Tex. 2012) (citing law review article discussing common multiples).

For AT&T 1, the cross-check multiplier is 3.86, which is the 33% fee ($49,666,666) divided by the lodestar cross-check dollars ($12,841,203.10). *See* Lanier Decl. (ECF No. 515-1) at 3. For AT&T 2, the cross-check multiplier is 3.73, which is the 33% fee ($9,333,333) divided by the lodestar cross-check dollars ($2,505,245). *See* Ostrow Decl. (ECF No. 516-1) at 4. These ranges fall within the general range of multipliers found in other cases and confirm the efficacy of a contingent fee of 33% in both instances.

Accordingly, the court approves as fair and reasonable attorneys' fees in the sum of

$49,666,666 for AT&T 1 Class Counsel, and the sum of $9,333,333 for AT&T 2 Class Counsel, in recognition of exemplary representation in this multidistrict litigation.

**E. Approval of Costs**

After reviewing the matter of litigation costs, the court approves as fair and reasonable expenses in the sum of $828,612.64 requested by AT&T 1 Class Counsel. Ex. C to Lanier Decl. (ECF No. 515-3) at 2. And after reviewing the matter of litigation costs, the court approves as fair and reasonable expenses in the sum of $231,438.36, as requested by AT&T 2 Class Counsel. Ex. B. to Mot. for Final Settlement Approval (ECF No. 356-2) ¶ 51. All approved amounts for AT&T 1 Class Counsel are to be paid from the AT&T 1 Settlement Fund, and all approved amounts for AT&T 2 Class Counsel are to be paid from the AT&T 2 Settlement Fund.

**F. Approval of Service Awards**

Finally, Class Representatives assisted in Class Counsel's investigation and reviewed case documents. The court finds that service awards of $1,500 for each Class Representative (totaling $54,000) are appropriate. All objections to service awards are overruled. The service awards are approved to be paid in accordance with the Settlement Agreement.

* * *

For the reasons explained, the court grants the November 3, 2025 unopposed motion for final approval of class action settlement and applications for attorney's fees, costs, and service awards, with a slight modification regarding the cy pres process.

**SO ORDERED**.

October 2, 2026.

SIDNEY A. FITZWATER
SENIOR JUDGE